# EXHIBIT 2

J. Preston Stieff (4764)
J. PRESTON STIEFF LAW OFFICES, LLC
110 South Regent Street, Suite 200
Salt Lake City, Utah 84111
Telephone: (801) 366-6002
Email: jps@StieffLaw.com

Jeremy J. Patterson, *Pro Hac Vice*
Frances C. Bassett, *Pro Hac Vice*
Joanne H. Curry, *Pro Hac Vice*
Michael W. Holditch, *Pro Hac Vice*
Robert T. Lawrence, *Pro Hac Vice*
PATTERSON EARNHART REAL BIRD & WILSON LLP
1900 Plaza Drive
Louisville, Colorado 80027
Telephone: (303) 926-5292
Facsimile: (303) 926-5293
Email: jpatterson@nativelawgroup.com
Email: fbassett@nativelawgroup.com
Email: jcurry@nativelawgroup.com
Email: mholditch@nativelawgroup.com
Email: rlawrence@nativelawgroup.com

*Attorneys for Plaintiffs*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UTE INDIAN TRIBE OF THE UINTAH AND OURAY INDIAN RESERVATION, a federally recognized Indian Tribe, SHAUN CHAPOOSE, EDRED SECAKUKU, LUKE J. DUNCAN, RONALD WOPSOCK, JULIUS T. MURRAY III, and CHRISTOPHER L. TABBEE, individually on their own behalf and on behalf of all persons similarly situated,<br><br>Plaintiff,<br><br>v. | THIRD AMENDED AND SUPPLEMENTED COMPLAINT<br><br>Civil Case No. 2:21-CV-00573-JNP-DAO<br><br>Judge Jill N. Parish<br><br>Magistrate Judge Daphne A. Oberg |

UNITED STATES DEPARTMENT OF
INTERIOR; DEB HAALAND, Secretary of
the Interior, United States Department of the
Interior; BUREAU OF RECLAMATION;
BUREAU OF INDIAN AFFAIRS; THE
STATE OF UTAH; CENTRAL UTAH
WATER CONSERVANCY DISTRICT, a
political subdivision of the State of Utah;
SPENCER COX, in his capacity as Governor
of Utah, and TERESA WILHELMSEN, P.E.,
in her capacity as Utah State Engineer and
Director, Utah Division of Water Rights, Salt
Lake City, Utah,

      Defendants.

TABLE OF CONTENTS

I.   GENERAL NATURE OF THE ACTION ............................................................................. 1

II.  PARTIES ................................................................................................................................ 2

III. JURISDICTION AND VENUE ........................................................................................... 6

IV.  STATEMENT OF FACTS ................................................................................................... 8

A.   A BRIEF HISTORY OF THE TRIBE AND ITS WATERS ........................................... 8

B.   THE UNITED STATES' ROLE AS FEDERAL TRUSTEE - THE U.S. EXERCISES
COMPREHENSIVE, PERVASIVE, ELBORATE, AND EXCLUSIVE CONTROL OVER
TRIBAL WATERS, TRIBAL WATER RIGHTS, AND THE UIIP ...................................... 12

   i.   1899 Act ........................................................................................................................ 15

   ii.  The Uintah Indian Irrigation Project and its Governing Laws and Regulations ............ 16

C.   DEFENDANTS' MISMANAGEMENT OF THE TRIBE'S WATER AND FAILURE TO
RECOGNIZE TRIBAL WATER RIGHTS .......................................................................... 19

   i.   Federal mismanagement of the UIIP .............................................................................. 19

   a.   Incomplete Development and Construction of the Uintah Indian Irrigation Project ...... 20

   b.   Failure to Provide Storage Necessary to Support a Fully Functional UIIP ................... 21

   c.   Deferred Maintenance and Disrepair of the UIIP .......................................................... 23

   d.   Designation of UIIP Lands as Non-Assessable .............................................................. 24

   e.   Unlawful Secretarial Transfers of Water Rights ............................................................ 25

   f.   Inadequate Water Quality for Agricultural Production ................................................... 26

   g.   Midview Exchange Agreement ...................................................................................... 27

   h.   Other Practices Inconsistent with the Trust Status of the UIIP ...................................... 30

   i.   Unfulfilled Federal Obligations from the 1965 Deferral Agreement ............................. 31

   ii.  The Central Utah Project Completion Act of 1992 ........................................................ 35

   a.   The proposed 1990 Revised Compact ............................................................................ 36

   b.   Failure of Tribal Compensation under the CUPCA ....................................................... 37

   c.   Failure to Rehabilitate Bottle Hollow Reservoir ........................................................... 39

i

    d.   The Failure to Provide Tribal Storage under CUPCA Sections 201(c) and 203............ 39

   D.  THE GREEN RIVER BLOCK EXCHANGE CONTRACT............................................ 40

    i.  The Terms of the Green River Block Exchange Contract................................................ 41

    ii.  Tribal Comments and Request for Environmental Impact Statement.............................. 43

   E.  CLASS ACTION ALLEGATIONS ..................................................................................... 45

F.  EXHAUSTION OF ADMINISTRATIVE REMEDIES AND ACCRUAL OF CLAIMS ..... 47

STATEMENT OF CLAIMS....................................................................................................... 50

  FIRST CLAIM FOR RELIEF – (Against all Defendants) ...................................................... 50

  SECOND CLAIM FOR RELIEF – (Against the Federal Defendants) .................................... 52

  THIRD CLAIM FOR RELIEF ................................................................................................. 54

  FOURTH CLAIM FOR RELIEF - (Against the Federal Defendants) ..................................... 59

  FIFTH CLAIM FOR RELIEF – (Against all Federal Defendants) ......................................... 60

  SIXTH CLAIM FOR RELIEF – (Against all Federal Defendants).......................................... 62

  SEVENTH CLAIM FOR RELIEF – (Against the Federal Defendants) .................................. 63

  EIGHTH CLAIM FOR RELIEF – (Against the Federal Defendants)...................................... 64

  NINTH CLAIM FOR RELIEF (Against the Federal Defendants).......................................... 65

  TENTH CLAIM FOR RELIEF (Against the Federal Defendants) ......................................... 70

  ELEVENTH CLAIM FOR RELIEF (By Tribe and Class Action Plaintiffs against all
  Defendants) ............................................................................................................................ 75

# I. GENERAL NATURE OF THE ACTION

1. Through this action, the Tribe seeks declaratory and injunctive relief to enforce the Federal Defendants' fiduciary duties to the Tribe in relation to the management of the Tribe's Reserved Water Rights and related resources administered by Federal Defendants. The Tribe also alleges that the State and Federal Defendants have conspired to racially discriminate against the Ute Indian Tribe members by deliberately and systematically excluding the Tribe and its members from the benefits derived from federally-financed public water storage facilities and infrastructure in the State of Utah. The suit seeks declaratory, monetary, and injunctive relief against all Defendants for the violation of the Tribe members' rights to due process and equal protection of the law under the Fifth and Fourteenth Amendments to the U.S. Constitution and Title VI of the Civil Rights Act of 1964.

2. The Tribe seeks relief in relation to Defendant USBR's failure to undertake an adequate environmental review and its consequent issuance of a Final Environmental Assessment ("Final EA") and Finding of No Significant Impact ("FONSI") for the Green River Block Exchange ("GRBE") Contract between USBR and the State of Utah.[1] The GRBE Contract illegally allows the State of Utah to extract additional water from the Green River and the Colorado River Basin and grants Utah a stored water right in the Flaming Gorge Reservoir to the detriment of the Tribe and its members.

3. The Tribe challenges the Federal Defendants' refusal to prepare an Environmental Impact Statement ("EIS") under the National Environmental Policy Act ("NEPA"). In issuing the

---

[1] The Final EA and FONSI are posted on the website for the United States Bureau of Reclamation, and incorporated herein,
https://www.usbr.gov/uc/envdocs/ea/20190100-GreenRiverBlockWaterExchangeContract-FinalEAandFONSI-508-PAO.pdf (last visited on 1/19/2022).

FONSI and Final EA, the Federal Defendants relied on outdated, inaccurate data and disregarded more recent scientific studies and USBR's own data showing a growing water deficit and a 110-year trend of decreasing water supply in the Colorado River Basin due to rising temperatures, persistent drought, and increased depletions and demands on the Colorado River.

4. The Tribe challenges Federal Defendants' execution and implementation of the GRBE Contract as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under § 706 of the Administrative Procedure Act ("APA") based upon (*i*) Defendants' failure to account for the Tribe's senior water rights held in trust by the United States; (*ii*) Federal Defendants' failure to consider impacts of the GRBE Contract on the Tribe's water rights; (*iii*) Federal Defendants' failure to consult the Tribe before issuing its EA and executing the GRBE Contract; and (*iv*) the Defendants' continuing pattern of invidious discrimination against the Ute Indians on the grounds of race, ancestry, ethnicity, national origin and religion, and Defendants' collusion and conspiracy to effectively deprive the Tribe and its members of their water rights in favor of non-Indian water users in the State of Utah.

5. The Tribe challenges the execution and implementation of the GRBE Contract as a breach of Defendants' trust duty to manage, secure, protect, and develop the Tribe's water rights.

## II. PARTIES

6. Plaintiff Ute Indian Tribe of the Uintah and Ouray Reservation is a federally recognized, sovereign Indian tribe. 84 Fed. Reg. 1204 (Feb. 1, 2019). The Tribe is comprised of three bands of Ute Indians: the Uintah, Whiteriver, and Uncompahgre Bands, who today occupy the Uintah and Ouray Indian Reservation in the Green River Basin of northeastern Utah. The Reservation is located within a portion of the Tribe's aboriginal lands and encompasses just over four million acres within the Reservation's exterior boundaries.

7.     The Tribe is organized in two ways under the Indian Reorganization Act of 1934 ("IRA"), 25 U.S.C. § 5101-5144.[2]  The Tribe is organized as a tribal government under 25 U.S.C. § 5123 and is also chartered as a federal corporation under 25 U.S.C. § 5124.  The Tribe brings this cause of action on its own behalf and on behalf of its members as *parens patriae* to protect their health, welfare, natural resources, and economic security.

8.     Plaintiff Shaun Chapoose is an enrolled member of the Ute Tribe who resides on the Uintah and Ouray Reservation.  Mr. Chapoose is an elected tribal leader who sits on the Tribe's six-member governing body, the tribal Business Committee, and serves as the Committee's Chairman.  As a tribal member, Mr. Chapoose shares a beneficial proprietary interest in the Tribe's Winters Reserved Water Rights, and he suffers injury as a result of the claims alleged herein.

9.     Plaintiff Edred Secakuku is an enrolled member of the Ute Tribe who resides on the Uintah and Ouray Reservation.  Mr. Secakuku is an elected tribal leader who sits on the Tribe's six-member governing body, the tribal Business Committee, and serves as the Committee's Vice-Chairman.  As a tribal member, Mr. Secakuku shares a beneficial proprietary interest in the Tribe's Winters Reserved Water Rights, and he suffers injury as a result of the claims alleged herein.

10.    Plaintiff Luke J. Duncan is an enrolled member of the Ute Tribe who resides on the Uintah and Ouray Reservation.  Mr. Duncan is an elected tribal leader who sits on the Tribe's six-member governing body, the tribal Business Committee.  As a tribal member, Mr. Duncan shares

---

[2] The IRA is "a statute specifically intended to encourage Indian tribes to revitalize their self-government." *Fisher v. District Court*, 424 U.S. 382, 387 (1976).  The IRA implements a federal policy of reestablishing tribal governments, reconstituting tribal land bases, and revitalizing tribal economies and cultures.  *See* Cohen's Handbook of Federal Indian Law §4.04[3][a], p. 256 (Nell Jessup Newton ed., 2012).

a beneficial proprietary interest in the Tribe's Winters Reserved Water Rights, and he suffers injury as a result of the claims alleged herein.

11.     Plaintiff Ronald Wopsock is an enrolled member of the Ute Tribe who resides on the Uintah and Ouray Reservation.  Mr. Wopsock is an elected tribal leader who sits on the Tribe's six-member governing body, the tribal Business Committee.  As a tribal member, Mr. Wopsock shares a beneficial proprietary interest in the Tribe's Winters Reserved Water Rights, and he suffers injury as a result of the claims alleged herein.

12.     Plaintiff Julius T. Murray III is an enrolled member of the Ute Tribe who resides on the Uintah and Ouray Reservation.  Mr. Murray is an elected tribal leader who sits on the Tribe's six-member governing body, the tribal Business Committee.  As a tribal member, Mr. Murray shares a beneficial proprietary interest in the Tribe's Winters Reserved Water Rights, and he suffers injury as a result of the claims alleged herein.

13.     Plaintiff Christopher L. Tabbee is an enrolled member of the Ute Tribe who resides on the Uintah and Ouray Reservation.  Mr. Tabbee is an elected tribal leader who sits on the Tribe's six-member governing body, the tribal Business Committee.  As a tribal member, Mr. Tabbee shares a beneficial proprietary interest in the Tribe's Winters Reserved Water Rights, and he is suffers injury as a result of the claims alleged herein.

14.     All plaintiffs bring this action on their own behalf and on behalf of all persons similarly situated, as set forth under the "Class Action Allegations" alleged *infra*.

15.     The United States Department of the Interior ("DOI") is a federal agency of the United States of America that is responsible for the agency actions and inactions alleged herein.  The DOI is vested with numerous trust, fiduciary, and other legal duties owed to the Ute Tribe

under various treaties, executive orders, Congressional acts, judicial decrees, regulations, and express and implied contracts.

16. Deb Haaland (the "Secretary") is the Secretary of the Interior. The Secretary is vested with numerous trust, fiduciary and other legal duties owed to the Tribe under various treaties, executive orders, Congressional acts, judicial decrees, and express and implied contracts.

17. The Bureau of Reclamation ("USBR") is a federal agency within the DOI. The USBR is vested with numerous trust, fiduciary, and other legal duties owed to the Tribe under various treaties, executive orders, Congressional acts, judicial decrees, regulations, and express and implied contracts. USBR issued the Final EA and FONSI, and executed the GRBE Contract that are subjects of the Tribe's complaint.

18. The Bureau of Indian Affairs ("BIA") is a federal agency within the DOI. The BIA is vested with numerous trust, fiduciary and other legal duties owed to the Tribe under various treaties, executive orders, Congressional acts, judicial decrees, regulations, and express and implied contracts.

19. The State of Utah is a sovereign state that was granted intervention in this suit and has since been named as a Defendant.

20. The Central Utah Water Conservancy District ("CUWCD") is a political subdivision of the State of Utah. Defendant CUWCD is the Utah state agency that was authorized by Congress to receive federal funds and complete construction of the Central Utah Project—the largest water infrastructure program ever undertaken in the State of Utah.

21. The Honorable Spencer Cox is the Governor of Utah.

22. Teresa Wilhelmsen, P.E. is the Utah State Engineer and Director of the Utah Division of Water Rights.

## III.  JURISDICTION AND VENUE

23.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1362 because the action is "brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."  This matter arises under the Federal Defendants' fiduciary duties relating to the management and protection of the Tribe's water rights and water resources imposed upon the Federal Defendants by Congress.

24.     This Court also has jurisdiction over this matter because it arises under the Constitution and various law and treaties of the United States, including:

   a.  The Treaty of Guadalupe Hidalgo in 1848;

   b.  Treaty of 1849 (9 Stats. 984); Ute Treaty of 1863 (13 Stat., 673); Ute Treaty of 1868 (15 Stat., 619); and Act of April 29, 1874, Chapter 136 (18 Stat., 36);

   c.  Exec. Order of Oct. 3, 1861, 1 Kapp. 900 (2d ed. 1904);

   d.  Act of March 1, 1899, 30 Stat. 941

   e.  The Reclamation Act of 1902, Pub. L. 57-161, ch. 1093, 32 Stat. 388;

   f.  The Act of June 21, 1906, Pub. L. 59-258, Stat. 325, 375;

   g.  *Winters v. United States*, 207 U.S. 564 (1908) and its progeny;

   h.  The Act of March 3, 1909, 35 Stat. 811;

   i.  *Cedarview Irrigation Company*, no. 4427, slip op. (D. Utah 1923) and *Dry Gulch Irrigation Company*, No. 4418, slip op. (D. Utah 1923);

   j.  The Act of May 28, 1941, 55 Stat. 209;

   k.  Colorado River Storage Project Act of April 11, 1956, P.L. 485, 70 Stat. 105, 43 U.S.C. §§ 620 *et seq.*, as amended.

l. 25 U.S.C. § 177;

m. Federal regulations governing the BIA's operation and maintenance of the Uintah Indian Irrigation Project, 22 Fed. Reg. 10479, 10637-38 (Dec. 24, 1957);

n. The Irrigation Operation and Maintenance Regulations, 25 C.F.R. Part 171;

o. The Reclamation Projects Authorization and Adjustments Act of 1992, Pub. L. 102-575, 106 Stat. 4600.

p. The Equal Protection and Due Process clauses of the United States Constitution.

q. The Civil Rights Act of 1871, 42 U.S.C. § 1983.

r. Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d.

25. The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1361 because it is an "action in the nature of mandamus to compel an officer or employee of the United States…to perform a duty owned to the plaintiff."

26. The Court has jurisdiction to grant Plaintiff's request for a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

27. Under 5 U.S.C. § 702, sovereign immunity cannot bar this action for nonmonetary relief against agencies and officers of the United States. Further, sovereign immunity cannot bar claims relating to the Uintah Indian Irrigation Project because the Act of June 21, 1906, Pub. L. 59-258, Stat. 325, 375 expressly provides the Secretary may "sue and be sued" in matters relating to said Project and/or Tribal Water Rights.

28. The State of Utah has waived sovereign immunity by seeking and being granted intervention in this suit.

29. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(e) and the Order dated September 15, 2021 of the District Court for the District of Columbia (ECF 115, Case No.

1:18-cv-00547-CJN) transferring this case to the United States District Court for the District of Utah.

## IV.  STATEMENT OF FACTS

### A.  A BRIEF HISTORY OF THE TRIBE AND ITS WATERS

30.  The Ute Indians once "ranged from the Wasatch Front all the way to the Colorado Front Range—from present-day Salt Lake City to Denver."[3]  In return for the Ute Indians' cessions of vast tracts of valuable tribal lands to the federal government, the United States executed treaties with the Utes that guarantee the Tribe a tribal homeland.[4]  That homeland is situated in Utah.

31.  The present-day Uintah and Ouray Indian Reservation was originally two separate reservations.  The first reservation, the Uintah Valley Reservation, was established by Executive Order on October 3, 1861, confirmed by Congress in the Act of May 5, 1864, § 2, 13 Stat. 63, and encompasses 2,039,040 acres in the Uinta Basin of Utah.[5]  The second reservation, the Uncompahgre Reservation, was established pursuant to the Act of June 15, 1880 (ch. 223, 21 Stat. 1999), and the Executive Order of January 5, 1882, and it encompasses approximately 2,000,000 acres, also in the Uinta Basin.  Both Reservations were established to provide a permanent homeland for the Ute Indians and to enable the Tribe and its members to become self-sustaining through agricultural and other economic pursuits. Together, the Uintah Valley Reservation and

---

[3] CHARLES WILKINSON, FIRE ON THE PLATEAU, CONFLICT AND ENDURANCE IN THE AMERICAN SOUTHWEST, 128 (1999).

[4] Treaty of 1849 (9 Stats. 984); Ute Treaty of 1863 (13 Stat., 673); Ute Treaty of 1868 (15 Stat., 619); and Act of April 29, 1874, Ch. 136 (18 Stat., 36).

[5] According to the U.S. Board on Geographic Names, "Uinta" is the proper spelling for natural features, whereas "Uintah" is the spelling applied to political entities; however, the two spellings are often used interchangeably.  *See* Informational Flyers - UINTAH COUNTY HERITAGE MUSEUM (uintahmuseum.org) (last visited 1/18/2022).

Uncompahgre Reservation are organized under the Indian Reorganization Act to form a single reservation known as the Uintah and Ouray Reservation (the "Reservation.").

32.     Utah is the third most arid State in the country.  Because there is little rainfall over the summer, the only viable source of water is winter snowmelt and the ability to store it.   In testimony before a Senate Committee in 1990, then U.S. Senator Jake Garn of Utah described the State of Utah's exceptionally dry climate, explaining:

> Even with summer droughts, there is sufficient snow melt to carry even today's and future population if we have the ability to store it through the summer months. [This] is a concept that I have to continue to try to get over to my colleagues of winter snowfall, summer drought, and the need to be able to store that [winter snowmelt].[6]

33.     This critical need for year-round water applies equally to the Ute Indian Tribe.  At times during the nineteenth century, Ute Indians in Utah were recorded as being in a "state of nakedness and starvation, destitute and dying of want."[7]   In 1906, the Commissioner of Indian Affairs, in his annual report, described conditions on the Uintah and Ouray Reservation, stating, in pertinent part:

> The future of these [Ute] Indians depends upon a successful irrigation scheme, for without water their lands are valueless, and starvation or extermination will be their fate.

Rept. of the Comm. of Ind. Aff., 1906.

34.     The Tribe is the beneficial owner of the water rights appurtenant to its Reservation lands.  And, as authorized by the Indian Reorganization Act of 1934, (IRA), 25 U.S.C. §§ 5101 – 5144, the Ute Tribe has purchased more than 40,794.4 acres of former Indian allotments on its

---

[6] Central Utah Project Completion Act Hearing on S. 2969.  Before the Subcomm. on Water and Power of the Senate Comm. on Energy and Nat. Res., 101st Cong.,132 (1990).

[7] *Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*, 521 F. Supp. 1072, 1094-96 (D. Utah 1981) ("Ute I").

Reservation, all or nearly all of which is serviced with irrigation water by the UIIP; therefore, the Ute Tribe is now the record owner of those former Indian allotments.

35.     In 1908, the United States Supreme Court ruled that when the United States establishes an Indian reservation, the Federal Government impliedly reserves the amount of water necessary to fulfill the reservation's purpose. *Winters v. United States*, 207 U.S. 564 (1908) (now known as the "*Winters* Doctrine"). The water rights reserved to the Ute Tribe upon the establishment of the Uintah Valley and Uncompahgre Reservations are referred to hereafter as the Tribe's "*Winters* Reserved Water Rights."

36.     The Tribe's *Winters* Reserved Water Rights encompass the entire amount of water necessary to sustain a viable and permanent homeland within the exterior boundaries of the Uintah and Ouray Reservation. Indian reserved water rights are not limited in use to irrigation or any other specific purpose or use. *Arizona v. California*, 439 U.S. 419, 421 (1979); *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 48 (9th Cir. 1981).

37.     The Tribe's *Winters* Reserved Water Rights, established upon the creation of the Tribe's Reservation—and *before* the allotment of land in severalty to individual Indians—are *tribal* trust assets that are held by the United States, as trustee, for the benefit of the Tribe.

38.     Because the Tribe's statutory and *Winters* Reserved Water Rights vested upon the creation of the Tribe's reservation, the Tribe's Reserved Water Rights are "present perfected" rights, recognized and protected in Article VIII of the 1922 Colorado River Compact. *Arizona v. California*, 373 U.S. 546, 600 (1963). Article VIII of the 1922 Colorado River Compact states that "[p]resent perfected rights to the beneficial use of waters of the Colorado River System are unimpaired by this compact." Thus, the Tribe's *Winters* Reserved Water Rights exist separate

from, independent of, and senior to the interstate apportionment framework set forth in the Colorado River Compact.

39.     A portion of the Tribe's *Winters* Reserved Water Rights were quantified through two federal judicial decrees in 1923. When conflicts arose between the Utes and their non-Indian neighbors over the surface streams flowing through the reservation, the United States went into court, as trustee for the Utes, and secured both (*i*) an adjudication of the Tribe's water rights on the Lake Fork, Whiterock and Uintah Rivers, and (*ii*) an injunction prohibiting non-Indian interference with tribal waters in these Rivers. *United States v. Dry Gulch Irrigation Co.*, No. 4418, slip op. (D. Utah 1923); *United States v. Cedarview Irrigation Co.*, No. 4427 slip op. (D.Utah 1923).

40.     The two federal decrees affirm the Tribal Reserved Water Rights for irrigation of 59,771.69 acres of Reservation land from the Lake Fork and Uintah Rivers, with a total diversion duty of 3.0 acre-feet per year per acre, for a total annual diversion right of 179,315.07 acre-feet per year.

41.     The Reservation acreage identified as having an appurtenant *Winters* Reserved Water Rights in the 1923 decrees makes up only a fraction of the irrigable lands within the Reservation's boundaries, meaning that the *Winters* Reserved Water Rights quantified in the 1923 decrees comprise only a fraction of the Tribe's total quantity of Indian reserved water rights under the *Winters* doctrine.

42.     Around 1960, the Tribe retained E.L. Decker, a former employee of the Bureau of Reclamation, to survey the Tribe's reservation lands and produce a report quantifying the

historically and presently irrigated Reservation lands, as well as future practicably irrigable lands.[8] The report he prepared, "the Decker Report," was subsequently revised to correct for errors and was submitted to the Utah State Engineer.

43.    The Decker Report, as revised, organized irrigable lands within the exterior boundaries of the Reservation into seven different "Groups" based on the stream source of the water.

44.    The total acreage identified in the Decker Report for Groups 1-7, consisting of historical, present, and future practicably irrigable lands with an appurtenant Tribal *Winters* Reserved Water Right, was 129,331 acres, for a total water volume of 549,685 acre feet per year.

**B.    THE UNITED STATES' ROLE AS FEDERAL TRUSTEE - THE U.S. EXERCISES COMPREHENSIVE, PERVASIVE, ELBORATE, AND EXCLUSIVE CONTROL OVER TRIBAL WATERS, TRIBAL WATER RIGHTS, AND THE UIIP**

45.    It is a foundational axiom of federal Indian law that the United States "has charged itself with moral obligations of the highest responsibility and trust…" and that "[i]ts conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by the most exacting fiduciary standards." *Seminole Nation v. United States*, 316 U.S. 286 (1942).

46.    When President Abraham Lincoln established the Uintah Valley Reservation in 1861, the Federal government knew that the lands it was reserving for the Tribe were virtually worthless: a team of surveyors had described the entire Uinta Basin as "one vast contiguity of waste, and measurably valueless, except for nomadic purposes, hunting grounds for Indians, and

---

[8] In *Arizona v. California*, 373 U.S. at 600-601, the Supreme Court affirmed the special master's ruling that tribal water rights are quantified by the amount of "practicably irrigable acreage," or "PIA," that exists within the reservation.

to hold the world together." Charles Wilkinson, Fire on the Plateau, Conflict and Endurance in the American Southwest, 149-50 (1999).

47. When, in early 1861, a federal Superintendent of Indian Affairs arrived in Utah, he described the Utes as a defeated people, suffering in a "state of nakedness and starvation, destitute and dying of want." Letter from Sup. Davies to Comm. Dole of June 30, 1861, in Report of the Commissioner of Indian Affairs, 1861, at 129, incorporated herein.

48. From the 1861 establishment of the Uintah and Ouray Reservation onwards, the United States, through its actions, has affirmatively assumed enforceable trust duties to make the Tribe's reservation a viable homeland. Between 1849 and 1868, the United States Senate ratified three separate treaties with the Ute Indians, (*i*) an 1849 Treaty, ratified on September 9, 1850, 9 Stats. 984; (*ii*) an 1863 Treaty, ratified on March 25, 1864, 13 Stat. 673; and (*iii*) an 1868 Treaty, ratified on March 2, 1968, 15 Stats., 619. Collectively, these Treaties obligate the United States to protect the Ute Indians "in the … possession of their said lands and property" and to assist the Tribe in making its Reservation a viable homeland.

49. In its complaints in *Dry Gulch* and *Cedarview*, which led to the 1923 Decrees, the United States readily admitted that the United States has assumed enforceable trust obligations to the Ute Indians. In pertinent part, the United States affirmatively alleged:

- that the Ute Indians are "wards" of the United States;

- that the Tribe's reservation lands are "of less value" than the lands the Tribe was forced to cede to the United States at the point of starvation;

- that "all" of the Tribe's reservation lands are "arid in character and will not produce crops without irrigation" and that "unless irrigated" the Tribe's lands "are comparatively valueless;"

- that it is the "intent and policy and the *duty*" of the United States "to protect" the Ute Indians "in their rights … and material welfare;"

13

- that the Ute Indians "on account of their lack of development … and their dependent condition, are unable to cope with white men in the scramble for water;"

- that non-Indian interference with the flow of surface waters through the Reservation has "caused …[the Ute] Indians to suffer the damage of and to lose large and valuable agricultural crops," resulting in "great and irreparable damage and injury" to the Indians.

United States' complaints in *Dry Gulch* and *Cedarview*, U.S. District Court for the District of Utah, case numbers 4418 and 4427.

50.     The United States' admissions in *Dry Gulch* and *Cedarview* constitute *judicial admissions* that the United States is now estopped from repudiating. *See, e.g., New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (parties are estopped from asserting one legal position in earlier litigation and a contrary legal position in later litigation because the doctrine of judicial estoppel prohibits parties from playing "fast and loose with the courts" (citations omitted) (emphasis added)).

51.     For over a century, the Federal Defendants have assumed and exercised comprehensive, pervasive, elaborate, and exclusive control over the Tribe's *Winters* Reserved Water Rights.

52.     The Federal Defendants' comprehensive, pervasive, elaborate, and exclusive control over the Tribe's *Winters* Reserved Water Rights is manifest in the Federal Defendants' control over the waters themselves, as well as the Federal Defendants' exclusive control over the infrastructure necessary to develop put the water rights to productive use.

53.     The Federal Defendants' comprehensive, pervasive, elaborate, and exclusive control over the Tribe's waters has not only prevented the Tribe from assuming control over the use and development of its *Winters* Reserved Water Rights, but has left the Tribe in a position of

complete reliance on its federal trustee to property secure, manage, protect, and allow development of this invaluable resource.

54.     The Federal laws and regulations identified below exemplify the United States' comprehensive, pervasive, and elaborate control over the Tribe's *Winters* Reserved Water Rights.

   **i.     1899 Act**

55.     In the 1899 Indian Appropriations Act, the United States Congress confirmed and declared the Ute Tribe's rights to Reservation water resources.  The Act of March 1, 1899, 30 Stat. 941 ("1899 Act"), authorized the Secretary of the Interior to grant rights of way for the construction of ditches and canals on or through the Reservation for the purpose of diverting and appropriating those waters, and provided explicitly that:

> all such grants shall be subject at all times to the paramount rights of the Indians on said reservation to so much of said waters as may been appropriated, or may hereafter be appropriated or needed by them for agriculture and domestic purposes; and it shall be the duty of the Secretary of the Interior to proscribe such rules and regulations as he may deem necessary to secure to the Indians the quantity of water needed for their present and prospective wants, and to otherwise protect the rights and interests of the Indians and the Indian service.

56.     With the 1899 Act, Congress established the Ute Tribe's water rights as "paramount" to that of any appropriator.  Congress recognized that the Tribe has both present and future "paramount" rights to as much water as the Tribe wants or needs for agricultural and domestic purposes.  And Congress explicitly conferred upon the Secretary a fiduciary duty to secure and protect the amount of water necessary to satisfy the Tribe's "present and prospective wants."

57.     Congress's directive to the Secretary in the 1899 Act is non-discretionary; it confers a mandatory fiduciary duty on the Secretary both (a) to *secure* the amount water to satisfy the

Tribe's present and prospective wants and (b) to *protect* the Tribe's rights and interests in its water resources.

58.     But the 1899 Act also leaves the Tribe at the mercy of the United States in one crucial respect:  the Tribe is completely dependent on the Secretary to ensure that the 1899 Act's unilateral authorization for non-Indians to divert and appropriate scarce waters on Reservation lands does not interfere with and prevent the Tribe from sustaining a permanent homeland on the stark and arid lands the United States designated as the Tribe's permanent homeland

59.     The Ute Indian Tribe is the only Indian tribe in the United States with a Congressional Act that confirms the Tribe's unqualified "paramount" rights to its Reservation water resources for both present and future use.

### ii.   The Uintah Indian Irrigation Project and its Governing Laws and Regulations

60.     In a 1905 Report, the Superintendent of Indian Affairs warned in 1905 that "[t]he future of these [Ute] Indians depends upon a successful irrigation scheme, for without water their lands are valueless, and starvation or extermination will be their fate,"[9] Congress responded by authorizing construction of the Uintah Indian Irrigation Project; stipulating expressly that "title to the project" was to be held "in trust for the Indians;" and providing for the Secretary of Interior to "sue and be sued" in relation to the Irrigation project.  1906 Appropriation Act, Publ. L. 59-258, Stat. 325, 375.

61.     The 1906 Act stated:

[t]hat such irrigation systems shall be constructed and completed and held and operated … and the title thereto until otherwise provided by law shall be in the Secretary of the Interior in trust for the Indians, and he may sue and be sued in matters relating thereto[.][10]

---

[9] Rept. of the Comm. of Ind. Aff., 1906.
[10] Pub. L. 59-258,  Stat. 325, 375.

The Indian irrigation project authorized under the 1906 Act is now known as the Uintah Indian Irrigation Project (hereafter the "UIIP").

62.     Funds for construction of the UIIP came from proceeds of the Federal Government's forced sale of the Tribe's "surplus lands," which lands the Federal Government sold by to non-Indians at the price of $1.25 per/acre.[11]

63.     Title to the UIIP has been at all times and remains held by the United States as a trust asset of the Tribe.

64.     Specific and comprehensive Federal regulations governing the BIA's operation and maintenance of the UIIP were promulgated prior to 1957 as Part 121, and subsequently renumbered as Part 199 on December 24, 1957, 22 Fed. Reg. 10479, 10637-38 (Dec. 24, 1957) ("1957 regulations").  These regulations applied specifically to the UIIP and provide the BIA with pervasive and comprehensive control of the UIIP.

65.     The 1957 regulations continued a system for the assessment of operation and maintenance fees payable by landowners within the UIIP.  The regulations provided that "Bills for the yearly assessment of construction and operation and maintenance charges will be issued each year for the record owner of land within the project," with an "annual per-acre charge for operation and maintenance…levied against the entire irrigable area of each farm unit or allotment to which irrigation water can be delivered from present constructed works."

66.     Section 199.20 of the regulations stated that "[n]o persons other than those specifically designated by the project engineer are authorized to regulate project structures or to interfere in any way with project-operated canals or any works appurtenance thereto or to the water

---

[11] *Ute I*, 521 F. Supp. at 1099.

flowing therein." The term "project engineer" was in reference to the BIA engineer charged with implementing the regulations.

67.     The federal regulations also required the BIA to deliver water to "one point on the upper boundary of each farm unit on the project," and to "maintain the lateral system to said delivery point." These requirements confirmed that Federal Defendants' pervasive, comprehensive, and exclusive control over UIIP operations extended up to the property boundaries of individual irrigators.

68.     In 2008, the United States promulgated regulations that now govern the operation and maintenance of all irrigation projects administered by the BIA, including the UIIP. But the United States' exclusive responsibilities relating to the operation of the UIIP, as reinforced by the prior federal regulations, remain in full force and effect under the 2008 regulations.

69.     The BIA is responsible for UIIP recordkeeping, billing, and collections of the annual O&M fees from UIIP water users, and for negotiating and executing carriage agreements with private irrigators using state-based water rights.

70.     The Federal Government's pervasive, comprehensive, elaborate, and exclusive control over tribal water rights also results from the Federal Government's pervasive, comprehensive, elaborate, and exclusive control over Reservation lands within the UIIP service area.

71.     Since the UIIP was authorized by Congress under the 1906 Act, the BIA has been vested with the exclusive authority to designate lands to receive irrigation water delivered through the UIIP. Currently, over half of the lands in the UIIP service area are tribal lands held in trust by the United States.

72.     Pursuant to federal regulation, the BIA is exclusively responsible for determining whether lands within the UIIP service area are assessable, i.e., capable of receiving and utilizing irrigation water delivered from the UIIP and thus assessed an operation and maintenance fee.

73.     As explained in greater detail *infra*, the BIA routinely classifies lands within the UIIP service area as temporarily or permanently non-assessable lands without consultation or input from the Tribe or the individual Ute Indian landowner.

## C. DEFENDANTS' MISMANAGEMENT OF THE TRIBE'S WATER AND FAILURE TO RECOGNIZE TRIBAL WATER RIGHTS

i.     Federal mismanagement of the UIIP

74.     From the construction of the UIIP to the present, the BIA has been responsible for the operation and maintenance of the UIIP. *See* 22 Fed. Reg. 10479, 10637-38 (Dec. 24, 1957) (the "1957 regulations").

75.     In 2016 the UIIP, which was supposed to serve about 88,000 acres of allotted lands for the benefit of the Tribe and its members, only delivered water to approximately 61,000 acres of land, resulting in massive waste of the Tribe's water rights.

76.     This non-irrigated UIIP acreage is attributable to the Federal Defendants' mismanagement of the UIIP and the Tribal water rights it controls as trustee. As detailed in subsections a-i below, examples of such mismanagement include, but are not limited to, shortcomings in construction, failure to provide necessary storage, unlawful transfers of water rights under color of the 1941 Act, 55 Stat. 209, deferred UIIP maintenance, BIA's designation of some UIIP lands as non-assessable (preventing the delivery of water to such lands), and other administrative practices employed by the Federal Defendants that reflect a failure to fulfill their trust obligations to the Tribe.

a. Incomplete Development and Construction of the Uintah Indian Irrigation Project

77.    Pursuant to the 1906 Act authorizing construction of the UIIP, the BIA designed an Indian irrigation system to irrigate about 88,000 acres of allotted land ("UIIP Lands") via an extensive system of canals and ditches to convey water from three river drainages.

78.    Construction of the UIIP continued through about 1922, at which time the Project was considered to be essentially completed except for construction of a storage facility. However, the BIA never completed the planned storage facility and moreover abandoned the Uncompahgre Band (a subdivision of the Tribe) by failing to complete their portion of the UIIP.

79.    The Act of June 21, 1906 included authorization for the construction of irrigation systems to irrigate the allotted lands of the Uncompahgre Band members, who had ceded their aboriginal lands in Colorado and were settled on the Uncompahgre Reservation in Utah to establish a permanent homeland and become a self-sufficient agricultural economy.

80.    The BIA failed to fulfill its duties as trustee to complete the irrigation program for these Tribal allottees, and these Tribe members were forced to abandon the irrigation of their lands. The respected Uncompahgre Elder, Chipeta, was interviewed by the Superintendent of the Uintah & Ouray Agency in 1916 and Chipeta confirmed that representatives of the Federal Government had promised her:

> … that if I came to this country I would be given a home better than the home I was abandoning [in Colorado]. My people were made the same promise that they would be given good lands and that water would be placed on their lands. None of these promises have been kept. I and my people were located for the most part on White River, and on the bottoms of the lower Duchesne, and these lands are desert lands today. . . . I realize that the people in Washington have many things to do, and they have forgotten about us Uncompahgrees [sic]. We have lands it is true, but without water, these lands are of no value to us.

These lands continue to this day to be wasted from the failure of the federal government to keep its promises and provide for the development of irrigable lands on the Uncompahgre portion of the reservation.

81.     Although numerous Indian allottees did not benefit from the UIIP throughout the early to mid-twentieth century, the United States nonetheless continued to assess *all* Indian allottees for UIIP construction and maintenance charges every year since 1915.  When some allottees became delinquent on UIIP assessments, no water was delivered to these lands but the indebtedness nevertheless accumulated – leading to a loss of these Indian-owned lands through condemnation (forced sale) without any monetary benefit to the allottees.  This resulted in a significant reduction in Indian-owned lands that were originally included in the UIIP.

      b.   Failure to Provide Storage Necessary to Support a Fully Functional UIIP

82.     Since before the UIIP was first authorized, Federal Defendants were aware of the construction of water storage facilities by non-Indian private irrigators that would interfere with the natural flows of the Lakefork and Uinta Rivers—rivers whose natural flows were already insufficient to meet the irrigation needs of the Tribe.

83.     In its 1916 complaints to adjudicate a portion of the Tribe's Reserved Water Rights, the United States acknowledged that insufficient natural flow exists in the Uinta-Whiterocks and Lake Fork-Yellowstone River Basins to properly irrigate Indian lands.  The United States attested to the court:

> [t]he water supply of said Uintah River, except when said river is at stages of high flow, is and at all times has been insufficient to supply the needs of the United States and said Indians for the irrigation of the irrigated lands . . . with the consequence that the waters of said river, *unless conserved by storage*, will become progressively less able to supply the needs of the United States and of said Indians. . . . (emphasis added).

United States Bill of Complaint at 26, *United States v. Dry Gulch Irrigation Co.*, Docket No. 4418 (1916), incorporated herein; *see also* United States Bill of Complaint at 33-34, *United States v. Cedarview Irrigation Co.*, Docket No. 4427, ECF No 83, pp. 43-44, incorporated herein.

84.     In its *Dry Gulch* and *Cedarview* complaints, the United States also cited the Presidential Proclamation of July 14, 1905, setting aside 1,010,000 acres of Indian land as an addition to the Uintah Forest Reserve.  Under that Proclamation, the "United States…set apart" Reservation lands "at the head-waters of the streams…as forest reserve lands" so that "the water supply [for the] Indians would be maintained" upon unallotted lands being opened for entry by non-Indians.

85.     The federal district court agreed with the United States that storage was essential to preserve the water supply for the Indians' irrigation needs, that reservoirs would therefore be required, and that the UIIP must construct such storage to serve Tribal lands.

86.     Numerous past and present studies have shown that a diversion duty of 4.0 acre-feet per acre per year (33% more than that issued in the federal decrees) is the amount of water needed to provide irrigation for economically beneficial agricultural pursuits.

87.     Several quantifications of tribal water shortages have been computed over the past century.  Water shortages on these lands are frequent: on average, seven (7) to eight (8) years out of ten (10) years, the Tribe and its members experience water shortages.

88.     Without storage, the Tribe's Reserved Water Rights are (i) wasted and lost as tribal water flows downstream to non-Indian water users without any economic benefits or compensation to the Tribe, and (ii) insufficient, under a 3.0 acre foot water duty, for proper crop irrigation.

89.     To this day there is no water storage for the lands under the Uintah Indian Irrigation Project, resulting in massive and continuous economic and cultural losses to the Tribe.

90.     Storage is absolutely necessary for the Tribe to utilize its Reserved Water Rights and develop its Reservation lands.   Unfortunately, the Federal Defendants have breached their fiduciary duties to the Tribe by denying them storage and allowing the Tribe's water to flow off the Reservation unutilized, thus prioritizing the demands of non-Indian water users over the needs of the Tribe.   In support of this contention, the Tribe incorporates herein the Declaration of Woldezian Mesghinna, Ph.D., P.E., submitted as part of the Tribe's objection to the United States' Motion to Dismiss, ECF No. 85, pp. 182-86, ¶¶ 8-13.

c.     Deferred Maintenance and Disrepair of the UIIP

91.     Over the past several decades the UIIP has fallen into grave disrepair due to the Federal Defendants' well-documented neglect. As but one example, HKM Associates prepared a UIIP Rehabilitation and Betterment Plan for the BIA in 1982 that concluded 84% of UIIP structures needed rehabilitation and noted substantial erosion on UIIP waterways, infestation of brush and trees in the bank areas of UIIP waterways, sections of UIIP canals damaged by livestock, and excessive water seepage.   These and other deteriorations have diminished UIIP efficiency and prevented it from delivering water entirely to various areas.

92.     In 2008 the BIA itself admitted:

The Uintah [Indian] Irrigation Project has deferred maintenance needs in excess of $86.1 million to bring the aging, deteriorated infrastructure up to current standards. The majority of our diversion structures lack any safety features to keep personnel safe while operating gates and cleaning debris for the upstream side of the structures.   There is no fencing or gates to prevent the general public from getting on any of our structures of features.

U.S. Dept. of Interior, BIA, Western Region, "Operation and Maintenance Guidelines: Uintah Indian Irrigation Project, Uintah and Ouray Agency" (Dec. 23, 2008), incorporated herein.

93. The deterioration of the UIIP has resulted in the inability of the UIIP to deliver available water to irrigable lands within the Project and such lands being rendered temporarily or permanently non-assessable.

94. Moreover, some of this deterioration has been caused by use of UIIP facilities to deliver water to non-Indian water users outside the UIIP pursuant to outdated carriage agreements. The Federal Defendants have failed to renegotiate these carriage agreements for decades and thus has allowed outdated fixed annual per-acre rates to persist long after they ceased to reflect market value for the water delivered.

95. Federal Defendants' failure to complete and maintain the UIIP has prevented the Tribe from establishing a viable agricultural economy to uphold and further the purpose of the Reservation as a permanent homeland for the Tribe.

    d.   <u>Designation of UIIP Lands as Non-Assessable</u>

96. Since the BIA began operating the UIIP to irrigate 78,950 acres of land within the Tribe's Reservation boundaries, the BIA has designated a substantial portion of this designated acreages as either temporarily non-assessable ("TNA") or permanently non-assessable ("PNA").

97. According to the BIA's 2008 National Irrigation Handbook, the primary reasons for designating lands as non-assessable are limiting factors such as topography, soil conditions, or the inability of the UIIP to deliver water.

98. These purportedly non-assessable lands have been deemed by the BIA as either temporarily or permanently incapable of being irrigated under the UIIP, despite being included within the acreage that the BIA initially designated as lands to be irrigated under the UIIP.

99.     These TNA/PNA designations have resulted in a reduction of irrigated trust acreage under the UIIP, adverse economic impacts to the tribe, and a reduction of funding available to maintain the UIIP.

100.     A significant portion of UIIP acreage designated non-assessable is directly attributable to the mismanagement of the UIIP by the United States, including its failure to maintain and rehabilitate UIIP lands and facilities.

101.     A disproportionately high portion of the UIIP Lands designated as non-assessable are Indian trust lands.  While approximately half of the UIIP lands are tribal or allotted lands, over 98% of the UIIP lands designated TNA are tribal or allotted lands.  Similarly, over 93% of the UIIP lands designated PNA are tribal or allotted lands.

102.     These lands were rendered non-assessable due to the Federal Defendants' failure to maintain those portions of the UIIP, and these non-assessable lands are disproportionately tribal lands because the UIIP operation and maintenance fees have been used primarily to benefit downstream non-Indian landowners whose water rights are inferior to the Tribe's.

e.     Unlawful Secretarial Transfers of Water Rights

103.     In the Act of May 28, 1941, 55 Stat. 209, Congress authorized the Secretary to "transfer water rights, with the consent of the interested parties, to other lands under [the UIIP] and to make necessary contracts to effectuate such transfers," a Federal statute that reinforces the Federal Defendants' pervasive and exclusive control over the Tribe's Reserved Water Rights under the UIIP.

104.     It was not until 2013, that the Tribe learned for the first time that the Secretary has violated the 1941 Act by transferring tribal waters to non-Indian owned lands outside of the UIIP Project lands.  The details of that discovery, detailed in the Declaration of Frances Bassett, ECF

No. 86, pp. 150-57, are incorporated herein and further illustrate the pervasive and exclusive control that the United States exercises over the Tribe's Reserved Waters and the UIIP.

105.     The Federal Defendants have also violated their trust obligations to the Tribe and defied the legislative intent underlying the 1941 Act by making false promises to Indian landowners, pressuring them to place tribal lands into PNA status under the UIIP.  On information and belief, the Federal Defendants suspended or deferred irrigation charges assessed against Indian property under the UIIP to compel the Indians to consent to the extinguishment of their water rights and then transferred those water rights to other lands.  Once divested of water rights these Tribal lands became worthless.

106.     The Secretary ultimately transferred the Tribe's water rights from about 10,000 acres of trust lands thus designated PNA to other non-Indian lands in violation its fiduciary duties to the tribe as trustee.   The Tribe has never been compensated for these losses.

f.   Inadequate Water Quality for Agricultural Production

107.      In addition to their failure to maintain UIIP infrastructure, the Federal Defendants have also failed to preserve the quality of the water being delivered through this infrastructure.

108.     Since the conception of the UIIP, the Tribe has relied upon Federal Defendants to administer the UIIP in a manner that yields economic benefits commensurate with the Tribal water rights being delivered and consumed through the Project.  By exercising pervasive control over the Tribe's Reserved Water Rights through the UIIP, the Federal Defendants have forced the Tribe to rely completely upon the Federal Defendants' management of the Project.

109.     The water supplied by Federal Defendants for the UIIP is both polluted and high in salinity, making the water unsuitable for efficient agricultural cultivation.  The 2016 Utah State Water Plan for the Uintah Basin lists the Lake Fork River, the Uinta River/Deep Creek, and the

Duchesne River as water bodies impaired by high concentrations of total dissolved solids (TDS).[12] The Federal Defendants have thus failed to ensure that water delivered through the UIIP is suitable for irrigation, reducing crop yields and causing significant economic losses to the Tribe.

g. Midview Exchange Agreement

110.    In 1967, the Federal Defendants entered into an agreement with the Tribe and an organization of non-Indian secondary water rights irrigators known as the Moon Lake Water Users Association ("Association") to provide for water right exchanges and transfer of irrigation facilities (n/k/a the "Midview Exchange"). Under the Midview Exchange, the BIA transferred a portion of the Tribe's *Winters* Reserved and federally-decreed water rights in the Lake Fork River to the USBR "for the use and benefit of the Moon Lake Project." As set forth in the 1923 Decrees, these *Winters* Reserved Water Rights have a priority date of October 3, 1861. The Midview Exchange Agreement guaranteed that the minimum Association acreage to be served by the Tribe's Lake Fork River rights "shall not be less than" the total acreage serving the UIIP from the Duchesne River, but "in no event less than 7,500 acres"—providing the Association with a minimum acreage of Reserved Water Rights regardless of whether the UIIP was irrigating fewer than 7,500 acres under the agreement.

111.    In exchange for use of the Tribe's water rights in the Lake Fork River, Defendant USBR agreed to transfer to the BIA, for the use and benefit of the UIIP, two state-based water rights in the Duchesne River with inferior priority dates of June 22, 1918, and August 3, 1922.

---

[12] *See* https://water.utah.gov/wp-content/uploads/2019/SWP/Uintah/UintahBasin2016.pdf (last visited on 1/18/2022).

112.    The Tribe's receipt of *state*-based water rights under the Exchange is significant because, in contrast to *Winters* Reserved Water Rights, these state-based rights can be forfeited through non-use under Utah state law.

113.    As part of the agreement to transfer the Tribe's senior-priority water rights for the use and benefit of the Association, Defendant USBR and the Association agreed to transfer the right, title, and interest in the Midview Dam and Reservoir, Duchesne Diversion Dam, Duchesne Feeder Canal, and Midview Lateral together with all facilities and property appurtenant thereto (collectively, the "Midview Property") to the BIA to operate and maintain "as part of the [UIIP]".

114.    Because the Midview Property was to be transferred to the Defendant BIA as part of the UIIP—a tribal asset held by the United States in trust—the Tribe was effectively promised that beneficial ownership in the Midview Property would be transferred to the Tribe.  However, the Federal Defendants never fulfilled this promise and thus breached their contractual obligations under the Midview Exchange Agreement, breached their fiduciary duties to the Tribe, and violated federal law.

115.    As a result of the BIA's decisions to designate Indian trust lands served under the Midview Exchange Agreement as temporarily or permanently non-assessable and, therefore, ineligible to receive water, about 1,500 acres of trust lands are no longer irrigated under the Midview Exchange Agreement.  Meanwhile, the Moon Lake Water Users Association continues to use the Tribe's Reserved Water Rights in the Lake Fork River to serve the 7,500-acre minimum set forth in the Midview Exchange Agreement.

116.    The Midview Exchange Agreement has been and continues to be an inequitable exchange for the Tribe.  Federal Defendants have failed to address this inequity, resulting in substantial economic losses to the Tribe.

117.    In 1968, the parties to the Midview Exchange Agreement signed a Transfer Agreement providing for the internal transfer of the Midview Property from the USBR to the BIA to become part of the UIIP, stating:

> Pursuant to Article 8 of the [Midview Exchange], the Bureau of Reclamation and the Moon Lake Water Users Association hereby transfer· to the Bureau of Indian Affairs the jurisdiction of the right, title, and interest in and to the Midview Dam and Reservoir, Duchesne Diversion Dam, Duchesne Feeder Canal, and Midview Lateral together with the facilities and property appurtenant thereto.

118.    Through this 1968 Transfer Agreement, the BIA expressly accepted jurisdiction over the Midview Property and agreed to "operate and maintain said facilities including necessary replacements as a part of the Uintah Indian Irrigation Project."

119.    Yet, unbeknownst to the Tribe, the Federal Defendants never completed the underlying paperwork to formally transfer the Midview Property from USBR to the BIA.  The Tribe did not learn of this omission until the BIA was asked to approve an easement for rights-of-way to Duchesne County in 2014.

120.    The BIA neither obtained the Tribe's consent to the rights-of-way, nor ensured that the Tribe received just compensation for the rights-of-way.  The Federal Defendants have since denied the Tribe's beneficial ownership and trust status of the Midview Property.

121.    The Midview Exchange Agreement is an illegal conveyance of tribal trust property prohibited by 25 U.S.C. § 177 because Congress authorized neither the conveyance of title nor beneficial interest to the Tribe's Reserved Water Rights in the Lake Fork River.  Yet the parties to the Midview Exchange Agreement, including the BIA, continue to satisfy the terms of the Midview Exchange Agreement as if the Exchange is a legally efficacious agreement.

122.    In 2016, in response to the Tribe's administrative challenge, the Bureau of Indian Affairs advised the Tribe that it would not hold the Midview Property as a tribal trust asset under

the UIIP as promised in the Midview Exchange Agreement and instead would continue to hold the property as government fee property. Efforts by the Tribe to convince the BIA otherwise have been fruitless.

123. Despite documentation of the UIIP's significant deferred maintenance needs, the UIIP remains burdened by its obligation to deliver water to non-Indian irrigators in the Association through UIIP facilities, a cost that is absorbed exclusively through the operation and maintenance fees that are charged to the Indian water users of the UIIP. The BIA assesses no additional costs for carrying water to non-Indian Association water users, an untapped revenue stream that would support the rehabilitation and betterment of the UIIP.

124. In violation of the Midview Exchange Agreement, the BIA is now using water from the Midview Reservoir to irrigate lands other than those designated for irrigation under the Exchange – in particular, lands under the Pahcease canal, part of the UIIP, which only have a direct flow from the Duchesne River. The BIA's diversion of water to other lands reduces the amount stored Duchesne River to which the Tribe is entitled under the Agreement.

h. Other Practices Inconsistent with the Trust Status of the UIIP

125. Rather than rectifying their shortcomings as a trustee, the Federal Defendants now refuse to recognize the UIIP as a Tribal trust asset altogether.

126. The BIA regularly engages in what it terms "informal operating practices" in which the BIA executes informal agreements allowing non-Indians to utilize UIIP water and infrastructure, doing so without consulting the Tribe and in violation of the BIA's duty of undivided loyalty to the Tribe as its trustee. The Tribe first learned of these "informal operating practices" no earlier than 2013. *See* Declaration of Frances Bassett, ECF No. 86 at 150-57, incorporated herein.

i. <u>Unfulfilled Federal Obligations from the 1965 Deferral Agreement</u>

127.   The Decker Report was commissioned to quantify the Tribe's Reserved Water Rights from the Colorado River system and the effect of those rights on the Central Utah Project ("CUP"), a major project for developing Utah's apportionment of water from the Colorado River system.  The CUP was authorized by Congress in the Colorado River Storage Project Act of 1956.

128.   The CUP was sponsored by Defendant CUWCD and conceived as "a series of aqueducts, diversion and storage dams, and tunnels that would effectively move water" from the Uinta River Basin in northeastern Utah to the "growing population centers along the Wasatch Front."[13]  Defendant USBR was responsible for building the CUP and divided it into six units: Bonneville, Jensen, Vernal, Upalco, Uintah, and Ute Indian.

129.   The central (and largest) component of the CUP is the Bonneville Unit, a substantial trans-basin water delivery project that now moves water from various Reservation streams in the Uinta Basin across the Wasatch Mountains to the Wasatch Front, a metropolitan region containing several contiguous cities including Salt Lake City, Provo, Ogden, and others.

130.   The Bonneville Unit thus required the diversion and transfer of water from the Uinta Basin to the Bonneville Basin.  However, because of the pending Uinta Basin Adjudication in Utah's Eighth Judicial District Court, Defendants could not certify to Congress that there were no disputed claims to the water they planned to move across the Uinta Basin to the Bonneville Unit.  Defendants therefore conceived of a "Deferral Agreement" under which the Tribe would defer the use of its Reserved Water Rights.

---

[13] Jim Kichas, <u>The Law of the River: The Central Utah Project</u>, May 22, 2015, posted online at https://archivesnews.utah.gov/2015/05/22/the-law-of-the-river-the-central-utah-project (last visited on 1/18/2022).

131.    On September 20, 1965, Defendants BIA, USBR, CUWCD, and the Tribe entered into this Deferral Agreement whereby the Tribe agreed to defer use of a portion of its Reserved Water Rights for the development of 15,542 acres of land.  This allowed Utah and the DOI to secure funding for the Bonneville Unit by certifying to Congress that water rights for the Unit were uncontested and that construction could proceed without the Tribe's interference.

132.    The principal *quid pro quo* of the Deferral Agreement was the Tribe's deferral of 15,542 acres of its water rights in exchange for the Federal and State Defendants' "full and complete recognition of the Tribe's Reserved Water Rights as quantified in the Decker Report … *without resort to litigation*."  Deferral Agreement, Art. 4 (emphasis added).

133.    The Bonneville Unit construction thus proceeded only because the Defendants agreed the Tribe's *Winters* Reserved Water Rights in the Colorado River system would be (*i*) established as quantified in the Decker Report, (*ii*) have priority dates consistent with the advent of the Winters Doctrine, and (*iii*) be enforceable without further adjudication of the Tribe's rights.

134.    Beyond serving as consideration for the Tribe's deferral of its rights, this binding quantification of the Tribe's Reserved Water Rights is essential to the legality of the Deferral Agreement as a necessary predicate to ensure the Tribe possessed a cognizable property to defer.

135.    The Tribe's bargained-for consideration under the Deferral Agreement also included the Federal Defendants' promise to the Tribe of supplemental water and storage.  The Federal Defendants agreed therein that the planned Upalco and Uintah Units of the CUP would provide the water storage and related infrastructure needed by the Tribe for the delivery of its Reserved Water Rights under the UIIP.

136.    Further consideration for the Tribe's deferral of its water included the Federal Defendants' promise in the Agreement that the Ultimate Phase of the CUP would provide water

to the Tribe's lands. In a 1988 Memorandum from Regional Solicitor William Robert McConkie to the Superintendent of the BIA's Uintah and Ouray Agency, Solicitor McConkie stated that it was "the intent that the ultimate phase of the Central Utah Project would supply supplemental water and full service water, as applicable, to all Indian water right lands in Groups 1 through 7 [as designated in the Decker Report]" (emphasis in original).

137.    The Deferral Agreement also contained promises relating to the BIA's management of the Tribe's Reserved Water Rights. For example, in Paragraph 8 the BIA promised to move the diversion points for the Wissiup, Leland, and Ouray School Canals upstream to the Duchesne Feeder Canal. This promise was grounded the BIA's acknowledgement that these canals were supplying polluted water to irrigators under the UIIP.

138.    Upon execution of the Deferral Agreement, the United States and Utah were then able to seek Congressional funding for the Bonneville Unit by certifying to Congress that the Utah had an uncontested right to water in the Uinta Basin. *See* State of Utah Resolution H.C.R. No. 2, approved October 10, 1973, ECF No. 86 at 210-15, incorporated herein.

139.    With passage of the Colorado River Basin Project Act of 1968, Congress recognized the Deferral Agreement as a binding agreement. The Act amended the Colorado River Storage Project Act of 1956 (*i.e.*, the Act authorizing the construction of the CUP) to account for Defendants' obligations under the Deferral Agreement, stating:

> That the planning report for the Ute Indian unit of the Central Utah Participating Project shall be completed on or before December 31, 1974, to enable the United States of America to meet the commitments heretofore made to the Ute Indian Tribe of the Uintah and Ouray Indian Reservation under the Agreement dated September 20, 1965 (Contract No. 14-06-W-194).

140.    Further, in 1973 the Utah State Legislature passed a Concurrent Resolution, signed by the Governor, recognizing the CUWCD had bound Utah to the promises made in the Deferral

Agreement and sought Congressional funding for the CUP based on the Tribe's agreement to defer some of its water rights and refrain from challenging construction of the Bonneville Unit. *See* ECF No. 86 at 210-15, incorporated herein.

141. Had the Tribe's Federal Trustee abided by the Deferral Agreement, it would have yielded significant annual economic returns for the Tribe. The Upalco Unit alone was to provide full service irrigation water, storage, and/or related infrastructure to a total of 33,450 acres of Tribal land – but was never built. The Uintah Unit was to provide 64% of the nearly 50,000 AFY of storage to the Tribe and would have featured two reservoirs: the 47,000 AF Uintah Reservoir and the 32,000 AF Whiterocks Reservoir. These reservoirs and related infrastructure were to provide full service or supplemental irrigation to a total of 39,648 acres of Tribal lands.

142. Although Congress appropriated construction funds for the Upalco Unit in 1981, by 1986 the USBR had indefinitely postponed its construction citing "increased costs and lack of demand" for municipal and industrial water. USBR continued "planning" for the Uintah Unit into the 1980s, but eventually decided to "postpone" the Uintah Unit indefinitely.

143. The Federal Defendants also abandoned the Ute Indian Unit, which was supposed to provide supplemental waters to the Bonneville, Upalco, and Uintah units to fulfill the Tribe's Reserved Water Rights pursuant to the CUP. In 1980, USBR issued a Concluding Report that effectively abandoned study of the Ute Indian Unit without any economic justification.

144. Defendants breached the Deferral Agreement as set forth above and also by failing to recognize the binding quantification of the Tribe's *Winters* Reserved Water Rights therein. For example, in August of 2018, the Tribe attempted to enter into an agreement allowing an oil and gas company on the Reservation to lease Tribal water for a period of less than seven years pursuant to 25 U.S.C. § 81(b). Defendants DOI and BIA thwarted this economic opportunity by refusing

to perform the ministerial task of instructing ditch riders to make water available to effectuate the transaction.  Defendant DOI justified its interference with the Tribe's use of its Reserved Water Rights by asserting the Tribe *has* no present perfected water rights.

145.    The Federal Defendants also refuse to recognize any sovereign authority by the Tribe over its Reserved Water Rights.  For example, in October 2018 the Tribe enacted a proposed Ute Water Resources Ordinance to establish a uniform tribal code to regulate its Reserved Water Rights.  Defendant DOI thwarted the proposed Ordinance, asserting the Tribe lacks any adjudicated Reserved Water Rights.

146.    On January 29, 2020, Defendant BIA issued a letter to the Tribe (copying the Utah State Engineer) asserting the Tribe lacks authority to issue tribal water permits from the Duchesne River, where the Tribe has substantial unused water rights recognized by the Decker Report and thus the Deferral Agreement.

147.    As a result of the Defendants' breaches Deferral Agreement and the Federal Defendants' breaches of their trust obligations, the Tribe has suffered and continues to suffer grave economic harm including lost crop yields due to insufficient irrigation.

    i.    **The Central Utah Project Completion Act of 1992**

148.    Since the execution of the Deferral Agreement, the Tribe has engaged in negotiations with Defendants to establish a legal framework for the use and development of the Tribe's now-quantified *Winters* Reserved Water Rights.

149.    In the 1980s, the Tribe and Utah agreed to a Ute Indian Water Compact ("proposed 1980 compact").  Among other provisions to facilitate development of the Tribe's Reserved Water Rights, Article III of the proposed compact stated that the parties would put forth their "best efforts in the expeditious planning and development of water projects for all group 5 lands, or substitute

lands, including the Uintah and Upalco Units, the Leland Bench Project, or other similar projects of the Central Utah Project" *without* relieving the United States of its responsibilities under the Deferral Agreement.

150.    Utah approved the proposed 1980 compact in 1980. Utah Code Ann., § 73-21-102. The Tribe approved the Compact in 1988 by Ordinance No. 88-03.

151.    The United States Congress, however, did not ratify the 1980 compact.  Instead, in 1992, Congress passed the Central Utah Project Completion Act (P.L. 102-575) ("CUPCA").

    a.    The proposed 1990 Revised Compact

152.    The CUPCA included a proposed version of the Ute Indian Water Compact (the "proposed 1990 Revised Compact") different from the 1980 Compact that the State of Utah and the Tribe had both approved.  The 1990 revisions are described in the sworn Declaration of former Tribal Business Committee Chairman Luke Duncan, ECF 84, pp. 1-30, incorporated herein.

153.    The proposed 1990 Revised Compact recognized that natural river flows are insufficient to meet the Tribe's irrigation needs and thus the proposed Revised Compact provided the Tribe with an additional 0.4 acre-feet/per-acre/per-year of stored water to supplement the Tribe's decreed water rights.  However, as described in former Chairman Duncan's Declaration, in all other respects the proposed 1990 Revised Compact was unacceptable to the Tribe.

154.    Insofar as it was merely a "proposed" compact, Congress made the proposed 1990 Revised Compact subject to ratification by both the State of Utah and the Tribe.  Because the proposed 1990 Revised Compact failed to (*i*) preserve the Tribe's water rights, (*ii*) or provide the Tribe water storage and related infrastructure, or (*iii*) allow for Tribal authority over tribal waters, the Tribe never ratified the 1990 proposed Compact.  Further detail as to this allegation is set forth

in the Declaration of Irene Cuch, another past Chair of the Tribal Business Committee (ECF No. 84, pp. 46-58), incorporated herein.

155.    Nearly twenty-six years passed before the Utah State Legislature enacted Senate Bill 98 ratifying the proposed 1990 Revised Compact in March of 2018.  However, the proposed 1990 Revised Compact was never ratified by the Tribe or the United States and thus has no legal effect.  In 2019 the Tribal Business Committee adopted a Resolution declaring the Tribe has never supported and will not ratify the proposed 1990 Revised Compact.

156.    Incredibly, Utah asserted in its Motion to Intervene in this lawsuit (ECF No. 32, filed April 17, 2019 at p. 4) that the Tribe agreed to the proposed 1990 Revised Compact and that that proposed Compact "guarantees" the State administrative and regulatory jurisdiction over the Tribe's *Winters* Reserved Water Rights and "primary administration of water within the reservation." *Id*.

b. Failure of Tribal Compensation under the CUPCA

157.    Under CUPCA, Title V, Congress (*i*) acknowledged the Federal Defendants' failure to fulfill their obligations to the Tribe under the Deferral Agreement, and (*ii*) established a mechanism that would partially and *conditionally* compensate the Tribe for the Federal Defendants' failure to construct the promised CUP storage facilities and related infrastructure.

158.    There were two separate components of this compensation mechanism.  First, CUPCA Section 502(a), titled "Bonneville Unit Tribal Credits," stated that:

> the Tribe shall receive from the United States 26 percent of the annual Bonneville Unit municipal and industrial capital repayment obligation attributable to thirty-five thousand five hundred acre-feet of water, which represents a portion of the Tribe's water rights that were to be supplied by storage from the Central Utah Project, but will not be supplied because the Upalco and Uintah units are not to be constructed.

159.    The amount of compensation to the Tribe under Section 502(a) is merely $2 million per year, a small fraction of the damages suffered by the Tribe due to the failure to construct the Upalco and the Uintah Units.  One reason for this dramatic shortfall is that compensation under Section 502(a) is based on figures that underestimate by 22,161 acre-feet/per year the value the Tribe would have received had the Upalco and Uintah Units been constructed as promised.  *See* Mesghinna Declaration, ECF No. 85, pp. 190-93, ¶¶ 24-34, incorporated herein.  Another reason is that Section 502(a) fails to account for other indispensable components of the irrigation process such as costs associated with the diversion dam, conveyance system, distribution system, and drainage systems.  As a result of the Federal Defendants' breach of their fiduciary duties to the Tribe, the Bonneville Unit Tribal Credits do not "put the Tribe in the same economic position it would have enjoyed had the features contemplated by the September 20, 1965, Agreement been constructed."

160.    Separate from the Bonneville Unit Tribal Credits, Sections 504, 505, and 506 of the CUPCA required the United States to pay the Tribe $198.5 million for various purposes that were unrelated to the Federal Defendants' failure to construct the Upalco and Uintah Units of the CUP.

161.    Section 507 provides for a conditional waiver of certain legal claims conditioned upon the Tribe's receipt of the funds identified in Sections 504, 505, and 506.  However, it also provides "[n]othing in this waiver of claims shall prevent the Tribe from enforcing rights granted to it under this Act or under the Compact."  And because the Tribe has not received its total entitlement under these Sections, the waiver of Section 507 is inoperative in any case.

162.    The CUPCA also mandates that a compact protecting the Tribe's water rights must be in place for any waiver to take effect.  The waiver of Section 507 is therefore null and void for yet another reason: the compact referred to therein was never ratified by the Tribe.

c.     <u>Failure to Rehabilitate Bottle Hollow Reservoir</u>

163.     Bottle Hollow Reservoir was intended by Defendant USBR to be one source of mitigation for environmental losses to the Tribe resulting from construction of the CUP. Section 505 of the CUPCA required the United States to pay $28.5 million for various improvements to reservoirs, stream habitat, and municipal water facilities for the Tribe. Of this $28.5 million sum, $500,000 was directed to be used toward cleanup of the contaminated Bottle Hollow Reservoir, an off-stream reservoir located within the Reservation built as part of the CUP. Title V, Section 505 also obligates the United States to "secure minimum flow of water to the [Bottle Hollow] reservoir to make it a suitable habitat for a cold water fishery." (emphasis added)

164.     The Federal Defendants never fulfilled this obligation, leaving the reservoir to be supplied by highly saline *warm* water return flows from Tribal irrigation water rights and thus ruining Bottle Hollow as a cold water fishery and violating the Congressional mandate of Title V, Section 505.

d.     <u>The Failure to Provide Tribal Storage under CUPCA Sections 201(c) and 203</u>

165.     Title II, Sections 201(c) and 203 authorized construction of water storage and infrastructure facilities that would replace the Upalco and Uintah units that were planned to store Ute tribal waters. Congress specified, and the Federal Defendants fully admitted, that CUPCA obligated Federal Defendants to provide water storage for the Tribe's Reserved Water Rights under Title II, Sections 201(c) and 203. However, to this day no provision has been made for the storage of tribal water pursuant to either Section 201(c) or Section 203 of CUPCA.

166.     Today, as the CUP nears completion, the Tribe – whose permanent homeland is in the Uinta Basin – has no storage facility and related water works from which to supply its Reserved Water Rights to its irrigable trust lands. At the same time, construction of water storage facilities

intended to benefit non-Indian water users in the Uinta Basin is nearing completion. It is a manifest injustice that results from the Federal Defendants' abdication of their fiduciary duties to the Tribe set forth above.

167.     The Tribe has suffered immense economic harm from this abdication, including the loss of promised storage and irrigation infrastructure, lost crop yields due to insufficient irrigation, and lost economic opportunities due to the Federal Defendants' misuse and diminishment of the Tribe's water.

## D. THE GREEN RIVER BLOCK EXCHANGE CONTRACT

168.     In 1958, Defendant USBR filed an application with Utah for water to be stored in the Flaming Gorge Reservoir, including 500,000 acre-feet of water from the Green River that was slated for the ultimate phase units of the CUP – including the Ute Indian Unit. As detailed *supra*, Defendant USBR breached its duties to the Tribe by failing to utilize the 1958 stored water right to deliver water from the Flaming Gorge Reservoir to the Tribe. Indeed, the Ute Indian Unit was abandoned altogether by the USBR before construction ever commenced. USBR also never completed construction on the Upalco and Uintah Units, which were to receive Green River water from the Ute Indian Unit to supply supplemental irrigation water to meet Tribal irrigation needs in the Lake Fork and Uinta River Basins. As a result of this failure, much of USBR's 1958 stored water right application was never perfected.

169.     Under Utah state law, the USBR could not hold an unperfected state water right application for more than 50 years. USBR therefore entered into an agreement on March 12, 1996 to assign the unperfected portion of this 1958 water storage right application (comprising 447,500 acre feet) to the Utah State Board of Water Resources.

170.    The agreement states that Utah could develop, divert, and perfect waters released from Flaming Gorge Reservoir "as permitted by law."  Assignment of Water Right No. 41-3479 (March 12, 1996), Attachment A.  As indicated above, this "1996 Assignment" to Utah related exclusively to water that had been reserved for the Ultimate Phase Units – units which were intended to provide water storage and related infrastructure for the Tribe.

171.    Notwithstanding USBR's trust responsibility to the Tribe and its 1958 stored water right originally appropriated to provide water to the Tribe, USBR assigned no portion of the 1958 stored water right application to the Tribe.  Instead, USBR unilaterally assigned the unperfected portion of the 1958 water right application (comprising 447,500 acre feet) to Utah's Board of Water Resources without notice to the Tribe.

**ii.  The Terms of the Green River Block Exchange Contract**

172.    The Green River Block Exchange Contract ("GRBE") is an agreement between USBR and the State of Utah.  The GRBE was executed on March 19, 2019, shortly after Defendant USBR issued a Final EA and FONSI (Finding of No Significant Impact) in January and February 2019.

173.    Under the GRBE, Utah purports to "forebear" depletions of Utah's apportionment of Colorado River waters under Article XV(b) of the Upper Colorado River Basin Compact, allowing USBR to utilize these waters to satisfy its requirements under the Endangered Species Act establishing in the 2006 Flaming Gorge Record of Decision (the "2006 ROD").  In exchange, contract language provides that Utah will be "authorized to deplete an equal amount of CRSP project water from [Flaming Gorge] releases throughout the year as water is needed for the Green River Block portion of the assigned water right."  U.S. Bureau of Reclamation, PRO-EA-16-020,

Green River Block Exchange Contract Final Environmental Assessment at 12 (2019) (hereinafter cited as "Final EA").

174.    The "right" that the State has agreed to forbear under the GRBE is not a perfected or certified water right.  To the contrary, it is no more than an unproven, unperfected quantity coming from Utah's apportionment of water from the Colorado River System under the 1948 Upper Colorado River Basin Compact.  The GRBE refers to this unproven, unperfected quantity of water as Utah's "Compact Entitlement Water" under Article XV(b) of the 1948 Upper Colorado River Basin Compact.

175.    But Article XV(b) of the 1948 does not, as the GRBE suggests, "entitle" Utah to any specific quantity of water from the Colorado River system.  Rather, it merely states that the provisions of the Compact "shall not apply to or interfere with the right or power of any signatory State to regulate within its boundaries the appropriation, use and control of water, the consumptive use of which is apportioned and available to such State by this Compact."

176.    The GRBE also gives Utah administrative authority over releases of water from Flaming Gorge, stating at Section 9(a) that "[w]ater right applications will be filed with the Utah State Engineer in accordance with State Law for all diversions of exchanged project water."  This provision removes the Tribe's trustee as the primary administrator of stored water and releases from Flaming Gorge.

177.    The express intent of the GRBE is to provide a "more reliable water supply" for Utah for future development projects along the Green River.  But with respect to the Tribe, the GRBE will significantly diminish its ability to market its presently perfected water in the Green River and thus reduce the Tribe's ability to develop and use its Reserved Water Rights.

### iii.     Tribal Comments and Request for Environmental Impact Statement

178.     On September 16, 2018, Defendants issued and requested public comments on a draft Environmental Assessment ("Draft EA") for the GRBE.  Ten days later, Defendants held a public meeting on the Draft EA in Vernal, Utah.  Representatives of the Tribe attended this meeting, but the Federal Defendants did not consult the Tribe directly.

179.     Following this meeting, the Tribe submitted detailed comments addressing key interests the Draft EA failed to address.  *See* Attachment B.  These comments note the Federal Defendants' failure to consult the Tribe regarding the GRBE and request such consultation take place prior to issuing any final EA or EIS.  Attachment B at 2-4.  The Tribe's comments also note the Draft EA's reliance on inadequate water supply and demand modeling.  In particular, the Draft EA failed to consider the 110-year trend of decreasing natural flow water supply in the Colorado River Basin.  The also Tribe noted USBR's own data shows the Colorado River's water supply at Lee's Ferry has decreased by an average of 34,000 acre-feet per year over the past 110 years and predicts the annual flow in the Colorado River will continue to diminish by 7.5 percent less than historic flow rates by 2025, 10.9 percent less by 2055; and 12.4 percent less by 2080.  Attachment B at 5-7.

180.     The Tribe also noted the Draft EA does not account for realistic future water development patterns when taking into account past trends and USBR's own predictions.  An EIS is therefore necessary to quantify environmental impacts by accounting for decreasing water supply and increasing water demand in the Colorado River Basin.  Attachment B at 7.  The Tribe's comments specifically included a request that an EIS be produced in accordance with NEPA requirements that utilizes adequate supply and demand modeling and quantifies any impacts from the GRBE on the Tribe's ability to use its Reserved Water Rights, including the Tribe's ability to

store water in the Flaming Gorge Reservoir to the extent needed to derive economic benefit from its present perfected rights. Attachment B at 2, 7, 9, 10-11.

181. Finally, the Tribe noted the Draft EA failed to identify the Tribe's Reserved Water Rights as a trust asset of the Tribe. Attachment B at 10.

182. In January 2019, USBR issued its Final EA. On February 13, 2019, USBR signed and issued the FONSI. USBR failed to produce the EIS required under NEPA and demanded by the Tribe along with several other commenters. The Final EA did not incorporate revised water supply modeling despite the Tribe's comments noting this failure in USBR's modeling assessing potential environmental impacts of the GRBE.

183. The Final EA was ultimately produced without any consultation with the Tribe. Section 1.5.2 of the EA states that "Government-to-government meetings are ongoing with the Ute Indian Tribe of the Uintah and Ouray Reservation about the Project." This statement is patently false. Federal Defendants never engaged in government-to-government consultation with the Tribe regarding the GRBE. USBR'S Final EA also mischaracterizes the Tribe's Reserved Water Rights, incorrectly stating they are contingent upon future execution of a compact between the Tribe, the United States, and Utah:

> The United States recognizes reserved water rights associated with the Uintah and Ouray Reservation and has been working with the Ute Tribe and the State of Utah for the past several decades to develop a Compact to quantify these rights. Once this Compact is signed, it is anticipated that the Ute Tribe will have a water right with a priority date of 1861 to the natural flows in the Green River. The hydrology analyses for both the FGFEIS and this EA assumed the eventual signing of the Compact (that volume of water was included as a reasonably foreseeable depletion) and show that the operation of FG Dam would not interfere with the exercise of these senior Green River water rights.
>
> Furthermore, development of the State water right along the Green River would not affect the ability of the Ute Tribe of the Uintah and Ouray Reservation to develop their reserved water rights as they hold senior water rights along the river and

> Reclamation must comply with applicable water law including the doctrine of prior appropriation.

Final EA § 3.13.2. This demonstrates the Federal Defendants' incorrect understanding that the Tribe's Reserved Water Rights will not be quantified until a compact is signed, when in fact the Tribe's Reserved Water Rights were already quantified under both the 1923 decrees and the Deferral Agreement – wherein both the United States and Utah adopted the quantification of tribal waters in the Decker Report as binding. At bottom, the Final EA illegally repudiates the U.S. Supreme Court's holding that Indian reserved water rights under the *Winters* doctrine vest upon establishment of the reservation. *Arizona v. California*, 373 U.S. 546, 600 (1963).

### E. CLASS ACTION ALLEGATIONS

184. The Tribe also brings class action claims on behalf of a class consisting of all 2,070 individual Tribe members under Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure. It does so because the class is so numerous that joinder of all members is impracticable; there are questions of law and fact common to the class; the claims of the representative plaintiffs are typical of the claims of the class; the representative plaintiffs will fairly and adequately protect the interests of the class.

185. *Numerosity*. The class comprises approximately 2,070 individual Tribe member Indians.

186. *Fair and adequate representation*. Named Plaintiffs Chairman Shaun Chapoose, Vice Chairman Edred Secakuku, Luke Duncan, Ronald Wopsock, Christopher Tabbee, and Julius Murray III together form the Tribe's Business Committee, the elected governing body of the Tribe. All members of the Tribe over the age of 21 who have maintained legal residence on the Reservation for a period of one year immediately prior to any election may vote in Tribal elections for Business Committee members and/or serve on the Business Committee. Under the Tribe's

Constitution, the Business Committee holds and exercises, *inter alia*, the following powers and responsibilities on behalf of the Tribe:

> (a) to negotiate with the Federal, State and local governments on behalf of the Tribe and to advise and consult with the representatives of the DOI on all activities of the Department that may affect the Tribe;
>
> (b) to employ legal counsel for the protection and advancement of the Tribe's rights;
>
> (c) to approve or veto any sale, disposition, lease, or encumbrance of tribal lands, interest in tribal lands, or other tribal assets;
>
> (d) to advise the Secretary regarding all Federal projects for the benefit of the Tribe;
>
> (e) to regulate all economic affairs and enterprises of the Tribe;
>
> (f) to levy taxes upon Tribe members;
>
> (g) to promulgate and enforce ordinances governing conduct of Tribe members; and
>
> (h) to safeguard and promote the peace, safety, and general welfare of the Tribe by regulating trade and the use and disposition of property upon the Reservation.

Like the other class members, the members of the Business Committee are Tribe members and beneficiaries of the trust obligations alleged herein and have suffered damages due to the loss of Tribal water arising from Defendants' conduct. As the elected governing body of the Tribe they are the individuals best suited to fairly and adequately protect the interests of the class members, i.e. the Tribe members.

187. *Common questions.* Questions of law or fact common to class members predominate over any questions affecting only individual members and include, *inter alia*, the legal standards governing the trust obligations of the Federal Defendants with respect to the Tribe's water rights and what practices are, have been, and will be necessary to achieve compliance with

such standards; the extent to which, if at all, the Federal Defendants have complied with such standards and have implemented or failed to implement such practices; what measures must be taken in order to correct past breaches of trust and bring the activities of Defendants into compliance with the law for the future; and the nature, extent, and lawfulness of the Defendants' interference with the exercise of the trust obligations of the Federal Defendants. The commonality of these questions to all members of the class is rooted in the members' universal need for sufficient water to maintain a viable Reservation.

188. *Typicality*. Because the claims alleged herein concern the impact of Defendants' actions and omissions upon the availability of water for all Tribe members, the claims of the representative Plaintiffs and all other members of the class arise from the same practices and course of conduct of the Defendants and are based on the same legal theories. The claims asserted against Defendants herein thus apply generally to all members of the class such that final injunctive relief and corresponding declaratory relief is appropriate respecting the entire class.

## F. EXHAUSTION OF ADMINISTRATIVE REMEDIES AND ACCRUAL OF CLAIMS

189. Under CUPCA, Title V Section 501(b), the purported settlement/waiver of claims therein included both "[t]his Act" (i.e., the CUPCA) and "the proposed Revised Ute Indian Compact of 1990" (i.e., the proposed 1990 Revised Compact discussed *supra*).

190. And under CUPCA, Section 503(a), the proposed 1990 Revised Compact would be effective only upon ratification "by the State [of Utah] *and* the Tribe." (emphasis added)

191. At no time before the Tribe's filing of its first Complaint in this action on March 8, 2018 had either the Tribe or the State of Utah ratified the proposed 1990 Revised Compact. Utah only ratified the Compact on May 8, 2018 – two months after the Tribe filed its Complaint.

192.	More importantly, the State's ratification was unilateral and the Tribe never ratified the Compact – rendering the purported settlement/waiver of claims contemplated by CUPCA, Section 501(b), null and void.  *See* Cuch Declaration (ECF No. 84, pp. 46-49), incorporated herein.

193.	Following years of negotiations between the Tribe, the State of Utah, and the Federal Defendants over the latter's continued failure to fulfill its obligations, Defendants submitted a modified proposed Compact to the Tribe in 2009 (the "proposed 2009 Compact").

194.	The Tribe also refused to ratify the proposed 2009 Compact for the same reasons it had refused to ratify the proposed 1990 Revised Compact (detailed *supra*); however, the Tribe continued negotiating with Defendants towards a compact that would be acceptable to the Tribe.

195.	For years the Federal Defendants strung the Tribe along, promising in correspondence from 2012 to 2016 to "investigate" potential solutions to the Federal Defendants' failures to fulfill their trust obligations and to adhere to the various statutes, treaties, and agreements asserted in this Complaint.  On May 29, 2015 Defendant DOI met with the Tribe in Washington, D.C. to discuss the development of water storage facilities for the Tribe.

196.	Ultimately, however, the Federal Defendants refused the Tribe's insistence that Defendants fulfill their obligations to the Tribe.  Notwithstanding that the purported settlement/waiver of the Tribe's claims under CUPCA was expressly contingent upon the Tribe's ratification of the proposed Revised Compact of 1990, which never occurred, in correspondence dated March 3, 2016, Federal Defendants stated flatly that CUPCA "was intended to and did resolve all of the Tribe's reserved water rights claims, including issues arising under the 1965 Deferral Agreement."

197.    With this final refusal by the Federal Defendants – premised upon an erroneous reading of CUPCA – and following years of negotiations to honor their obligations as trustee, the Tribe at last exhausted any potential administrative remedies for its claims.

198.    The Tribe's claims therefore accrued no earlier than March 3, 2016 – the date its negotiations with the Federal Defendants concluded with their final refusal to honor their obligations. *See, e.g., Crown Coat Front Co. v. United States*, 386 U.S. 503, 522 (1967) (claims accrued when administrative remedies were exhausted, not before); *Hudson v. Aetna Life Ins. Co.*, 66 F.3d 338 (10th Cir. 1995) (a claim does not accrue prior to required exhaustion because "exhaustion of administrative remedies is an implicit prerequisite to seeking judicial relief.").

199.    To the extent any of the Tribe's claims did not require exhaustion of administrative remedies, those claims remain timely under the continuing-violation doctrine and the doctrines of equitable estoppel and/or equitable tolling.

200.    The Tribe's assertion of claims was delayed by both (*i*) its years of negotiations with the State and Federal Defendants during which time the Tribe reasonably and diligently pursued its rights, and (*ii*) by the decades-long delays in the completion of the CUP, which Congress intended to be complete by 2005 but which remains under construction to this day.[14] The Tribe's delay in asserting its claims was induced both by the Federal Defendants' repeated assurances and by ongoing delays in the completion of the CUP.

201.    Moreover, the Federal Defendants' failure to complete the CUP and to fulfill the other trust obligations asserted herein constitute an unreasonable delays of agency action. Under 5. U.S.C. § 706(1) and related case law, the continuing-violation doctrine tolls claims alleging

---

[14] *See* status of CUP completion on Defendant USBR's website: https://www.usbr.gov/projects/index.php?id=498 (last visited on 1/18/2022).

unreasonable delay of agency action. *The Wilderness Soc. v. Norton*, 434 F.3d 584, 588 (D.C. Cir. 2006) (Section 706(1) imposes upon federal agencies an ongoing obligation to avoid unreasonable delay); *Appalachian Voices v. McCarthy*, 989 F. Supp. 2d 30, 44–46 (D.D.C. 2013) (same).

## STATEMENT OF CLAIMS
### FIRST CLAIM FOR RELIEF – (Against all Defendants)
### (Estoppel, Breach of Trust, Declaratory and Enforcement Relief)

202.    The Plaintiffs incorporate and re-allege all paragraphs and allegations in this Complaint as if fully set forth herein.

203.    The Tribe's *Winters* Reserved Water Rights were quantified in the 1960 Decker Report, as amended, based upon the practicably irrigable acreage ("PIA") within the Uintah and Ouray Reservation.

204.    To remove any legal impediment to federal funding for construction of the CUP, the Ute Tribe agreed to defer development of a portion of the Tribe's Group 5 Water Rights.  In return, the State and Federal Defendants promised, *inter alia*, to recognize the full quantity of Tribe's Water Rights appurtenant to the acreage comprising Groups 1-7 in the Decker Report, as amended, "without resort to litigation."  Deferral Agreement, p. 4, ¶ 4.

205.    Defendants' agreement to the Decker Report's quantification of the Tribe's water rights was not a mere concession to the Tribe; rather, Defendants' agreement was a necessary predicate for there to be a legally enforceable deferral of the Tribe's vested property rights (as opposed to a sham agreement and a fraud upon the U.S. Congress and American taxpayers).  In turn, the Deferral Agreement allowed the State and Federal Defendants to seek Congressional funding for the CUP by certifying to Congress that the State of Utah had an uncontested right to water in the Uinta Basin.

206.     At all times pertinent to the negotiation and execution of the Deferral Agreement, and in the years since, the United States, as the Tribe's trustee, was under a trust responsibility to act in the Tribe's best interest.  The United States, however, acting through the Federal Defendants, has consistently and egregiously failed to comply with its trust responsibilities to the Tribe and its members, and continues to do so.

207.     The State and CUWCD have continuously reaped the benefits of the Deferral Agreement from the date of its execution through the present; accordingly, Defendants are estopped from repudiating the quantification of the Tribe's Water Rights in the Agreement, as confirmed, "without resort to litigation."

208.     The Ute Tribe has never entered into arms-length negotiations with the parties to the Deferral Agreement, nor the United States Congress, to compromise the Tribe's rights under the Deferral Agreement.  Nor has the Tribe ever executed a written agreement that purports to settle, waive, or extinguish the Tribe's rights under the Deferral Agreement.

209.     The Ute Tribe has fully performed its obligations under the Deferral Agreement; however, the Defendants now refuse to recognize the quantification of the Tribe's Water Rights under the Agreement.

210.     Consequently, an actual controversy exists between the parties in relation to the Deferral Agreement and the question whether Defendants are estopped from repudiating their agreement to the Agreement's quantification of the Tribe's Water Rights.

211.     The controversy did not arise until mid-2012 at the earliest, during the course of the Tribe's negotiations with the State and Federal Defendants over the terms of a water compact that is a statutory requisite under CUPCA, Section 503(a) in order for Title V of CUPCA to be binding upon the Ute Tribe.  The Tribe's complaint was timely filed within six years thereafter.

212. The Tribe has no adequate administrative remedies because all potential administrative remedies for the wrongs alleged herein have been exhausted.

213. None of the Tribe's claims are time-barred because, under 5. U.S.C. § 706(1) and related case law, the continuing-violation doctrine tolls claims alleging unreasonable delay of agency action. *Wilderness Soc.*, 434 F.3d at 588; *Appalachian Voices*, 989 F. Supp. 2d at 44–46.

214. The Tribe seeks a declaration from this Court that (*i*) the 1965 Deferral Agreement would be void *ab initio* as a sham and a fraud but for its effect as a binding quantification of the Tribe's Water Rights; (*ii*) Defendants are estopped from repudiating the quantification of the Tribe's Water Rights under the Deferral Agreement; (*iii*) the United States has a trust obligation to defend the full quantity of the Tribe's Reserved Water Rights agreed to in the Deferral Agreement; and requests appropriate judicial enforcement under 28 U.S.C. § 2202.

## SECOND CLAIM FOR RELIEF – (Against the Federal Defendants)
### (Breach of Trust and Request for Enforcement: Storage of Tribal Water)

215. Plaintiffs incorporate and re-allege all paragraphs and allegations in this Complaint as if fully set forth herein.

216. Regardless of the status or interpretation of the 1965 Deferral Agreement, the Tribe's *Winters* Reserved Water Rights in the Lake Fork and Uinta Rivers were fully, fairly and conclusively adjudicated in the 1923 *Cedarview* and *Dry Gulch* decrees, and therefore, the Tribe's water rights in the Lake Fork and Uinta Rivers are *fully quantified* and have been fully quantified since 1923.

217. And the Federal Defendants instituted and litigated the *Cedarview* and *Dry Gulch* cases on the Tribe's behalf and in the Defendants' express capacity as the Tribe's federal trustee.

218. As stated *supra*, paragraphs 48-53, the Federal Defendants conceded in their *Cedarview* and *Dry Gulch* complaints that the Tribe's Treaties with the United States and the

Tribe's dependent status impose upon the Federal Defendants specific and enforceable trust duties to secure, protect, preserve and assist the Tribe in developing its *Winters* Reserved Water Rights—a judicial admission the Federal Defendants cannot now repudiate

219.     The Federal Defendants' purpose and intent in adjudicating the Tribe's *Winters* Reserved Water Rights in the Lake Fork and Uinta river basins was to secure water for delivery to Reservation lands through the UIIP—a purpose and intent that is manifest in the 1923 decrees themselves.

220.     At all times relevant, the Federal Defendants have exercised comprehensive, pervasive, elaborate, and exclusive control over (*i*) the Tribe's 1923 decreed *Winters* Reserved Water Rights, and (*ii*) the UIIP, both of which are trust assets beneficially owned by Ute Tribe.

221.     And as the Federal Defendants themselves conceded in their 1923 complaints in *Dry Gulch* and *Cedarview*, without water storage and related infrastructure, the Tribe's 1923 decreed natural flow water rights are insufficient for proper irrigation during periods when water available through natural flow is insufficient.

222.     An actual controversy exists because Federal Defendants have failed to provide storage facilities necessary to enable the Tribe and its members to utilize the Tribe's 1923-decreed water rights for proper and efficient crop irrigation throughout the entire irrigation season, a violation of Federal Defendants' statutory and trust obligations to enforce, protect, and preserve the Ute Indian Tribe's paramount rights to water.

223.     The Tribe has no adequate administrative remedies because all potential administrative remedies for the wrongs alleged herein have been exhausted.

224.    None of the Tribe's claims are time-barred because, under 5. U.S.C. § 706(1) and related case law, the continuing-violation doctrine tolls claims alleging unreasonable delay of agency action.  *Wilderness Soc.*, 434 F.3d at 588; *Appalachian Voices*, 989 F. Supp. 2d at 44–46.

225.    The Tribe is entitled to a decree requiring the Federal Defendants to immediately provide access to water storage infrastructure as needed to supplement its 1923 decreed *Winters* Reserved Water Rights and to allow delivery of sufficient irrigation water to all irrigable lands within the UIIP service area.  Alternatively, in the event existing storage infrastructure cannot be used to satisfy this purpose, a decree requiring Federal Defendants to construct storage infrastructure needed to satisfy this purpose.

### THIRD CLAIM FOR RELIEF

### (Estoppel, Breach of Trust, Interpretation of CUPCA, Declaratory and Enforcement Relief)

226.    Plaintiffs incorporate and re-allege all paragraphs and allegations in this Complaint as if fully set forth herein.

227.    In October 1992, Congress enacted the "Reclamation Projects Authorization and Adjustment Act of 1992," Pub. L. No. 1020-575, §§ 501-07, 106 Stat. 4600, 4650-55 (1992) ("1992 Reclamation Act").

228.    Included as "Titles II through VI" of the 1992 Reclamation Act was an Act that Congress statutorily denominated as the "Central Utah Project Completion Act," stating:

> Titles II through VI of this [1992 Reclamation] Act may be cited as the "Central Utah Project Completion Act".

Title II, Section 200(a).

229.    Title II, Sections 201(c) and 203 authorized construction of water storage and infrastructure facilities that would replace the Upalco and Uintah units that had been planned to

store Ute tribal waters. The Section 203 replacement project was denominated as the "Uinta Basin Replacement Project."

230.     Congress denominated Title V of the 1992 Reclamation Act as "Ute Indian Rights Settlement." In its legislative findings for Title V, Congress found that:

> Without the implementation of the plans to construct additional [water] storage in the Uinta Basin, the water users (both Indian and non-Indian) continue to suffer water shortages and resulting economic decline.

Title V, Section 501(a)(4).

231.     Section 503(a) makes reference to a proposed "*Revised Ute Indian Compact*" dated October 1, 1990. However, the Revised Compact itself is not attached to the Title V or the Act.

232.     In identifying the legislative purpose of Title V, the Act refers to the entire CUPCA Act—that is, to "Titles II through VI" of the 1992 Reclamation Act—and not simply to Title V. Congress also made clear that the "Revised Ute Indian Compact" dated October 1, 1990 was merely a "*proposed*" compact:

> (b) Purpose. This Act *and* the *proposed* Revised Ute Indian Compact of 1990 are intended to—
>
> (1)  quantify the Tribe's reserved water rights;
> (2)  allow increased beneficial use of such water; and
> (3)  put the Tribe is the same economic position it would have enjoyed had the features contemplated by the September 20 1965 [Deferral] Agreement been constructed.

Section 501(b). By this language Congress made clear that Title V's "Ute Indian Settlement" was to be read in *pari material* with Title II of the Act, and that the Ute Indian Settlement was to include water storage facilities and infrastructure that would "put the Tribe is the same economic position it would have enjoyed had the features contemplated by the September 20, 1965 [Deferral] Agreement been constructed." *Id*.

233.     At all times pertinent to the enactment and implementation of CUPCA, the United

States, as the Tribe's trustee, has been under a trust responsibility to act in the Tribe's best interest.

The United States itself, through the Federal Defendants, has affirmatively acknowledged and

assumed this trust responsibility to the Ute Tribe on multiple instances.  For example, in 1993—

the year following CUPCA's enactment—the Defendant DOI entered into a Cost-Sharing

Agreement for construction of the Uinta Basin Replacement Project—an Agreement that explicitly

recognizes that:

> [T]he Secretary [of Interior] is required to ensure that replacement features planned,
> designed and constructed for the Uintah and Upalco Units of the Central Utah
> Project are consistent with the Secretary's trust responsibilities to the Ute Indian
> Tribe on the Uintah and Ouray Indian Reservation….

August 11, 1993 Agreement between U.S. Department of Interior and the Central Utah Water

Conservancy District, p. 1, *see* ECF No. 83, pp. 68-74, incorporated herein.

234.     Two years later, in 1995, the Department of Interior issued a legal memorandum to

the Program Director for CUPCA captioned, "Storage of Indian Water Rights Water in the Uinta

Basin Replacement Project Facilities."  In that memorandum, the Federal Defendants openly

opined, *inter alia*, that:

- Ute tribal lands cannot be put to "productive use" "without storage of Indian
  waters as anticipated in the 1906 [UIIP] Project Act, the 1923 [*Dry Gulch* and
  *Cedarview*] Federal Court decrees and in the [1965] Deferral Agreement."

- Congress intended that Indian reserved water rights water for the 1906 [UIIP]
  Project be stored in CUPCA Section 201(1) and Section 203 replacement
  facilities.

- The State of Utah and the Central Utah Water Conservancy District and the
  United States recognized all Reservation tribal water rights (Groups 1 through
  7), with a priority date of October 3, 1861, for the Uinta Valley Reservation
  (Groups 1 through 5, which includes all 1906 [UIIP] Project lands), and
  accepted both flow and storage rights for reserved Indian water rights, *all
  without resort to litigation*.

- The Central Utah Project Completion Act, while terminating authorization for the Upalco and Uintah Units, authorized replacement facilities on a smaller scale but for the same purposes, including construction of facilities to provide for increased beneficial use of [Ute Indian] reserved water rights water. Because storage is the only means whereby this purpose can be accomplished for Indian water right lands, we conclude that it is a purpose of the CUPCA to store [Ute Indian] reserved water rights water.

"Storage of Indian Water Rights Water in the Uinta Basin Replacement Project Facilities," U.S. Depart of the Interior Memorandum to the Program Director, Central Utah Project Completion Act, Office of the Secretary, dated October 13, 1995 (emphasis added), ECF No. 83, pp. 75-94, incorporated herein.

235.    In 1996, the Federal Defendants, submitted a "Certification of Indian Water righted lands," certifying that lands irrigated by the Tribe's *Winters* Reserved Water Rights would be served by construction of the Uinta Basin Replacement Project.  *See* ECF No. 84, pp. 120-22, incorporated herein.

236.    When it enacted CUPCA, Congress made clear that the Title V Ute Indian Settlement was subject to multiple contingencies.  For instance, Section 503(a) states that the Revised Ute Indian Compact is "*subject to re-ratification by the State [of Utah] and the [Ute] Tribe.*"  Yet, to this day, the *proposed* Revised Ute Indian Compact of October 1, 1990 has never been ratified "by the State [of Utah] and the [Ute] Tribe," as required by Section 503(a).  And no provision has been made for the Ute Tribe to benefit from the water storage facilities that were authorized and built under Title II of the 1992 Reclamation Act.

237.    Instead, the United States, acting through the Federal Defendants, has consistently and egregiously failed to comply with its trust responsibilities to the Tribe and its members, and continues to do so.

238.    An actual controversy exists between the parties over the interpretation and implementation of Titles II and V of the CUPCA.  The Ute Tribe first became aware of this controversy in mid-2012 during the course of the Tribe's negotiations with the Federal and State Defendants over the terms of the "proposed revised" water compact that is a statutory requisite of CUPCA Section 503(a) in order for Title V of CUPCA to be binding upon the Ute Tribe.

239.    Although Section 507 of CUPCA purports to provide the Tribe's "waiver" of claims relating to the United States' failure to construct the Uintah, Upalco, and Ute Indian Units of the CUP, any such waiver was expressly contingent upon (*i*) the Tribe's "receipt of the section 504, 505, and 506 moneys"; (*ii*) ratification of the Congressionally-revised "*proposed*" Ute Indian Compact of 1990, Title V, Section 503(a); and (*iii*) construction of CUPCA Section 201(1) and Section 203 replacement facilities to include water storage and related infrastructure for Ute tribal waters.  None of these conditions have been satisfied.

240.    The Tribe has never received the 504, 505, and 506 moneys for the purpose of effectuating the Section 507 "waiver," and the funds under Sections 504 and 505 have not been properly placed into trust for the benefit of the Tribe, nor have they been treated as trust funds by the Federal Defendants.  There also has never been a ratification of the "*proposed Revised Ute Indian Compact of 1990*," CUPCA, Title V, Sections 501(b) and 503(a), by all parties; and the CUPCA Section 201(1) and Section 203 replacement facilities do not store Ute Indian reserved water right waters.  Accordingly, there has been no effective "waiver" under Section 507 of the CUPCA.

241.    Alternatively, even if the Section 507 "waiver" is legally efficacious, that "waiver" is limited to the Tribe's contract-based claims arising from the Federal Defendants' failure to construct the Uintah, Upalco, and Ute Indian Units in the ultimate phase of the CUP; the Section

507 waiver does not negate the Federal Defendants' duty to provide water storage for the Tribe in the CUPCA Section 201(1) and Section 203 replacement facilities.

242.     Alternatively, as detailed *supra*, paragraphs 157-62, Title V of CUPCA is unenforceable because it was based on a mutual mistake of fact that makes it impossible to ever achieve the express Congressional purposes of (*i*) permitting increased beneficial use of the Tribe's Reserved Water Rights, and (*ii*) putting the Tribe "in the same economic position it would have enjoyed had the features contemplated by the September 20, 1965 Agreement been constructed."

243.     Alternatively, Title V of CUPCA is unconscionable and, hence, unenforceable, and the purported "settlement" under Title V instead constitutes an uncompensated taking of tribal property

244.     The Tribe has no adequate administrative remedies because all potential administrative remedies for the wrongs alleged herein have been exhausted.

245.     None of the Tribe's claims are time-barred because, under 5. U.S.C. § 706(1) and related case law, the continuing-violation doctrine tolls claims alleging unreasonable delay of agency action. *Wilderness Soc.*, 434 F.3d at 588; *Appalachian Voices*, 989 F. Supp. 2d at 44–46.

### FOURTH CLAIM FOR RELIEF - (Against the Federal Defendants)
### (Breach of Trust and Enforcement Relief: UIIP Rehabilitation)

246.     Plaintiffs incorporate and re-allege all paragraphs and allegations in this Complaint as if fully set forth herein.

247.     As detailed *supra*, paragraphs 48-73, at all times relevant Federal Defendants have exercised comprehensive, pervasive, elaborate, and exclusive control over the administration of the UIIP, including operation and maintenance of UIIP infrastructure.

248.     The UIIP has fallen into a state severe disrepair at the hands of the Federal Defendants, resulting in suboptimal efficiency in delivering the Tribe's federally-decreed tribal

waters to irrigable lands within the UIIP service area. This has rendered the UIIP completely incapable of delivering tribal water to certain irrigable lands within the Uintah and Ouray Reservation, resulting in those lands being classified as temporarily or permanently non-assessable.

249. The UIIP's suboptimal efficiency, resulting from the Federal Defendants' inadequate maintenance, has resulted not only in diminished crop cultivation on the Uintah and Ouray Reservation, but also in tribal water going unused and flowing off-reservation where it is used by non-Indian water users with no compensation to the Tribe.

250. The Tribe has no adequate administrative remedies because all potential administrative remedies for the wrongs underlying its claims herein have been exhausted.

251. None of the Tribe's claims are time-barred because, under 5. U.S.C. § 706(1) and related case law, the continuing-violation doctrine tolls claims alleging unreasonable delay of agency action. *Wilderness Soc.*, 434 F.3d at 588; *Appalachian Voices*, 989 F. Supp. 2d at 44–46.

252. Pursuant to the Federal Defendants' unsatisfied fiduciary duty to operate and maintain the UIIP with care and prudence, the Tribe is entitled to a decree directing the Federal Defendants to rehabilitate the UIIP infrastructure as required in order to reinstate optimal efficiency in delivering tribal water to irrigable lands on the Uintah and Ouray Reservation.

## FIFTH CLAIM FOR RELIEF – (Against all Federal Defendants)
### (Imposition of Constructive Trust – Midview Exchange Agreement)

253. Plaintiffs incorporate and re-allege all paragraphs and allegations in this Complaint as if fully set forth herein.

254. As detailed s*upra*, paragraphs 110-124, in return for Defendant BIA's conveyance of the Tribe's *Winters* Reserved and federally-decreed water rights to Defendant USBR, the Midview Exchange Agreement provided for the Ute Tribe to have beneficial ownership of the

Midview Dam and Reservoir, Duchesne Diversion Dam, Duchesne Feeder Canal, and Midview Lateral, together will all facilities and property appurtenant thereto ("Midview Property"). The Midview Property was to be administered by the BIA as part of the UIIP, a tribal trust asset. In contravention of this Agreement, Federal Defendants have never transferred title to the Midview Property into trust for benefit of the Tribe.

255.    The Indian Non-Intercourse Act ("NIA"), 25 U.S.C. § 177, provides that "No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." The United States Supreme Court has found that the "obvious purpose" of the NIA is "to prevent unfair, improvident or improper disposition by Indians of lands owned or possessed by them to other parties, except the United States, without the consent of Congress." *Federal Power Commission v. Tuscarora Indian Nation*, 362 U.S. 99, 119 (1960).

256.    25 U.S.C. § 177 applies to the Midview Exchange Agreement because the tribal waters "exchanged" therein consist of the Tribe's federally-decreed water rights in the Lake Fork River which constitute tribal property.

257.    The Midview Exchange Agreement violates 25 U.S.C. § 177 because the United States Congress never vested Defendants BIA and USBR with authority to permanently alienate the Tribe's *Winters* reserved and federally-decreed water rights. Nor did Congress ever consent to the Midview Exchange Agreement. Nor did Congress ever consent to the Tribe's *Winters* reserved and federally-decreed water rights being alienated from the Tribe for use by non-Indians.

258.    As the Tribe's trustee, Federal Defendants were charged with a duty of honesty and good faith dealing. Federal Defendants knew, or should have known, that the Exchange

Agreement was an illegal conveyance of tribal property and that it was not in the Tribe's best interest. Yet, the Federal Defendants induced the Tribe into executing the Agreement based on promises they made to the Tribe that were false and illusory. As the trust beneficiary, the Tribe was entitled to, and did, reasonably place its trust and reliance in the Federal Defendants' superior knowledge and sophistication—the Tribe had no reason to know or suspect that the Agreement violated 25 U.S.C. 177, or that the Agreement was not in the Tribe's best interest. The Federal Defendants' actions as trustee were constructively fraudulent, entitling the Tribe to the imposition of a constructive trust on the Tribe's federally-decreed water right that were illegally alienated under the Exchange Agreement. *E.g., Tenneco Oil Company v. Joiner*, 696 F.2d 768, 775 (10th Cir. 1982) (a constructive trust will be imposed where a fiduciary relationship exists and the fiduciary violates the "duty of loyalty and honesty which the relationship demands.").

259. Plaintiffs' claims are not time barred because (*i*) the Federal Defendants concealed material facts relating to their egregious breach of trust, and (*ii*) the Tribe did not discover these material facts until 2014. The Tribe exhausted its administrative remedies in 2016.

260. The Tribe seeks (*i*) a declaration from this Court that the Midview Exchange Agreement is illegal and void *ab initio* under 25 U.S.C. § 177 and (*ii*) appropriate judicial enforcement under 28 U.S.C. § 2202, including the imposition of a constructive trust on the Tribe's federally-decreed water rights that were illegally exchanged.

### SIXTH CLAIM FOR RELIEF – (Against all Federal Defendants)

### (Alternatively, Enforcement of Midview Exchange Agreement)

261. Plaintiffs incorporate and re-allege all paragraphs and allegations in this Complaint as if fully set forth herein.

262. Alternatively, to the Fifth Claim for Relief, the Tribe seeks a declaration that the Tribe is entitled to specific performance under the Midview Exchange, including, without limitation, the transfer of the Midview Property into trust for the benefit of the Tribe as part of the UIIP.

### SEVENTH CLAIM FOR RELIEF – (Against the Federal Defendants)
### (Estoppel, Breach of Trust, Declaratory and Enforcement Relief -
### Obligations Relating to Bottle Hollow Reservoir)

263. Plaintiffs incorporate and re-allege all paragraphs and allegations in this Complaint as if fully set forth herein.

264. Section 505(c) of the CUPCA appropriated federal funds for the specific purpose of decontaminating Bottle Hollow Reservoir and securing a minimum flow of water to Bottle Hollow Reservoir to make it a "suitable habitat for a cold-water fishery."

265. Congress's intent in including this provision was to instruct Federal Defendants of certain specific measures that had to be taken to mitigate the adverse environmental impacts that the CUP had and would continue to have on the Ute Indian Tribe.

266. Section 505(c) of the CUPCA not only established a statutory obligation on the part of Federal Defendants, but also provided further definition to Federal Defendants' fiduciary obligations toward the Tribe and its members.

267. Nonetheless, an actual controversy exists because Federal Defendants have not secured a water right to Bottle Hollow for the benefit of the Tribe, as required under Section 505(c) of the CUPCA and Federal Defendants' fiduciary obligations.

268. The Tribe has no adequate administrative remedies because all potential administrative remedies for the wrongs alleged herein have been exhausted.

269.     None of the Tribe's claims are time-barred because, under 5. U.S.C. § 706(1) and related case law, the continuing-violation doctrine tolls claims alleging unreasonable delay of agency action. *Wilderness Soc.*, 434 F.3d at 588; *Appalachian Voices*, 989 F. Supp. 2d at 44–46.

270.     The Tribe is entitled to (*i*) a declaration from this Court Federal Defendants have an ongoing statutory and fiduciary obligation to secure water rights in the Bottle Hollow reservoir sufficient to enable the Bottle Hollow Reservoir to be used as a cold water fishery, and (*ii*) appropriate judicial enforcement under 28 U.S.C. § 2202.

## EIGHTH CLAIM FOR RELIEF – (against the Federal Defendants)
## (Request for Accounting)

271.     Plaintiffs incorporate and re-allege all paragraphs and allegations in this Complaint as if fully set forth herein.

272.     Both the UIIP and the Tribe's Reserved Water Rights are held by the United States in trust for the benefit of the Ute Indian Tribe and its members.

273.     Federal Defendants have a trust obligation to keep the beneficiaries apprised of the disposition of the trust corpus, including information showing how Federal Defendants have exercised their statutory authority over the management and administration of both monetary and non-monetary trust assets.

274.     In spite of this duty, Federal Defendants have not provided an historical accounting apprising the Tribe of its activities impacting the trust corpus of its Reserved Water Rights, nor have Federal Defendants provided an historical accounting of its administration - including repair, maintenance, and rehabilitation - of the UIIP.  No accounting had been provided as of the date this Complaint was filed.

275.     The Tribe's right to an accounting was not waived and released under a 2012 settlement in *Ute Indian Tribe of the Uintah and Ouray Reservation v. United States,* No. 06-866

L (Fed Cl December 19, 2006), because the 2012 Settlement Agreement expressly preserved the Tribe's claims based on the federal government's failure to "establish, acquire, enforce, or protect" the Tribe's water resources. Alternatively, Section 6(a) of the Settlement Agreement entitles the Tribe to request an accounting of its trust assets in the years "after," or since, the March 18, 2012 execution of the Settlement Agreement.

276. The Tribe has no adequate administrative remedies because all potential administrative remedies have been exhausted.

277. None of the Tribe's claims are time-barred because, under 5. U.S.C. § 706(1) and related case law, the continuing-violation doctrine tolls claims alleging unreasonable delay of agency action. *Wilderness Soc.*, 434 F.3d at 588; *Appalachian Voices*, 989 F. Supp. 2d at 44–46.

**NINTH CLAIM FOR RELIEF (Against the Federal Defendants)**

**(Violation of the APA and Breach of Trust: Green River Block Exchange Contract)**

278. Plaintiffs incorporate and re-allege all paragraphs and allegations in this Complaint as if fully set forth herein.

279. USBR's execution of the GRBE Contract in 2019 and commitment to be legally bound by its terms is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law because (i) it contradicts federal law and policy requiring the United States to recognize tribal trust corpus and act in manner consistent with its trust duties to the Tribe and (ii) it is premised on a legally indefensible assumption that the State of Utah's unperfected apportionment of Colorado River water can be freely alienated and transferred.

280. As statutory authority for the GRBE, the above-named Defendants rely on Section 14 of the Reclamation Project Act of 1939, 43 U.S.C. § 389, which authorizes the Secretary to "enter into such contracts for exchange or replacement of water, water rights, or electric energy or

for the adjustment of water rights, as in his judgment are necessary and in the interests of the United States..."

281. In spite of USBR's characterization of the GRBE as an "exchange" involving existing water rights held by the State, the water "rights" that are the subject of the GRBE are not legally recognized water rights at all.

282. First, the State water "right" that the State has agreed to forbear under the GRBE is nothing more than an unproven, unperfected quantity coming from the State's apportionment of water from the Colorado River System under the 1948 Upper Colorado River Basin Compact. The Upper Colorado River Basin Compact does not vest the State of Utah with presently perfected water rights in the Green River or its tributaries. The entire premise of this forborne State water "right" is the incorrect and wholly unfounded assumption that Article XV(b) of the Upper Colorado River Basin Compact, which merely confirms the states' administrative authority over their respective apportionments of water from the Colorado River system, establishes a perfected and quantified water right for the State of Utah in the Green River.

283. Even assuming, *arguendo*, that the State of Utah possesses a "right" that could be exchanged, the State's right is, at most, a right to "run of the river flows" on the Green River and its tributaries. A run of the river flow fluctuates both in time and space, meaning the water right is unpredictable and can be quite erratic seasonally and yearly. What the GRBE Contract purports to do is to exchange an undependable run of the river flows (what Utah would otherwise have) to a highly dependable stored water right, making the State's water rights, if any, more dependable and, hence, superior to the Ute Tribe's 1861 and 1882 Reserved Water rights.

284. Furthermore, quantifying the State of Utah's "entitlement" to Green River water under the Upper Colorado River Basin Compact cannot be accomplished without first accounting

for the present perfected water rights in the Green River, including the *Winters* Reserved Water Rights of the Ute Indian Tribe. No such accounting took place prior to the execution of the GRBE Contract, and no such accounting has taken place to date.

285. The other State water "right" under the GRBE – that which was assigned to the State in 1996 – is likewise unproven and unperfected and thus not a legally recognizable water right. BOR's 1996 Assignment did not vest the State of Utah with any current, perfected water rights that could be "exchanged." All the State of Utah received under this 1996 Assignment was the "undeveloped and unperfected portion of" the water right that USBR had filed with the State of Utah in anticipation of the Ultimate Phase of CUP. Assignment of Water Right No. 41-3479 (March 12, 1996).

286. Because there are no legally recognized water rights comprising the "exchange" under the GRBE, the GRBE is a sham contract that gives the state a reliable stored water supply, at the expense of the Tribe and its ongoing water storage needs, without legal authority under 43 U.S.C. § 389 or any other authorizing statute.

287. Even if there was legally recognized and transferrable property right to an unperfected portion of the State of Utah's apportionment of Colorado River water, it is arbitrary and capricious for the Tribe's trustee to put such a transfer into effect without first accounting for the Tribe's senior priority, present perfected water rights that exist separate from, senior to, and independent of the interstate apportionment of water under the Colorado River Compact. As Defendants acknowledge in the Final EA for the GRBE Contract, it is Department of Interior policy to "identify, protect, and conserve the trust resources of federally recognized Indian tribes and … to consult with tribes on a government-to-government basis whenever plans or actions affect tribal trust resources, trust assets, or tribal safety" Final EA § 3.3.13 (citing Department

Manual, 512 DM 2).  As Defendants further acknowledge in the Final EA, Defendants' Indian Trust Asset ("ITA") policy required that "[a]ll impacts to ITAs, even those considered nonsignificant, must be discussed in the trust analysis in NEPA compliance documents and appropriate compensation or mitigation must be implemented."  Final EA § 3.3.13.

288.    The Final EA states that the Ute Indian Tribe "*will* have a water right with a priority date of 1861 to natural flows in the Green River" only once the Ute Tribe has executed a compact with the State of Utah and the United States that includes a quantification of the Tribe's *Winters* reserved water rights.  Final EA § 3.13.2 (emphasis added).

289.    This statement, by the Tribe's Federal trustee, is legally incorrect, and it fundamentally misapprehends and misrepresents the status of the Tribe's *Winters* Reserved Water Rights in at least two respects.  First, the statement demonstrates Defendants' incorrect assumption that the Tribe's Reserved Water Rights will not be quantified until a Compact is signed, notwithstanding that the Tribe's Reserved Water Rights have already been quantified under (i) the 1923 decrees and (ii) the Decker Report, which the parties stipulated to be binding "without resort to litigation" in the 1965 Deferral Agreement.  Second, the statement suggests that the Tribe does not even possess *Winters* Reserved Water Rights in the first instance until a compact with the U.S. and State of Utah is executed.  That erroneous assumption is directly contrary to controlling U.S. Supreme Court precedent which recognizes that Indian reserved water rights under the *Winters* doctrine are "present perfected" rights that become vested upon the date the Indian reservation is established.  *Arizona v. California*, 373 U.S. 546, 600 (1963).

290.    Defendants failed to consult with the Tribe in identifying Tribal trust assets, as required under the policies cited in the Final EA.  Had Defendants complied with the Federal Government's own policies and properly consulted with the Tribe, Defendants would have been

68

alerted to Defendants' legal errors relating to Defendants' mischaracterization of the current vested and quantified status of the Tribe's *Winters* Reserved Water Rights.

291.     In addition, the Defendants' decision to enter into the GRBE Contract cannot be "necessary and in the interests of the United States," as required under 43 U.S.C. § 389, because the GRBE violates the Defendant's responsibilities as trustee to the Ute Indian Tribe by prioritizing the stored water needs of the State of Utah over the severe, longstanding, and well-documented storage needs of the Ute Indian Tribe.

292.     As outlined *supra*, the Tribe's federal trustee has continuously failed to provide the requisite storage facilities – or the means to procure the requisite storage facilities – for over a century.  Flaming Gorge Dam and Reservoir were created, in part, to supply water for the Ute Indian Unit, which was planned as part of the ultimate phase of the Central Utah Project, to provide Green River water to support the Uintah and Upalco Units in supplying supplemental irrigation water to the Tribe and to thereby meet the Tribe's irrigation needs in the Lake Fork and Uinta River Basins.  Unfortunately, Defendants abandoned the Ute Indian Unit, and hence, the planned Tribal benefits from Flaming Gorge Dam and Reservoir never came to fruition.  Today, the Tribe's need for water storage remains unmet, and the Tribe's lack of storage continuously results in fully vested Tribal water flowing off the Reservation with no economic benefit to the Tribe and its members.

293.     Instead of utilizing federally-administered storage infrastructure to help meet the needs of its Tribal beneficiary, the Federal Defendants have conspired with the State of Utah to limit the water storage that is available to the Tribe in order for the Tribe to derive economic benefit from the Tribe's senior-priority, present perfected water rights.

294.    In entering into the GRBE Contract Defendants have granted the State of Utah not just a right to stored water in Flaming Gorge, but also the right to administer water releases from Flaming Gorge, thus removing administrative control from the Tribe's trustee and giving control over Flaming Gorge water releases to a party whose interests are adverse to those of the Tribe.

295.    USBR's (i) failure to recognize vested tribal water rights as trust assets and (ii) outright disregard for its longstanding trust duties to the Tribe, whether viewed separately or in conjunction with one another, are alone sufficient to show that USBR's execution of the GRBE Contract was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

296.    Based on the foregoing, the Defendants' execution and implementation of the GRBE is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706, and the GRBE Contract should be declared a legal nullity.

### TENTH CLAIM FOR RELIEF (Against the Federal Defendants)
### (Violation of the APA and NEPA: Green River Block Exchange Contract)

297.    Plaintiffs incorporate and re-allege all paragraphs and allegations in this Complaint as if fully set forth herein.

298.    Pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370, and its implementing regulations, federal agencies are required to prepare an Environmental Impact Statement ("EIS") for any major federal action that may significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.4, 1508.3. "Affecting" means that a federal action will or *may* have an effect. "Significant" includes consideration of context and intensity and both short-term and long-term impacts. 40 C.F.R. § 1508.27.

299.    The intensity or severity of the impact must be evaluated in light of various factors including, *inter alia*, the unique characteristics of the geographic area and proximity to historic or

cultural resources, whether the action may have uncertain or unknown risks; the degree to which the action may establish precedent for future similar actions; and whether the action may adversely affect or cause loss or destruction or destruction of significant scientific, cultural, or historic resources. 40 C.R.R. §§ 1508.27.

300. A federal action that will or *may* affect an Indian tribe's ability to access and develop its *Winters* Reserved Water rights is an action that significantly affects the quality of the human environment within the meaning of 42 U.S.C. § 4332(2)(C), and its implementing regulations, 40 C.F.R. § 1502.4 and § 1508.3.

301. An agency's failure to prepare an EIS violates NEPA if the agency failed to meet any one of the following factors:

(1) the agency failed to take a "hard look" at the problem;
(2) the agency failed to identify relevant areas of environmental concern;
(3) as to problems the agency identified and studied, the agency failed to make a convincing case that the impact on the human environment was insignificant; or
(4) if there is an impact of true significance, the agency failed to convincingly establish that changes to the project would sufficiently reduce the impact to a minimum.

*Sierra Club v. Peterson*, 717 F.2d 1409, 1413 (D.C. Cir. 1983).

302. While any one of the foregoing factors is sufficient to invalidate an agency's action for failing to undertake an EIS, here the Federal Defendants have failed to satisfy *any* of the above factors.

303. Defendants failed to take a "hard look" at the existing and future projected water supply and demands on the Green River and the Colorado River, and their tributaries. The Colorado River Basin is currently over-allocated, meaning that more water is currently being diverted from the system than is being replenished into the system in most years. As depicted on

the chart below, Defendant USBR's own estimated natural flow data shows the Colorado River's water supply at Lee's Ferry has decreased by an average of 34,000 acre-feet/per year over the past 110 years:



Figure 1: USBR Natural Flow Data for the Colorado River at Lee's Ferry with a linear trend line. This decreasing trend of average annual flow in the Colorado River is also acknowledged in Defendant USBR's Colorado River Water Supply and Demand Report, published in 2012.[15] More recent scientific studies predict that water levels in streams and rivers in the western U.S. will continue to decline at even more aggressive rates due to warming temperatures and earlier

---

[15] This report is a a matter of public record, available at
https://www.usbr.gov/lc/region/programs/crbstudy/finalreport/index.html.
(last visited on 1/19/2022).

snowmelt and soil thaw.[16]  Indeed, Defendant USBR's sister agency, the U.S. Fish and Wildlife Service—the federal agency vested with authority over endangered plant and animal species— questioned Defendants USBR's failure to consider declining water supplies as a matter of concern in its comments on the Draft GRBE EA:

> Reclamation's modeling is based on the 1906 through 2015 hydrologic record, with no consideration of hydrologic changes or tends associated with warming temperatures.  Is it realistic to assume that the upper Colorado River basin hydrology in the future will look like that of the past, given recent research suggesting otherwise?[17]

Attachment C, USFWS letter of 11/1/2018, p. 2.

304.    In failing to take a "hard look" at the existing and future projected water supply and demands on the Green and the Colorado Rivers, the Federal Defendants also failed to take a "hard look" at the potential impacts to the environment of the Uintah and Ouray Indian Reservation in relation to the Tribe's senior-priority, present perfected *Winters* Reserved Water Rights to the natural flow of the Green River and its tributaries.  At most, Defendants' Final EA and FONSI reflect an improperly cursory and perfunctory consideration of potential impacts on the availability of the full quantity of the Tribe's senior-priority Green River water rights.

305.    Relying on circular logic— i.e., "if the premise is true, then the conclusion must be true"—the Final EA suggests, summarily, that due to the senior priority of the Tribe's *Winters* Reserved Water Rights, "The Proposed Action would not affect senior water rights, including the Ute Tribe's 1860 and 1861 priority date water rights."[18]  But even if Defendants' entirely

---

[16] Earlier Snowmelt Decreases Streamflow, Reduces Forests' Ability to Regulate Atmospheric Carbon Dioxide, published on 8/3/2016 by the National Science Foundation and available to the public at https://www.nsf.gov/news/news_summ.jsp?cntn_id=189304, (last visited on 1/19/2022).

[17]  At https://www.usbr.gov/uc/envdocs/ea/20190100-GreenRiverBlockWaterExchangeContract-FinalEAandFONSI-508-PAO.pdf, p. 175 (last visited on 1/19/2022).

[18] *Id.* at p. 4, ¶ 13.

speculative and conclusory statement were true, Defendants' tautology considers only the Tribe's 1860-61 Uintah Valley Reservation Water Rights. The Final EA fails altogether to consider—much less address—the potential impacts of the GRBE contract upon the Tribe's 1882 Uncompahgre Reservation Reserved Water Rights—water rights that are sourced *directly* from the Green River. Defendants thus failed to identify relevant areas of environmental concern.

306. In failing to acknowledge the Tribe's fully vested *Winters* Reserved Water Rights in the Green River and its tributaries, Defendants failed property to identify impacts upon the full availability of these waters as a relevant area of environmental concern.

307. In addition, Defendants failed altogether to determine whether there were any potential impacts on culturally significant natural resources on the Uintah and Ouray Reservation that rely on water flows from the Green River and its tributaries.

308. The Draft and Final EAs also failed to consider (*i*) the potential impacts to the environment that will or *may* result from Section 9(a) of the GRBE contract, which effectively gives the State of Utah administrative authority over releases of water from a *federal* reservoir, Flaming Gorge Reservoir; (*ii*) whether the action may have uncertain or unknown risks; and (*iii*) the degree to which the action may establish precedent for future similar actions.

309. Even as to the limited problems that Defendants properly identified and studied, Defendants failed to make a convincing case that the impacts of the GRBE Contract will be *insignificant*. 40 C.F.R. § 1508.27. To the contrary, Defendants relied on inadequate water supply and demand modeling to support its FONSI, failing to account for a 110-year trend of decreasing water supply in the Colorado River Basin, together with more recent scientific studies that raise red flags as to future water supplies. Defendant DOI's own U.S. Fish and Wildlife Service noted in its comments on the GRBE Draft EA that the Draft's characterization of the changes to flow

regime in the Green River as "insignificant" were not clearly supported and that the Draft EA did not provide adequate information on which to base the EA's conclusions:

> Much of the language contained within Section 3.3.1 (Hydrology) describes changes in Flaming Gorge [water] releases and Green River discharge in relative qualitative terms such as: "insignificant", "nearly identical", "almost identical", "slightly lower", "negligible", etc. None of these terms provide *quantitative* descriptions of the change that allow the reader to understand the magnitude of the change.
>
> It is unclear how 58,957 AF [acre feet] of additional releases from FG [Flaming Gorge] to offset Green River consumptive [uses] can be considered "essentially the same as" current releases, as this equates to roughly 300 [cubic feet per second] of additional releases over a 100-day irrigation season. Related, the Statement is made on page 11 that "no change in operations is being considered", which seems inconsistent with the EA analysis.

Attachment C, USFWS letter of 11/1/2018, p. 2. Because Defendants failed properly to recognize the potentially significant impacts of the GRBEB Contract, Defendants did not identify any changes to the GRBE Contract that could minimize these significant impacts.

310. Because the GRBE Contract is a major federal action for the purposes of NEPA, *see* 42 U.S.C. § 4332(2)(C), that may have significant impacts on the environment, Defendants violated NEPA in adopting a FONSI in reliance upon an EA. Because Defendants did not prepare an EIS, they have failed to comply with NEPA, and issuance of the FONSI is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" that must be "set aside" in accordance with the APA. 5 U.S.C. §§ 706(1), (2)(A).

## ELEVENTH CLAIM FOR RELIEF

### (By Tribe and Class Action Plaintiffs against all Defendants)

**(Breach of Trust and Denial of Due Process and Equal Protection under the Fifth and Fourteenth Amendments to the U. S. Constitution, 42 U.S.C. § 1983, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d)**

311. Plaintiffs incorporate and re-allege all paragraphs and allegations in this Complaint as if fully set forth herein.

312.     The Ute Indians of the Uintah and Ouray Indian Reservation constitute a distinct minority population based on their race, ancestry, ethnicity, national origin and religion.  Class Action Plaintiffs are members of that distinct minority.

313.     The creation of an Indian reservation generally involves the diminishment of a tribe's traditional homelands in return for a guarantee of permanent and protected territory, giving Indian tribes a property interest in their reserved waters that is recognized by implication in their federal reservation treaties.  *Winters*, 207 U.S. at 576, *see generally*, A. Dan Tarlock, *Law of Water Rights & Resources* § 9:38 (2016).  That is true of the Ute Indians who were forced to cede millions of acres of valuable land to the Federal government in the nineteenth century.  Therefore, the Tribe and its members are the beneficial owners of the Reserved Water Rights appurtenant to the Reservation as recognized in (*i*) the Tribe's treaties with the United States, (*ii*) the *1923 Dry Gulch* and *Cedarview* Decrees, and (*iii*) the 1965 Deferral Agreement.  The Tribe's reserved waters are a tribal asset beneficially owned in common by all Class Action Plaintiffs and members of the Tribe.

314.     Water is essential to life on earth, *see* Sandra Alters, *Biology:  Understanding Life* 39 (3d ed. 2000).  As recognized by the U.S. Congress in 1992, CUPCA Section 501(a)(4), without adequate water storage and related infrastructure, the Ute Tribe and its members are disadvantaged and suffer economically.

315.     Congress opened the original Uintah Valley Indian Reservation to non-Indian settlement under the Indian Appropriations Act of March 3, 1905, 33 Stat. 1048, 1069-1070.  The Act specifically authorized the President of the United States to "*set apart and reserve any reservoir site or other lands necessary to conserve and protect the water supply for the [Ute] Indians*." 33 Stat. at 1069-1070.  Pursuant to that authority, President Theodore Roosevelt issued

76

proclamations dated August 3, 1905 ("Proclamation 589"), and August 14, 1905 ("Proclamation 591"), reserving approximately 56,000 acres of tribal lands within the original Uintah Valley Indian Reservation for a "*reservoir site necessary to conserve the water supply for the Indians*." However, as described by the Honorable Bruce S. Jenkins in *Ute Tribe v. Utah*, those 56,000 acres of land were "*already under study by the U. S. Reclamation Service*" (the predecessor agency to Defendant USBR) as a reservoir site for non-Indians. *Ute Tribe v. Utah*, 521 F. Supp. at 1127. "The Reclamation Service offered to purchase the reserved Ute lands at $1.25 per acre for construction of a water reservoir for non-Indians. The offer was refused." *Id*. The Reclamation Service then went to Congress and secured legislation condemning the Indian lands for construction of a non-Indian water storage reservoir. That legislation, the Act of April 4, 1910, ch. 140, 36 Stat. 269, 285, terminated all "right, title and interest of the Indians" in the tribal lands and "passed" legal title to the tribal lands to the non-Indian "owners of the lands" that would be irrigated by the planned non-Indian storage reservoir—a reservoir known today as "Strawberry Reservoir." *Id*.

316. The events of 1905-1910 established an historical pattern of persistent racial animus and invidious discrimination on the part of the Defendants that continues to this day—animus and discrimination that is directed against the Ute Indians in order to benefit the majority white population of Utah. Collectively, the Defendants have engaged in a continuous and systematic practice of diverting scarce water resources and related infrastructure in Utah to benefit non-Indian water users at the expense of the Tribe, its members, and the Class Action Plaintiffs.

317. Nothing evinces racial animus more clearly than the intentional, purposeful and/or knowing diversion of water—a resource essential to life—and its related infrastructure away from a minority population in order to make that essential resource available for the primary or exclusive

benefit of the majority non-minority population.  Racial and ethnic animus of this stripe is what

has motivated nearly all racial and ethnic cleansing and genocidal campaigns that have been waged

against minority populations throughout human history.  Further, it is an incontrovertible fact of

American history that non-Indian greed for Indian land and Indian resources is what has motivated

nearly all, if not all, of the racial cleansing and genocidal campaigns that non-Indians in the United

States have waged against the Native Americans populations in the United States.  Plaintiffs allege

that it is racial and ethnic animus of this stripe that has motivated all of the wrongs Plaintiffs have

alleged in their complaint.  Such invidious discrimination on the part of the United States is a

betrayal and gross breach of the Federal government's trust obligations to the Tribe, its members,

and the Class Action Plaintiffs.  Such discrimination on the part of the State Defendants is

actionable under 42 U.S.C. § 1983, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §

2000d.

318.    The State of Utah does not deny the State's own sordid history based on this stripe

of racial and ethnic animus.  On a state website, the State of Utah admits:

> Growing frictions over land and resources led to Utah's most intense Mormon-
> Indian conflict, the Black Hawk War [of 1865-1867]. The Utes and their allies
> killed around 75 Anglos; the Mormons in return killed many Indians.

*See* Black Hawk War (utah.gov), incorporated herein, last visited on 1/19/2022.

319.    The only difference between the genocidal wars waged against Native Americans

in the nineteenth century and the present-day campaigns to strip Native Americans of their land

and resources is the tactics by which today's wars are waged.  As aptly articulated by American

historian Angie Debo:

> Every schoolboy knows that from the settlement of Jamestown to the 1870's Indian
> warfare was a perpetual accompaniment of American pioneering, but the second
> stage in dispossessing the Indians is not so generally and romantically known.  The
> age of military conquest was succeeded by the age of economic absorption, when

the long rifle of the frontiersman was displaced by the legislative enactment and court decree of the legal exploiter, and the lease, mortgage, and deed of the land shark.

Angie Debo, And Still the Waters Run, the Betrayal of the Five Civilized Tribes, preface (1940).

320. Utah Governor Spencer Cox is the State of Utah's chief executive officer. As such, Governor Cox is responsible for implementing state laws and overseeing the operation of the State's executive branch. It is Governor Cox's responsibility to insure that the State of Utah complies with federal laws, including the Ute Tribe's treaties with the United States.

321. Teresa Wilhelmsen, P.E., is the Utah State Engineer and Director of the Utah State Division of Water Rights. State Engineer Wilhelmsen is "responsible for the general administrative supervision of the waters of the state and the measurement, appropriation, apportionment, and distribution of those waters." UTAH CODE ANN. § 73-2-1(3)(a).

322. On information and belief, within the last four years and continuing through today, Governor Cox and State Engineer Wilhelmsen have participated in, adopted, and/or ratified one or more acts or omissions, taken under color of Utah state law, custom or practice, which acts or omissions are depriving the Ute Tribe and the Class Action Plaintiffs of the beneficial use of the Tribe's Reserved Water Rights in violation of the Plaintiffs' members' constitutional guarantees of due process and equal protection. These acts and/or omissions are an ongoing violation of constitutional and federal law. As an example, these acts include, without limitation, (1) the State of Utah's repudiation of the quantification of the Tribe's Reserved Water Rights under the 1965 Deferral Agreement; (2) the State's solicitation and approval of the Green River Block Exchange Contract, granting the State of Utah administrative authority over water releases from Flaming Gorge Dam and Reservoir; (3) the State of Utah's continued assertion of administrative jurisdiction over tribal waters inside the Tribe's Reservation in violation of Federal statutory and decisional

law, including, without limitation, the Tribe's Treaties of 1849, 1863 and 1865, and federal court rulings in the *Ute Tribe v. Utah* line of cases;[19] and (4) one or more actions taken in concert or collusion with one or more Federal Defendants and/or their officers to insure that no tribal waters are stored in CUP facilities or the CUPCA Section 201(1) and Section 203 replacement facilities. As an example, during the years 2011-2017, Federal Defendants and their agents and employees urged the Ute Tribe to develop proposals for storing tribal waters in CUP facilities; however, once the Tribe had developed such proposals, identifying what the Tribe believed to be open storage capacity in CUP facilities, the Federal Defendants would then, on information and belief, allocate that open storage capacity to the State of Utah and/or the state's political subdivisions or irrigation/conservancy districts.

323. Defendant USBR describes the Central Utah Project as the "largest water resources development program ever undertaken" in the State of Utah.[20]

324. Defendant CUWCD is a political subdivision of the State of Utah. Defendant CUWCD was the Utah state agency authorized by Congress under CUPCA § 202(D) to receive federal funds and to assume responsibility for completing construction of the CUP.

325. On August 11, 1995, Defendant CUWCD and Defendant Interior Department entered into an "Agreement for the Sharing of Costs Associated with Replacement Features for the Uintah and Upalco Units of the Central Utah Project" authorized by CUPCA Section 201(1) and Section 203 ("1995 CSA"). *See* ECF No. 34-1, p. 67, incorporated herein. On information and belief, the 1995 CSA was still in effect when the Ute Tribe instituted this lawsuit on March 8, 2018.

---

[19] *E.g., Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*, 773 F.2d 1087 (10th Cir. 1985) (en banc).

[20] USBR website, https://www.usbr.gov/projects/index.php?id=498. Last visited on 1/17/2022.

326.    The 1995 CSA states that more than $213,814,000.00 in federal dollars was available in 1995 for construction of the CUPCA Section 201(1) and Section 203 replacement facilities. *See* ECF No. 34-1, p. 69, Art. IV(D). Federal funding for the replacement facilities was later augmented.

327.    Therefore, the CUP was funded by hundreds of millions of dollars in federal tax dollars over several decades. Now, as acknowledged in the Final GRBE EA, construction of the CUP is "nearing completion."[21] No federal funding has been appropriated for any future construction and none of the CUP facilities were built to serve the irrigation and water storage needs of the Ute Indians. These actions and omissions violate the due process and equal protections guarantees under the Fifth and Fourteenth Amendments to the U.S. Constitution, 42 U.S.C. § 983, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d.

328.    Through the CUP, water security has been provided to the non-Indian residents of Utah, but no comparable water security has been provided for the Ute Indians of the Uintah and Ouray Reservation and the Class Action Plaintiffs. Instead, the Federal Defendants have adopted a systematic and continuous practice of administering their authority in a manner that favors non-Indian water users in Utah to the detriment of the Tribe and its members, resulting in the diminishment of the Tribe's Reserved Water Rights on the impermissible bases of race, ancestry, ethnicity, national origin, and religion.

329.    Defendants have thus conspired, or acted in concert, to divert water, water storage reservoirs, and related infrastructure *away* from the Ute Indians of the Uintah and Ouray Reservation and *towards*, to, and in favor of the non-Indian white-majority population of Utah.

---

[21] Final EA, p. 6 states, "The 'Initial Phase' of the CUP included four units, of which 3 have been fully constructed, with the remaining unit nearing completion."

Defendants have done so intentionally, or deliberately, or with the knowledge that their actions would result in the discriminatory deprivation of water and water-infrastructure resources to the Ute Tribe and its members and would inure exclusively or primarily to the benefit of the non-Indian white-majority population of Utah. In doing so, Defendants have acted with both a discriminatory purpose and a discriminatory effect. Defendants have done so continuously and systematically.

330. The GRBE Contract between Defendant USBR and the State of Utah is but the latest act of conspiracy, racial animus, and invidious discrimination on the part of the State and Federal Defendants.

331. The Defendants' actions have resulted in substantial and ongoing economic harm and losses to the Ute Tribe, its members, and the Class Plaintiffs.

332. The Federal Defendants' actions and inactions and their discriminatory management of tribal waters alleged herein is in direct violation of the United States' (*i*) trust duty of undivided loyalty to the Tribe and its members, (*ii*) its statutory duties under the Ute Treaties of 1849, 1863 and 1868, and the 1899 and 1906 Acts to, *inter alia*, preserve and protect the Ute Indian Tribe's "paramount rights" to waters flowing through the Tribe's reservation, and (*iii*) the due process and equal protection guarantees of the Fifth Amendment to the U.S. Constitution.

333. The State Defendants' actions alleged herein were undertaken under color of state law, custom or practice and violate the due process and equal protection guarantees of the Fourteenth Amendment to the U.S. Constitution, 42 U.S.C. § 1983, and 42 U.S.C. §§ 2000d.

334. Pursuant to Rule 23(a) of the Federal Rules of Civil Procedure, the Class Action Plaintiff Representatives may sue on behalf of all members of the Ute Indian Tribe because (a) the class, comprising of approximately 2,070 members, is "so numerous that joinder of all members

is impracticable"; (b) the present claim for relief invokes questions of law and fact common to the whole Class; (c) the claims of the Representatives are typical of the claims of the Class; and (d) the Representatives are elected through a democratic process by members of the Class and are duty bound by the Constitution of the Ute Indian Tribe to fairly and adequately protect the interests of the Class.

335.    Pursuant to Rule 23(b)(2), the present Class Action Claim can be maintained because the Defendants have "acted or refused to act on grounds that apply generally to the class" by engaging in a pattern of discriminatory conduct that deprives each member of the Class their constitutional guarantees of due process and equal protection.  Therefore, "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

336.    Pursuant to Rule 23(b)(3), the present Class Action Claim can be maintained because the Defendants' conduct in violation of the members' constitutional guarantees of due process and equal protection, as herein alleged, impact the Tribal membership at large based on their shared character as members of the Ute Indian Tribe.  Therefore, "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

337.    The Tribe and Class Action Plaintiffs seek declaratory and injunctive relief, together with monetary damages as permitted by law in an amount to be proven at trial.

**WHEREFORE, PLAINTIFFS PRAY FOR THE FOLLOWING RELIEF:**

1.    A decree requiring the Federal Defendants to fulfill their trust obligations arising under (1) the Treaties of 1849, 1863 and 1868; (2) the Defendants' pervasive and exclusive control over the Tribe's *Winters* Reserved Water Rights and the UIIP; and (3) other federal law set forth

herein by granting the declaratory, injunctive, and other equitable relief identified in the Tribe's First through Tenth Claims for Relief.

2.  A decree ordering the Federal Defendants to provide a full and complete historical accounting of the following items concerning their management of Tribal trust assets:

    a.  trust funds received from operation and maintenance fee assessments, carriage agreements, leases, and all other additional sources related to the UIIP, including all funds within the purview of Section 203(f) of the CUPCA;

    b.  deferred UIIP maintenance, rehabilitation, and repair, including without limitation an accounting of the UIIP's maintenance needs, when the UIIP's maintenance needs were discovered, what steps have been taken to address these needs, and justifications for the onset and accumulation of deferred maintenance;

    c.  TNA/PNA designations of lands within the UIIP service area, including without limitation the ownership status of said lands and the basis for such designations;

    d.  funds appropriated for the development of the Uintah Basin Replacement Projects, including any such funds reverted back to the Treasury and the basis for such reversion; and

    e.  water rights transfers performed by the Secretary or his/her delegates pursuant to the 1941 Act, including the ownership status of lands impacted by such transfers and any evidence of written consent from Indian landowners impacted by such transfers.

3.  A declaration that the Midview Exchange Agreement is illegal and void *ab initio* under 25 U.S.C. § 177, together with (*ii*) appropriate judicial enforcement under 28 U.S.C. § 2202, specifically, the imposition of a constructive trust on the Tribe's federally-decreed water rights

that were illegally exchanged.  Alternatively, the Tribe seeks a declaration requiring specific performance under the Midview Exchange Agreement, including, without limitation, the transfer of the Midview Property into trust for the benefit of the Tribe as part of the UIIP.

4.        A decree granting the declaratory and injunctive relief to remedy the Class Action Plaintiffs' deprivation of due process and equal protection under the law set forth herein.

5.        Monetary damages as permitted by law based on Defendants' unlawful acts and omissions identified herein.

6.        An award of costs and attorney fees to the extent permitted by law, including pursuant to 42 U.S.C. § 1988(b).

7.        Such other and further relief as the Court shall deem just and proper.

Dated: _____, ___, 2022.

PATTERSON EARNHART REAL BIRD
& WILSON LLP

*/s/*_____
Frances C. Bassett, *Pro Hac Vice*
Jeremy J. Patterson, *Pro Hac Vice*
Michael W. Holditch, *Pro Hac Vice*
Robert T. Lawrence, *Pro Hac Vice*
Joanne Harmon Curry, *Pro Hac Vice*
1900 Plaza Drive
Louisville, Colorado 80027
Phone:  (303) 926.5292
Facsimile:  (303) 926.5293
Email: fbassett@nativelawgroup.com
Email: jpatterson@nativelawgroup.com
Email: mholditch@nativelawgroup.com
Email: rlawrence@nativelawgroup.com
Email: jcurry@nativelawgroup.com

J. PRESTON STIEFF LAW OFFICES, LLC

/s/ _____
J. Preston Stieff (4764)
110 South Regent Street, Suite 200
Salt Lake City, Utah 84111
Telephone: (801) 366-6002
Email: jps@StieffLaw.com

*Counsel for Plaintiffs*