J. Preston Stieff
**J. PRESTON STIEFF LAW OFFICES, LLC**
311 South State Street, Suite 450
Salt Lake City, Utah 84111
Telephone: (801) 366-6002
Email: JPS@StieffLaw.com

Frances C. Bassett, *Pro Hac Vice*
Joanne H. Curry, *Pro Hac Vice*
Jeremy J. Patterson, *Pro Hac Vice*
Michael W. Holditch, *Pro Hac Vice*
**PATTERSON EARNHART REAL BIRD & WILSON LLP**
1900 Plaza Drive
Louisville, Colorado 80027
Telephone: (303) 926-5292
Facsimile: (303) 926-5293
Email: fbassett@nativelawgroup.com
Email: jcurry@nativelawgroup.com
Email: jpatterson@nativelawgroup.com
Email: mholditch@nativelawgroup.com

*Attorneys for Plaintiffs*

---

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF UTAH

| | |
|---|---|
| UTE INDIAN TRIBE OF THE UINTAH & OURAY RESERVATION, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF INTERIOR, ET AL., <br><br> Defendants. | **PLAINTIFFS' MOTION FOR** <br><br> **JUDICIAL NOTICE** <br><br><br> Civil Case No. 2:21-CV-00573-JNP-DAC <br><br> Judge Jill N. Parrish <br><br> Magistrate Judge Daphne A. Oberg |

Pursuant to Rule 201(d) of the Federal Rules of Evidence, Plaintiffs, the Ute Indian Tribe of the Uintah and Ouray Reservation and affiliated parties ("Tribal Plaintiffs"), ask the Court to take judicial notice of the documents attached to this motion, which Plaintiffs plan to discuss during the court hearing this week on Friday, September 1, 2023.

Rule 201(d) provides for judicial notice to be taken at "*any stage of the proceeding*." Plaintiffs ask the Court to judicially notice the materials attached to this motion:

1) Sections 1 and 2 of the Title VI Legal Manual, compiled by the United States Department of Justice, Attachment A.[1]

2) "What is Environmental Racism," an article published on May 24, 2023, by the Natural Resources Defense Council, Attachment B.[2]

3) Executive Order 14096 issued by President Biden on April 21, 2023, captioned Executive Order on Revitalizing Our Nation's Commitment to Environmental Justice for All, Attachment C.[3]

## LEGAL ARGUMENT

Rule 201(d) provides for judicial notice to be taken at "any stage of the proceeding." *E.g., Pueblo of Sandia v. United States*, 50 F.3d 856, 862 n.6 (10th Cir. 1995) (taking judicial notice of governmental correspondence for the first time on appeal). Judicial notice of governmental publications and executive orders is commonplace. *E.g.,*

---

[1] Available online at https://www.justice.gov/crt/fcs/T6manual (last visited on 8/30/2023).

[2] Available online at https://www.nrdc.org/stories/environmental-justice-movement (last visited on 8/30/2023).

[3] Available online at https://www.federalregister.gov/documents/2023/04.26.2023-08955/revitalizing-our-nations-commitment-to-environmental-justice-for-all (last visited on 8/30/2023).

*Massachusetts v. Westcott*, 431 U.S. 322, 323 n.2 (1977) (judicial notice of federal records); *Clapper v. Flynn*, 605 F.2d 519, 535 (10th Cir. 1979) (judicial notice of governmental reports).   Newspaper articles and similar materials are also subject to judicial notice.   *E.g., Norton v. SUWA*, 542 U.S. 55, 60 (2004) (referring to newspaper article and press release from the Motorcycle Industry Council); *Rapanos v. United States*, 547 U.S. 715, 769 (2006) (Kennedy, J., concurring opinion) (referring to newspaper articles).

When, as here, a party asks a court to take judicial notice of adjudicative facts and supplies the court with the necessary information, Evidence Rule 201 (c)(2) requires the court to comply with the request.   *Zimomra v. Alamo Rent-A-Car, Inc.*, 111 F.3d 1495, 1504 (10th Cir. 1997).

WHEREFORE, based on the facts and authorities cited herein, the Plaintiffs respectfully request that the Court take judicial notice of the materials submitted to the Court under Evidence Rule 201, attached hereto as <u>Attachments A, B and C</u>.

Respectfully submitted this 30th day of August, 2023.

PATTERSON EARNHART REAL BIRD
& WILSON LLP

*/s/ Frances C. Bassett*
Frances C. Bassett, *Pro Hac Vice*
Joanne H. Curry, *Pro Hac Vice*
Jeremy J. Patterson, *Pro Hac Vice*
Michael W. Holditch, *Pro Hac Vice*
1900 Plaza Drive
Louisville, Colorado 80027
Telephone: (303) 926-5292
Facsimile: (303) 926-5293
Email: fbassett@nativelawgroup.com
Email: jcurry@nativelawgroup.com
Email: jpatterson@nativelawgroup.com
Email: mholditch@nativelawgroup.com

J. PRESTON STIEFF LAW OFFICES, LLC

*/s/ J. Preston Stieff*
J. Preston Stieff (4764)
311 South State Street, Suite 450
Salt Lake City, Utah 84111
Telephone: (801) 366-6002
Email: JPS@StieffLaw.com

*Counsel for Plaintiffs*

# ATTACHMENT A

# TITLE VI LEGAL MANUAL



## CIVIL RIGHTS DIVISION

## U.S. DEPARTMENT OF JUSTICE

## I.      INTRODUCTION

In 1964, after years of intensive work on the part of civil rights advocates and their supporters in Congress, President Lyndon B. Johnson signed the landmark Civil Rights Act of 1964. Included among the Civil Rights Act's eleven titles is Title VI, codified at 42 U.S.C. § 2000d et seq. In 1963, President John F. Kennedy explained the need for Title VI:  "Direct discrimination by Federal, State, or local governments is prohibited by the Constitution. But indirect discrimination, through the use of Federal funds, is just as invidious." Title VI directly addresses the then-common practice of denying certain persons access to federally funded services, programs, and activities based on their race, color, or national origin.



At the March on Washington for Jobs and Freedom, on August 28, 1963, a demonstrator carries a placard calling for the passage of Title VI, *"No U.S. Dough to Help Jim Crow Grow."*

Specifically, Section 601 states the following:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.[1]

---

[1] The Title VI Legal Manual provides an overview of Title VI legal principles.  This document is intended to be an abstract of the general principles and issues that concern federal agency enforcement; it is not intended to provide a complete, comprehensive directory of all cases or issues related to Title VI.  For example, this Manual does not address all issues associated with private enforcement.  In addition, although the Manual refers to cases interpreting

The Civil Rights Division of the U.S. Department of Justice (DOJ) is responsible for coordinating the Title VI implementation and enforcement efforts of federal agencies pursuant to Executive Order 12250, 28 C.F.R.pt. 41, app. A. As part of its coordination role, the Division periodically issues policy guidance, directives, or other memoranda to federal agencies regarding Title VI. The Title VI Legal Manual summarizes current DOJ guidance documents and directives relating to Title VI. Persons referring to the manual should check the Division's websites (www.justice.gov/crt and www.lep.gov) for guidance documents and directives issued subsequent to the publication of this document.

---

Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681 et seq., and Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, where their interpretation overlaps with Title VI, the Manual should not be considered to be an overview of any statute other than Title VI.

## II:     SYNOPSIS OF LEGISLATIVE HISTORY AND PURPOSE OF TITLE VI

The Civil Rights Act of 1964 was a product of the growing demand during the early 1960s for the federal government to launch a nationwide offensive against racial discrimination. In calling for its enactment, President John F. Kennedy stated:

> Simple justice requires that public funds, to which all taxpayers of all races contribute, not be spent in any fashion which encourages, entrenches, subsidizes, or results in racial discrimination. Direct discrimination by Federal, State, or local governments is prohibited by the Constitution. But indirect discrimination, through the use of Federal funds, is just as invidious; and it should not be necessary to resort to the courts to prevent each individual violation.

*See* H.R. Misc. Doc. No. 124, 88th Cong., 1st Sess. 3, 12 (1963).

Title VI was not the first attempt to ensure that the federal government not finance discrimination based on race, color, or national origin. Beginning with Franklin Roosevelt, presidents issued Executive Orders prohibiting racial discrimination in hiring. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 720 & n.3 (1979) (White, J., dissenting).[1] Various prior Executive Orders prohibited racial discrimination in, for instance, the armed forces, employment by federally funded construction contractors, and federally assisted housing.[2] As Rep. Emanuel Celler, Chairman of the House Judiciary Committee and floor manager for the Civil Rights Act in the House of Representatives, noted:

> In general, it seems rather anomalous that the Federal Government should aid and abet discrimination based on race, color, or national origin by granting money and other kinds of financial aid. It seems rather shocking, moreover, that while we have on the one hand the 14th amendment, which is supposed to do away with discrimination since it provides for equal protection of the laws, on the other hand, we have the Federal Government aiding and abetting those who persist in practicing racial discrimination.

> It is for these reasons that we bring forth title VI. The enactment of title VI will serve to override specific provisions of law which contemplate Federal assistance to racially segregated institutions.

110 Cong. Rec. 2467 (1964) (*quoted in Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 330-31 (1978) (opinion of Marshall, J.). Congress recognized the need for a statutory nondiscrimination

---

[1] *See also Cooper v. Aaron*, 358 U.S. 1 (1958); *Simkins v. Moses H. Cone Mem'l Hosp.*, 323 F.2d 959 (5th Cir. 1963).

[2] Exec. Order No. 9981, 13 Fed. Reg. 4313 (July 26, 1948) (equal opportunity in the armed services); Exec. Order No. 10479, 18 Fed. Reg. 4899 (Aug. 13, 1953) (equal employment opportunity by government); Exec. Order No. 11063, 27 Fed. Reg. 11,527 (Nov. 20, 1962) (equal opportunity in housing), as amended by Exec. Order No. 12259, 3 C.F.R. § 307 (1981), *reprinted in* 42 U.S.C. § 3608.

provision to apply across-the-board "to make sure that the funds of the United States are not used to support racial discrimination." 110 Cong. Rec. 6544 (statement of Sen. Humphrey).

Senator Humphrey, the Senate manager of the Civil Rights Act of 1964, identified several reasons for the enactment of Title VI. *Id.* First, several federal financial assistance statutes, enacted prior to *Brown v. Bd. of Education*, 347 U.S. 483 (1954), expressly provided for federal grants to racially segregated institutions under the "separate but equal" doctrine that *Brown* overturned. Although *Brown* made the validity of these programs doubtful, the decision did not automatically invalidate these statutory provisions.

Second, Title VI would eliminate any doubts that some federal agencies may have had about their authority to prohibit discrimination in their programs.

Third, through Title VI, Congress would "insure the uniformity and permanence to the nondiscrimination policy" in all programs and activities involving federal financial assistance. 110 Cong. Rec. 6544 (1964). Title VI would eliminate the need for Congress to debate nondiscrimination amendments in each new piece of legislation authorizing federal financial assistance.[3]  As stated by Representative Celler, "Title VI enables the Congress to consider the overall issue of racial discrimination separately from the issue of the desirability of particular Federal assistance programs. Its enactment would avoid for the future the occasion for further legislative maneuvers like the so-called Powell amendment." *Id.* at 2468.[4]

Fourth, the supporters of Title VI considered it an efficient alternative to ponderous, time-consuming, and uncertain litigation. Prior legal challenges demonstrated that litigation involving private discrimination proceeded slowly, and the adoption of Title VI was seen as an alternative to such an arduous route. *See* 110 Cong. Rec. 7054 (1964) (statement by Sen. Pastore).

Further, federal funds continued to subsidize racial discrimination. For example, Senator Pastore addressed how North Carolina hospitals received substantial federal monies for construction, that the hospitals discriminated against Blacks as patients and as medical staff, and that, in the absence of legislation, judicial action was the only means to end these discriminatory practices.

> That is why we need Title VI of the Civil Rights Act, H.R. 7152—to prevent such discrimination where Federal funds are involved…. Title VI is sound; it is morally right; it is legally right; it is constitutionally right…. What will it accomplish?  It will guarantee that the money collected by colorblind tax

---

[3] *See* 6 Op. O.L.C. 83, 93 (1982) ("The statutes [Title VI, Title IX, Section 504, and the Age Discrimination Act] … [are] intended to apply to all programs or activities receiving federal financial assistance without being explicitly referenced in subsequent legislation.  They should therefore be considered applicable to all legislation authorizing federal financial assistance … unless Congress evidences a contrary intent.")

[4] The "Powell amendment" refers to the effort of Representative Adam Clayton Powell to add nondiscrimination clauses to federal legislation.  *See* 110 Cong. Rec. 2465 (1964) (Statement by Rep. Powell).

> collectors will be distributed by Federal and State administrators who are equally colorblind. Let me say it again: The title has a simple purpose—to eliminate discrimination in Federally financed programs.
>
> *Id.; see also Simkins v. Moses H. Cone Mem'l Hosp.*, 323 F.2d 959, 969 (4th Cir. 1963) (federal provisions undertaking to authorize segregation by state-connected institutions are unconstitutional).[5]

President Lyndon Johnson signed the Civil Rights Act of 1964 into law on July 2, 1964, after more than a year of hearings, analyses, and debate. During the course of congressional consideration, Title VI was one of the most debated provisions of the Act.

---

[5] At issue in *Simkins* was a provision of the Hill-Burton Act (Hospital Survey and Construction Act), 60 Stat. 1041 (1946), as amended, 42 U.S.C. § 291e(f), which "authorize[d] the construction of hospital facilities and the promotion of hospital services with funds of the United States on a 'separate-but-equal' basis." *Simkins*, 323 F.2d at 961.  The Act included a general nondiscrimination provision, but further stated that "'an exception shall be made in cases where separate hospital facilities are provided for separate population groups, if the plan makes equitable provision on the basis of  need for facilities and services of like quality for each such group;….'" *Id.* at 969 (quoting 42 U.S.C. § 291e(f)).

# ATTACHMENT B

# What Is Environmental Racism?

May 24, 2023

This form of systemic racism disproportionately burdens communities of color.[1]

The lead in Flint, Michigan's water, the toxic petrochemical plants in Lousiana's "Cancer Alley," the raw sewage backing up into homes in Centreville, Illinois, and the oil and gas projects that overburden some U.S. tribal reservations all have at least one thing in common: They're examples of environmental racism.

Environmental justice (EJ) advocates have fought these types of injustices for decades, but addressing the root causes has been a protracted and difficult road.  Here's why environmental racism is a systemic issue, how the problem is global in scope, and what we can begin to do in allyship with those who have long sought to dismantle it.

## What exactly is environmental racism?

The phrase *environmental racism* was coined by civil rights leader Dr. Benjamin F. Chavis Jr.  He defined it as the intentional siting of polluting and waste facilities in communities primarily populated by African Americans, Latines, Indigenous People, Asian Americans and Pacific Islanders, migrant farmworkers, and low-income workers.

Study after study has since shown that those communities are disproportionately exposed to fumes, toxic dust, ash, soot, and other pollutants from such hazardous facilities located in their midst.  As a result, they face increased risks of health problems like cancer and respiratory issues.

Of course, low-income communities of color have long complained of being treated as dumping grounds for environmental polluters.  However, it wasn't until 1982—after a rural Black community in North Carolina was

---

[1] Available online at the Natural Resources Defense Council website, https://www.nrdc.org/stories/environmental-justice-movement (last visited on 8/30/2023).

designated as a disposal site for soil laced with carcinogenic compounds—that those complaints garnered national attention.

The incident prompted civil rights leaders to converge on Afton, North Carolina, where they joined residents in marches and demonstrations. The waste site went in anyway, and it later leached compounds into the community's drinking water, but a spotlight had been turned on the pattern. This is part of what helped launch the environmental justice movement, which was the response by civil rights leaders to combat environmental racism.  In 1983, a member of the Congressional Black Caucus who was at the Afton protests went on to request a General Accounting Office (GAO) study that found 75 percent of hazardous waste sites in eight states were placed in low-income communities of color. The subsequent landmark report, *Toxic Wastes and Race in the United States*, coauthored by Chavis and Charles Lee for the United Church of Christ, revealed this pattern was even more widespread, and replicated across the entire country.

Eminent sociologist Robert Bullard, known as the "father of environmental justice," identified additional examples and helped solidify the growing movement.  He also expanded the definition of environmental racism as "any policy, practice, or directive that differentially affects or disadvantages (where intended or unintended) individuals, groups, or communities based on race."

At the time, and in the years since, countless other environmental justice leaders—from Richard Moore to Hazel M. Johnson—also played a significant role in shedding light on environmental racism and its ongoing impacts.

## Why does environmental racism exist?

It's a form of systemic racism.  And it exists largely because of policies and practices that have historically, and to this day, favored the health, well-being, and consumer choices of white communities over those of non-white, low-income communities.  Case in point: General Iron is a metal-shredding business that operated in Chicago's predominantly white, wealthy Lincoln Park neighborhood. In 2018, e-mails showed that city officials from then mayor Rahm Emanuel's administration pushed the business to move out of this neighborhood after community members complained and to make way for a multibillion-dollar private real estate

development.  The city then struck a deal to relocate the polluting operation to Chicago's predominantly Latine, low-income, and working-class Southeast Side neighborhood.

Bullard and others call such land use decision-making by local governments a form of systemic oppression, where race is a dominant factor.  While no one wants hazardous waste in their backyard, primarily white, middle- to higher-income communities have always been more successful at preventing it.  Conversely, poor communities of color are often perceived as passive and don't have the clout or resources to challenge the dumping of poison where they live.

### And how did those circumstances arise?

Many communities of color still suffer from the legacies of segregation and redlining, which were shaped and enforced through land use policies and local zoning codes.  These racist practices discouraged investment in these areas, which eroded asset values and the tax base, leading to crumbling housing and public infrastructure.  According to a report by the Tishman Environment and Design Center, polluting industries sought to locate their facilities where the value of land was low, and cities responded by zoning these already-struggling communities for industrial use.  Their rights to healthy, thriving spaces were further squandered by the U.S. Environmental Protection Agency (EPA), which has a well-documented history of favoring white communities.

A recent study by the University of California, Berkeley and Columbia University illustrates some of the current effects.  It found African American and Latine communities that had been redlined under the discriminatory Home Owners' Loan Corporation program have twice as many oil and gas wells today than mostly white neighborhoods.  That's no accident.

As is typical for targeted communities, Chicago's Southeast Side was largely left out of the decision to move the General Iron facility into its neighborhood.  So in the fall of 2020, the community fought back by filing a civil rights complaint against the city with the U.S. Department of Housing and Urban Development (HUD).  It was initiated by community leaders, including Peggy Salazar of the Southeast Environmental Task Force (with her successors Olga Bautista and Gina Ramirez) as well as Cheryl Johnson of People for Community Recovery, and supported by partners like NRDC.

3

There was also a hunger strike the following year by other local activists like Oscar Sanchez of the Southeast Youth Alliance and Breanna Bertacchi, a member of United Neighbors of the 10th Ward.

Soon after, Michael Regan, the first African American to serve as EPA administrator, requested that the city conduct an environmental justice analysis as part of the local permitting process. Then in July 2022, in response to the civil rights complaint, HUD announced that an investigation had found Chicago engaging in a pattern of civil rights violations through planning, zoning, and land use policies that routinely relocated polluting businesses from white communities to African American and Latine ones. The city still held out its opposition to HUD following this federal finding, but in May 2023, HUD, the city, and Southeast Side EJ activists announced a precedent-setting settlement, committing the city to a set of reforms to address its racist land use and environmental history and policies.

## What forms can environmental racism take?

Environmental racism plays out in many ways and has several cumulative impacts. These include mental and physical health issues, economic inequality, the desecration of cultural spaces, and disproportionate levels of pollution. Given its systemic nature, we could not begin to cover every instance, but here are some examples:

- **Flint** and **Benton Harbor, Michigan:** In 2014, a water system contaminated by lead turned into a crisis for the city of Flint. Four years later, neighboring Benton Harbor experienced the same thing.

  Both communities, which are predominantly Black and low-income, already suffered from a history of state and local government mismanagement. A subsequent failed response to this crisis resulted in years of lead leaching through pipes into drinking water. Lead exposure is linked to health consequences from heart and kidney disease in adults to impaired brain development in children.

  Water experts, community leaders, lawyers, and advocates came together with residents to resolve the crises, which included replacing lead pipes and securing alternative water sources and/or filters. What happened in Flint and Benton Harbor also helped galvanize a

national conversation calling for a systemic solution to lead exposure. The Biden administration has since committed to replacing all U.S. lead service lines within the next 10 years.

- **Dakota Access Pipeline:** The construction of this 1,200-mile pipeline for transporting crude oil began in 2016. Oil and gas giant Energy Transfer Partners initially proposed a path across the Missouri River just north of the predominantly white community of Bismarck, North Dakota. The U.S. Army Corps of Engineers rejected that route, in part because of the threat it posed to the state capitol's water supply. But then the Army Corps approved the pipeline to cross under the Standing Rock Sioux Tribe's primary water source, and it disregarded their concerns over the desecration of tribal sites and potential water contamination in the event of an oil spill.

  The tribe's yearlong protests and legal challenges drew international attention. Then, in response to the tribe's lawsuit, a federal court ruled in 2020 that permits for the project were illegally approved. It ordered the government to conduct the thorough review of environmental impact initially sought by the Standing Rock Sioux. The review is ongoing.

- **Louisiana's Cancer Alley:** Over the last several decades, this 85-mile stretch between Baton Rouge and New Orleans became the de facto sacrifice zone for mile after mile of gas and oil operations. This has resulted in an alarming number of health risks for the majority Black and low-income communities, which is how the area got the nickname "Cancer Alley." In fact, 7 of the 10 census tracts with the country's highest cancer risk levels from air pollution are found here.

  For a time, Cancer Alley residents protested these corporate polluters with little success. But that's begun to change, and Sharon Lavigne is leading the way. She's helped organize other residents in her community to push back against new polluters seeking to set up shop in their parish—and won. Plus, the EPA finally weighed in too. In a 56-page letter, it accused local and state officials of turning a blind eye to residents being subjected to large amounts of cancer-causing chemicals spewing into the air, soil, and water.

## Does environmental racism only happen in America?

It happens all over the world—although what it's called or how it's framed can be different. Race is used as the primary mechanism to distribute environmental benefits and harms in the United States, but in other countries, caste, ethnicity, and class can function in similar ways. Still, the outcomes are the same. In northern Mexico, for example, the mass shipment of used car batteries from the United States and other nations to metal recyclers—located there to profit from lax occupational and environmental laws—have led to high levels of lead poisoning among workers, and the contamination of soil, air, water, and livestock.

Meanwhile, at least 23 percent of e-waste from developed nations is exported to informal recycling operations in China, India, and West Africa's Benin, Cote d'Ivoire, Ghana, Liberia, and Nigeria. The local populations doing the work use rudimentary techniques because they lack the technology to handle e-waste more safely, and there isn't much in the way of environmental regulations. That has exposed entire towns to toxic materials, which have caused illness and contamination.

Environmental racism also rears its ugly head in the overall climate crisis. The world's wealthiest economies produce 80 percent of global emissions from coal, oil, and gas, but it's developing nations that bear the brunt of global warming's impacts.

## What must we do to begin to end environmental racism

There's so much to do, and we can all play a part. First, it's important to recognize that the answers are rooted in the environmental justice movement. As environmental justice leaders who met at the First National People of Color Environmental Leadership Summit in 1991 made clear: If environmental racism is forcing poison upon low-income people of color, justice then does not entail shifting those inequities to others (in the United States or abroad), but remedying them as well as preventing them in the future.

That starts with listening to the communities most impacted by environmental racism and the broader climate crisis. It means ensuring they

have a leading role in the decision-making processes regarding the policies that shape where they live and work. And it means holding those in power accountable for honoring the rights of all people to clean air, clean water, and healthy communities. In other words, true environmental justice requires dismantling the racist structures that created this problem.

This is finally being acknowledged on a global scale. A recent United Nations report stated, "There can be no meaningful solution to the global climate and ecological crisis without addressing systemic racism." Global efforts have also given birth to a dynamic and vocal climate justice movement that centers intersectionality and cross-border solidarity. The goal is to advocate for solutions that lead with and drive social transformation. At the most recent U.N. Conference of the Parties (COP27), environmental justice advocates successfully pushed the U.S. Department of State to drop its opposition to the global loss and damage fund. That said, leaders, particularly in the Global North, must do more, including meeting global commitments to climate mitigation, adaptation, and funding.

In the United States, the Biden administration created the Justice40 Initiative to direct 40 percent of all climate and clean energy federal investments to communities identified by the Climate and Economic Justice Screening Tool as overburdened by pollution. And both the Infrastructure Investment and Jobs Act (IIJA) and the Inflation Reduction Act (IRA) provide millions to fund this work. Those are important steps forward, but as NRDC community solutions advisor Mikyla Reta noted, there are also provisions in the IRA that support polluting industries, like oil and gas drilling. In addition, with segregation and its legacy still very much alive, implementing IIJA and IRA, and spending the money in equitable ways, poses challenges.

There's also a continued role to play by environmental organizations like NRDC. Historically, Big Green—primarily white environmental organizations—has had little or no involvement in the environmental struggles of people of color. That's what prompted environmental justice leaders in 1990 to cosign a widely shared letter to these groups, including NRDC, accusing them of racial bias and challenging them to address issues in EJ communities. In response, some mainstream environmental organizations began to diversify their organizations and developed their first environmental justice initiatives, but much work remains. First, these

organizations must actively continue to become more diverse spaces that reflect the communities disproportionately impacted by environmental issues. Also, they must continue finding ways to serve as allies to environmental justice partners and center them when helping to shape policy.

And though the response must largely be systemic, there are some things you can do too. For example, you could learn about the environmental hazards in your community and, if necessary, demand your representatives address problems. You can also read up on the environmental justice movement and find local EJ organizations to support so that they can continue to do this critical work.

Helping to end environmental racism is going to take all of us. For low-income communities of color besieged by it, the change can't come soon enough.

# ATTACHMENT C

APRIL 21, 2023

# Executive Order on Revitalizing Our Nation's Commitment to Environmental Justice for All

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to advance environmental justice, it is hereby ordered as follows:

Section 1.  Policy.  To fulfill our Nation's promises of justice, liberty, and equality, every person must have clean air to breathe; clean water to drink; safe and healthy foods to eat; and an environment that is healthy, sustainable, climate-resilient, and free from harmful pollution and chemical exposure.  Restoring and protecting a healthy environment — wherever people live, play, work, learn, grow, and worship — is a matter of justice and a fundamental duty that the Federal Government must uphold on behalf of all people.

We must advance environmental justice for all by implementing and enforcing the Nation's environmental and civil rights laws, preventing pollution, addressing climate change and its effects, and working to clean up legacy pollution that is harming human health and the environment.  Advancing environmental justice will require investing in and supporting culturally vibrant, sustainable, and resilient communities in which every person has safe, clean, and affordable options for housing, energy, and transportation.  It is also necessary to prioritize building an equitable, inclusive, and sustainable economy that offers economic opportunities, workforce training, and high-quality and well-paying jobs, including union jobs, and facilitating an equitable transition of the workforce as part of a clean energy future.  Achieving this vision will also require improving equitable access to parks, tree cover, playgrounds, sports fields, rivers, ponds, beaches, lakes, and all of the benefits provided by nature, including America's public lands and waters.  Pursuing these and other objectives integral to advancing environmental justice can successfully occur only through meaningful engagement and collaboration with underserved and overburdened communities to address the adverse conditions they experience and ensure they do not face additional disproportionate burdens or underinvestment.

We have more work to do to make environmental justice a reality for our Nation, both for today and for the generations that will follow us.  Even as many communities in the

United States have prospered and thrived in recent decades, many other communities have been left behind. Communities with environmental justice concerns face entrenched disparities that are often the legacy of racial discrimination and segregation, redlining, exclusionary zoning, and other discriminatory land use decisions or patterns. These decisions and patterns may include the placement of polluting industries, hazardous waste sites, and landfills in locations that cause cumulative impacts to the public health of communities and the routing of highways and other transportation corridors in ways that divide neighborhoods. These remnants of discrimination persist today. Communities with environmental justice concerns exist in all areas of the country, including urban and rural areas and areas within the boundaries of Tribal Nations and United States Territories. Such communities are found in geographic locations that have a significant proportion of people who have low incomes or are otherwise adversely affected by persistent poverty or inequality. Such communities are also found in places with a significant proportion of people of color, including individuals who are Black, Latino, Indigenous and Native American, Asian American, Native Hawaiian, and Pacific Islander. Communities with environmental justice concerns also include geographically dispersed and mobile populations, such as migrant farmworkers.

Communities with environmental justice concerns experience disproportionate and adverse human health or environmental burdens. These burdens arise from a number of causes, including inequitable access to clean water, clean air, natural places, and resources for other basic human health and environmental needs; the concentration of pollution, hazardous waste, and toxic exposures; and underinvestment in affordable housing that is safe and healthy and in basic infrastructure and services to support such housing, including safe drinking water and effective sewage management. The cumulative impacts of exposure to those types of burdens and other stressors, including those related to climate change and the environment, further disadvantage communities with environmental justice concerns. People in these communities suffer from poorer health outcomes and have lower life expectancies than those in other communities in our Nation. Moreover, gaps in environmental and human health data can conceal these harms from public view, and, in doing so, are themselves a persistent and pernicious driver of environmental injustice.

Nearly three decades after the issuance of Executive Order 12898 of February 11, 1994 (Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations), the Federal Government must build upon and strengthen its commitment to deliver environmental justice to all communities across America. Our Nation needs an ambitious approach to environmental justice that is informed by scientific research, high-quality data, and meaningful Federal engagement with communities with environmental justice concerns and that uses the tools available to the Federal Government, including

enforcement of civil rights and environmental laws.  Our Nation must also take further steps to dismantle racial discrimination and institutional bias that disproportionately affect the health, environment, safety, and resiliency of communities with environmental justice concerns.

To ensure that the Nation's policies and investments respond to the needs of every community, all people should be afforded the opportunity to meaningfully participate in agency decision-making processes that may affect the health of their community or environment.  The Federal Government must continue to remove barriers to the meaningful involvement of the public in such decision-making, particularly those barriers that affect members of communities with environmental justice concerns, including those related to disability, language access, and lack of resources.  The Federal Government must also continue to respect Tribal sovereignty and support self-governance by ensuring that Tribal Nations are consulted on Federal policies that have Tribal implications.  In doing so, we must recognize, honor, and respect the different cultural practices — including subsistence practices, ways of living, Indigenous Knowledge, and traditions — in communities across America.  As our Nation reaffirms our commitment to environmental justice, the Federal Government must continue to be transparent about, and accountable for, its actions.

It is the policy of my Administration to pursue a whole-of-government approach to environmental justice.  This order builds upon my Administration's ongoing efforts to advance environmental justice and equity consistent with Executive Order 13985 of January 20, 2021 (Advancing Racial Equity and Support for Underserved Communities Through the Federal Government), Executive Order 13990 of January 20, 2021 (Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis), Executive Order 14008 of January 27, 2021 (Tackling the Climate Crisis at Home and Abroad), Executive Order 14052 of November 15, 2021 (Implementation of the Infrastructure Investment and Jobs Act), Executive Order 14057 of December 8, 2021 (Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability), Executive Order 14082 of September 12, 2022 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022), and Executive Order 14091 of February 16, 2023 (Further Advancing Racial Equity and Support for Underserved Communities Through the Federal Government).  This order also supplements the foundational efforts of Executive Order 12898 to address environmental justice.  In partnership with State, Tribal, territorial, and local governments, as well as community organizations, businesses, and members of the public, the Federal Government will advance environmental justice and help create a more just and sustainable future for all.

Sec. 2.  Definitions.  As used in this order:

(a)  "Agency" means an executive agency as defined by 5 U.S.C. 105, excluding the Government Accountability Office and independent regulatory agencies, as defined in 44 U.S.C. 3502(5).

(b)  "Environmental justice" means the just treatment and meaningful involvement of all people, regardless of income, race, color, national origin, Tribal affiliation, or disability, in agency decision-making and other Federal activities that affect human health and the environment so that people:

(i)  are fully protected from disproportionate and adverse human health and environmental effects (including risks) and hazards, including those related to climate change, the cumulative impacts of environmental and other burdens, and the legacy of racism or other structural or systemic barriers; and

(ii)  have equitable access to a healthy, sustainable, and resilient environment in which to live, play, work, learn, grow, worship, and engage in cultural and subsistence practices.

(c)  "Federal activity" means any agency rulemaking, guidance, policy, program, practice, or action that affects or has the potential to affect human health and the environment, including an agency action related to climate change.  Federal activities may include agency actions related to:  assuring compliance with applicable laws; licensing, permitting, and the reissuance of licenses and permits; awarding, conditioning, or oversight of Federal funds; and managing Federal resources and facilities.  This may also include such activities in the District of Columbia and the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, American Samoa, Guam, the U.S. Virgin Islands, and other Territories and possessions of the United States.

(d)  "Tribal Nation" means an American Indian or Alaska Native tribe, band, nation, pueblo, village, or community that the Secretary of the Interior acknowledges as a federally recognized Tribe pursuant to the Federally Recognized Indian Tribe List Act of 1994, 25 U.S.C. 5130, 5131.

Sec. 3.  Government-Wide Approach to Environmental Justice.  (a)  Consistent with section 1-101 of Executive Order 12898 and each agency's statutory authority, each agency should make achieving environmental justice part of its mission.  Each agency shall, as appropriate and consistent with applicable law:

(i)  identify, analyze, and address disproportionate and adverse human health and environmental effects (including risks) and hazards of Federal activities, including those

related to climate change and cumulative impacts of environmental and other burdens on communities with environmental justice concerns;

(ii)    evaluate relevant legal authorities and, as available and appropriate, take steps to address disproportionate and adverse human health and environmental effects (including risks) and hazards unrelated to Federal activities, including those related to climate change and cumulative impacts of environmental and other burdens on communities with environmental justice concerns;

(iii)   identify, analyze, and address historical inequities, systemic barriers, or actions related to any Federal regulation, policy, or practice that impair the ability of communities with environmental justice concerns to achieve or maintain a healthy and sustainable environment;

(iv)    identify, analyze, and address barriers related to Federal activities that impair the ability of communities with environmental justice concerns to receive equitable access to human health or environmental benefits, including benefits related to natural disaster recovery and climate mitigation, adaptation, and resilience;

(v)     evaluate relevant legal authorities and, as available and appropriate, take steps to provide, in consultation with unions and employers, opportunities for workforce training and to support the creation of high-quality and well-paying jobs, including union jobs, for people who are part of communities with environmental justice concerns;

(vi)    evaluate relevant legal authorities and, where available and appropriate, consider adopting or requiring measures to avoid, minimize, or mitigate disproportionate and adverse human health and environmental effects (including risks) and hazards of Federal activities on communities with environmental justice concerns, to the maximum extent practicable, and to address any contribution of such Federal activities to adverse effects — including cumulative impacts of environmental and other burdens — already experienced by such communities;

(vii)   provide opportunities for the meaningful engagement of persons and communities with environmental justice concerns who are potentially affected by Federal activities, including by:

(A)  providing timely opportunities for members of the public to share information or concerns and participate in decision-making processes;

(B)  fully considering public input provided as part of decision-making processes;

(C)  seeking out and encouraging the involvement of persons and communities potentially affected by Federal activities by:

(1)  ensuring that agencies offer or provide information on a Federal activity in a manner that provides meaningful access to individuals with limited English proficiency and is accessible to individuals with disabilities;

(2)  providing notice of and engaging in outreach to communities or groups of people who are potentially affected and who are not regular participants in Federal decision-making; and

(3)  addressing, to the extent practicable and appropriate, other barriers to participation that individuals may face; and

(D)  providing technical assistance, tools, and resources to assist in facilitating meaningful and informed public participation, whenever practicable and appropriate;

(viii)  continue to engage in consultation on Federal activities that have Tribal implications and potentially affect human health or the environment, pursuant to Executive Order 13175 of November 6, 2000 (Consultation and Coordination With Indian Tribal Governments), the Presidential Memorandum of January 26, 2021 (Tribal Consultation and Strengthening Nation-to-Nation Relationships), and the Presidential Memorandum of November 30, 2022 (Uniform Standards for Tribal Consultation), and fulfill obligations established pursuant to Executive Order 13007 of May 24, 1996 (Indian Sacred Sites);

(ix)  carry out environmental reviews under the National Environmental Policy Act (NEPA), 42 U.S.C. 4321 *et seq.*, consistent with the statute and its implementing regulations and through the exercise of the agency's expertise and technical judgment, in a manner that:

(A)  analyzes direct, indirect, and cumulative effects of Federal actions on communities with environmental justice concerns;

(B)  considers best available science and information on any disparate health effects (including risks) arising from exposure to pollution and other environmental hazards, such as information related to the race, national origin, socioeconomic status, age, disability, and sex of the individuals exposed; and

(C)   provides opportunities for early and meaningful involvement in the environmental review process by communities with environmental justice concerns potentially affected by a proposed action, including when establishing or revising agency procedures under NEPA;

(x)   in accordance with Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d, and agency regulations, ensure that all programs or activities receiving Federal financial assistance that potentially affect human health or the environment do not directly, or through contractual or other arrangements, use criteria, policies, practices, or methods of administration that discriminate on the basis of race, color, or national origin;

(xi)   ensure that the public, including members of communities with environmental justice concerns, has adequate access to information on Federal activities, including planning, regulatory actions, implementation, permitting, compliance, and enforcement related to human health or the environment, when required under the Freedom of Information Act, 5 U.S.C. 552; the Government in the Sunshine Act, 5 U.S.C. 552b; the Clean Air Act, 42 U.S.C. 7401 *et seq.*; the Clean Water Act, 33 U.S.C. 1251 *et seq.*; the Emergency Planning and Community Right-to-Know Act of 1986 (EPCRA), 42 U.S.C. 11001 *et seq.*; or other environmental statutes with public information provisions;

(xii)   improve collaboration and communication with State, Tribal, territorial, and local governments on programs and activities to advance environmental justice;

(xiii)   encourage and, to the extent permitted by law, ensure that Government-owned, contractor-operated facilities take appropriate steps to implement the directives of this order;

(xiv)   consider ways to encourage and, as appropriate, ensure that recipients of Federal funds -- including recipients of block grant funding -- and entities subject to contractual, licensing, or other arrangements with Federal agencies advance environmental justice;

(xv)   develop internal mechanisms to achieve the goals of this order, including by:

(A)   creating performance metrics and other means of accountability;

(B)   identifying and dedicating staff, funding, and other resources; and

(C)   providing appropriate professional development and training of agency staff; and

(xvi)   consistent with section 2-2 of Executive Order 12898, ensure that Federal activities do not have the effect of:

(A)   excluding persons, including populations, from participation in Federal activities on the basis of their race, color, or national origin;

(B)   denying persons, including populations, the benefits of Federal activities on the basis of their race, color, or national origin; or

(C)   subjecting persons, including populations, to discrimination on the basis of their race, color, or national origin.

(b)   The Administrator of the Environmental Protection Agency (EPA) shall:

(i)   in carrying out responsibilities under section 309 of the Clean Air Act, 42 U.S.C. 7609, assess whether each agency analyzes and avoids or mitigates disproportionate human health and environmental effects on communities with environmental justice concerns; and

(ii)   report annually to the Chair of the Council on Environmental Quality (CEQ) and the White House Environmental Justice Interagency Council (Interagency Council) described in section 7 of this order on EPA's Clean Air Act section 309 reviews regarding communities with environmental justice concerns and provide recommendations on legislative, regulatory, or policy options to advance environmental justice in Federal decision-making.

(c)   In carrying out assigned responsibilities under Executive Order 12250 of November 2, 1980 (Leadership and Coordination of Nondiscrimination Laws), the Attorney General shall assess agency efforts to ensure compliance with civil rights laws in programs and activities receiving Federal financial assistance that potentially affect human health or the environment and shall report annually based on publicly available information to the Chair of CEQ regarding any relevant pending or closed litigation.

Sec. 4.   Environmental Justice Strategic Plans.  (a)  No later than 18 months after the date of this order and every 4 years thereafter, each agency shall submit to the Chair of CEQ and make available to the public online an Environmental Justice Strategic Plan.

(b)   Each Environmental Justice Strategic Plan shall, based on guidance provided by the Chair of CEQ under section 9 of this order, set forth the agency's vision, goals, priority actions, and metrics to address and advance environmental justice and to fulfill the directives of this

order, including through the identification of new staffing, policies, regulations, or guidance documents.

(c)  Each Environmental Justice Strategic Plan shall also identify and address opportunities through regulations, policies, permits, or other means to improve accountability and compliance with any statute the agency administers that affects the health and environment of communities with environmental justice concerns.  Such measures may include:

(i)   increasing public reporting by regulated entities;

(ii)  expanding use of pollution measurement and other environmental impact or compliance assessment tools such as fenceline monitoring;

(iii)  improving the effectiveness of remedies to provide relief to individuals and communities with environmental justice concerns, such as remedies that penalize and deter violations and promote future compliance, including harm mitigation and corrective action; and

(iv)  considering whether to remove exemptions or waivers that may undermine the achievement of human health or environmental standards.

(d)  No later than 2 years after the submission of an Environmental Justice Strategic Plan, each agency shall submit to the Chair of CEQ, and make available to the public, an Environmental Justice Assessment that evaluates, based on guidance provided by the Chair of CEQ under section 9 of this order, the effectiveness of the agency's Environmental Justice Strategic Plan.  The Environmental Justice Assessment shall include an evaluation of:

(i)   the agency's progress in implementing its Environmental Justice Strategic Plan;

(ii)  any barriers to implementing the agency's Environmental Justice Strategic Plan; and

(iii)  steps taken to address any barriers identified.

(e)  An agency's completion of an Environmental Justice Strategic Plan and Environmental Justice Assessment shall satisfy the requirements of section 1-103 of Executive Order 12898.

(f)  The Environmental Justice Scorecard established under section 223(d) of Executive Order 14008 shall address agency progress toward achieving the goals outlined in this order

and shall include, among other items, a section on agencies' Environmental Justice Strategic Plans and Environmental Justice Assessments.

(g)  The Chair of CEQ may request additional periodic reports, information, or evaluations on environmental justice issues from agencies.

(h)  Independent regulatory agencies are strongly encouraged to comply with the provisions of this order and to provide a notice to the Chair of CEQ of their intention to do so.  The Chair of CEQ shall make such notices publicly available and maintain a list online of such agencies.

Sec. 5.  Research, Data Collection, and Analysis to Advance Environmental Justice.  (a)  To address the need for a coordinated Federal strategy to identify and address gaps in science, data, and research related to environmental justice, the Director of the Office of Science and Technology Policy (OSTP) shall establish an Environmental Justice Subcommittee of the National Science and Technology Council (Environmental Justice Subcommittee).

(i)   The Director of OSTP, in consultation with the Chair of CEQ, shall designate at least two co-chairs of the Environmental Justice Subcommittee and may designate additional co-chairs as appropriate.  The membership of the Subcommittee shall consist of representatives of agencies invited by the Director, in consultation with the Chair of CEQ.

(ii)   The Environmental Justice Subcommittee and the Interagency Council described in section 7 of this order shall hold an annual summit on the connection of science, data, and research with policy and action on environmental justice.

(iii)  The Environmental Justice Subcommittee shall prepare, and update biennially, an Environmental Justice Science, Data, and Research Plan (Research Plan) to:

(A)  analyze any gaps and inadequacies in data collection and scientific research related to environmental justice, with a focus on gaps and inadequacies that may affect agencies' ability to advance environmental justice, including through the Environmental Justice Strategic Plans required under section 4 of this order;

(B)  identify opportunities for agencies to coordinate with the research efforts of State, Tribal, territorial, and local governments; academic institutions; communities; the private sector; the non-profit sector; and other relevant actors to accelerate the development of data, research, and techniques — including consideration of Indigenous Knowledge — to address gaps and inadequacies in data collection and scientific research that may affect agencies'

ability to advance environmental justice;

(C)  provide recommendations to agencies on the development and use of science, data, and research to support environmental justice policy and the agency responsibilities outlined in section 3 of this order;

(D)  provide recommendations to the Chair of CEQ on data sources to include in the Climate and Economic Justice Screening Tool established pursuant to section 222(a) of Executive Order 14008;

(E)  provide recommendations to agencies on ethical standards, privacy protections, and other requirements for the development and use of science, data, and research addressed in the Research Plan, including recommendations with respect to engaging in consultation with and obtaining consent of Tribal Nations; and

(F)  provide recommendations to agencies on:

(1)  encouraging participatory science, such as research or data collection undertaken by communities or the public, and, as appropriate, integrating such science into agency decision-making processes;

(2)  taking steps to ensure or encourage, as appropriate, that collections of data related to environmental justice include data from the Territories and possessions of the United States;

(3)  improving the public accessibility of research and information produced or distributed by the Federal Government, including through the use of machine-readable formats, where appropriate;

(4)  disaggregating environmental risk, exposure, and health data by race, national origin, income, socioeconomic status, age, sex, disability, and other readily accessible and appropriate categories;

(5)  identifying and addressing data collection challenges related to patterns of historical or ongoing racial discrimination and bias;

(6)  analyzing cumulative impacts (including risks) from multiple sources, pollutants or chemicals, and exposure pathways, and accounting for non-chemical stressors and current

and anticipated climate change;

(7)  in collaboration with Tribal Nations, as appropriate, collecting, maintaining, and analyzing information on consumption patterns of fish, wildlife, and plants related to subsistence and cultural practices of Tribal and Indigenous populations;

(8)  providing opportunities for meaningful engagement for communities with environmental justice concerns on the development and design of data collection and research strategies relevant to those communities; and

(9)  implementing sections 3-3 and 4-4 of Executive Order 12898 in an efficient and effective manner.

(b)  Consistent with sections 3-3 and 4-4 of Executive Order 12898, each agency shall take appropriate steps, considering the recommendations of the Environmental Justice Subcommittee, to promote the development of research and data related to environmental justice, including enhancing the collection of data, supporting the creation of tools to improve the consideration of environmental justice in decision-making, providing analyses of cumulative impacts and risks, and promoting science needed to inform decisions that advance environmental justice.

(c)  When conducting research and data collection in furtherance of the directives in this order and Executive Order 12898, agencies shall comply with applicable regulations and directives, including those related to standards of ethics for the protection of human subjects, such as those set forth in Executive Order 12975 of October 3, 1995 (Protection of Human Research Subjects and Creation of National Bioethics Advisory Commission), and the Presidential Memorandum of January 27, 2021 (Restoring Trust in Government Through Scientific Integrity and Evidence-Based Policymaking).

Sec. 6.  Community Notification on Toxic Chemical Releases.  To ensure that the public, including members of communities with environmental justice concerns, receives timely information about releases of toxic chemicals that may affect them and health and safety measures available to address such releases:

(a)  Each agency shall report in accordance with sections 301 through 313 of EPCRA after considering applicable EPA guidance and without regard to the Standard Industrial Classification or North American Industry Classification System delineations.

(b)  No later than 6 weeks following a release requiring notification by an agency under section 304(a) of EPCRA, the notifying agency shall hold a public meeting providing the information required under section 304(b)(2) of EPCRA, including information on the nature of the release, known or anticipated health risks, and the proper precautions to take as a result.  The agency shall provide notice of a public meeting no later than 72 hours after a release.

(c)  The Administrator of EPA shall evaluate available legal authorities and consider any additional steps it may require or encourage non-Federal facilities that report releases under EPCRA to undertake in connection with the report.

(d)  The Administrator of EPA shall provide the Environmental Justice Subcommittee established by section 5 of this order with an annual report on trends in data in the Toxic Release Inventory established by section 313 of EPCRA to inform the development of the Research Plan required under section 5(a)(iii) of this order.

Sec. 7.  White House Environmental Justice Interagency Council.  (a)  Section 1-102(b) of Executive Order 12898, as amended by section 220(a) of Executive Order 14008, and further amended by section 4(b) of Executive Order 14082, creating the White House Environmental Justice Interagency Council, is amended to read as follows:

"(b)  Membership.  The Interagency Council shall consist of the following additional members:

(i)    the Secretary of State;

(ii)   the Secretary of Defense;

(iii)  the Attorney General;

(iv)   the Secretary of the Interior;

(v)    the Secretary of Agriculture;

(vi)   the Secretary of Commerce;

(vii)  the Secretary of Labor;

(viii) the Secretary of Health and Human Services;

(ix)   the Secretary of Housing and Urban Development;

(x)   the Secretary of Transportation;

(xi)   the Secretary of Energy;

(xii)   the Secretary of Veterans Affairs;

(xiii)   the Secretary of Homeland Security;

(xiv)   the Administrator of the Environmental Protection Agency;

(xv)   the Director of the Office of Management and Budget;

(xvi)   the Chair of the Council of Economic Advisers;

(xvii)   the Administrator of General Services;

(xviii)   the Executive Director of the Federal Permitting Improvement Steering Council;

(xix)   the Director of the Office of Science and Technology Policy;

(xx)   the Assistant to the President and National Climate Advisor;

(xxi)   the Assistant to the President for Domestic Policy;

(xxii)   the Assistant to the President for Economic Policy;

(xxiii)   the Executive Director of the White House Gender Policy Council;

(xxiv)   the Senior Advisor to the President for Clean Energy Innovation and Implementation; and

(xxv)   other relevant agency heads as determined by the Chair of CEQ."

(b)  Section 1-102(d) of Executive Order 12898, as amended by section 220(a) of Executive Order 14008, is further amended by adding the following sentence at the end:  "The

Interagency Council shall support and facilitate interagency collaboration on programs and activities related to environmental justice, including the development of materials for environmental justice training to build the capacity of Federal employees to advance environmental justice and to increase the meaningful participation of individuals from communities with environmental justice concerns in Federal activities."

  (c)  Section 1-102(g) of Executive Order 12898, as amended by section 220(a) of Executive Order 14008, is amended to read as follows:  "Officers.  The head of each agency on the Interagency Council shall designate an Environmental Justice Officer within the agency with the authority to represent the agency on the Interagency Council and with the responsibility for leading agency planning and implementation of the agency's Environmental Justice Strategic Plan, coordinating with CEQ and other agencies, and performing such other duties related to advancing environmental justice as the head of the agency deems appropriate."

  (d)  Section 1-102 of Executive Order 12898, as amended by section 220(a) of Executive Order 14008, is further amended by adding the following at the end:

  "(h)  Memorandum of Understanding.  The Interagency Council shall adopt a Memorandum of Understanding among its members that sets forth the objectives, structure, and planned operations of the Interagency Council.

  (i)  Public meetings.  In coordination with the White House Environmental Justice Advisory Council, the Interagency Council shall hold at least one public meeting per year.  The Interagency Council shall prepare, for public review, a summary of the comments and recommendations discussed at public meetings of the Interagency Council.

  (j)  Clearinghouse.  The Administrator of EPA, in coordination with the Interagency Council, shall, no later than March 31, 2024, establish a public, internet-based, whole-of-government clearinghouse composed of culturally and linguistically appropriate and accessible materials related to environmental justice, including:

    (i)   information describing the activities of the members of the Interagency Council to address issues relating to environmental justice;

    (ii)  information on technical assistance, tools, and resources to assist communities with environmental justice concerns in building capacity for public participation;

    (iii)  copies of training materials developed by the Interagency Council or its members to

help individuals and employees understand and carry out environmental justice activities; and

(iv)   any other information deemed appropriate by the Administrator, in coordination with the Interagency Council."

(e)  Section 5-5(a) of Executive Order 12898 is amended to read as follows:  "The public may submit recommendations to Federal agencies relating to the incorporation of environmental justice principles into Federal agency programs or policies.  Each Federal agency shall convey such recommendations to the Interagency Council."

Sec. 8.  White House Office of Environmental Justice.  (a)  The White House Office of Environmental Justice is hereby established within CEQ.

(b)  The Office shall be headed by a Federal Chief Environmental Justice Officer, who shall be appointed by the President.  The Federal Chief Environmental Justice Officer shall advance environmental justice initiatives, including by coordinating the development of policies, programs, and partnerships to achieve the policies set forth in this order; identifying opportunities for collaboration and coordination with State, Tribal, territorial, and local governments; supporting the Interagency Council; and advising the Chair of CEQ and the Interagency Council on environmental justice matters.

(c)  The heads of all agencies shall cooperate with the Federal Chief Environmental Justice Officer and provide such information, support, and assistance as the Federal Chief Environmental Justice Officer may request, as appropriate.

Sec. 9.  Guidance.  Within 6 months of the date of this order, the Chair of CEQ shall issue interim guidance, in consultation with the Interagency Council, to inform agency implementation of this order, and shall request recommendations on the guidance from the White House Environmental Justice Advisory Council established by Executive Order 14008 (Advisory Council).  To reduce redundancy and streamline reporting obligations, the interim guidance shall identify ways for agencies to align other related efforts, such as obligations that agencies may have under Executive Order 13985 and Executive Order 14008.  Within 18 months of the date of this order, the Chair of CEQ shall issue final guidance after considering any recommendations of the Advisory Council.  The Chair of CEQ may revise any guidance, or issue additional guidance under this order, as appropriate, and shall consider any additional recommendations made by the Advisory Council in issuing or revising guidance under this section.

Sec. 10.  Reports to the President.  Within 1 year of the date for the submission of agency

Environmental Justice Strategic Plans to the Chair of CEQ under section 4(a) of this order, the Chair shall, after consultation with the Interagency Council and after considering recommendations from the Advisory Council, submit to the President a report that describes the implementation of this order, includes each agency's Environmental Justice Strategic Plan, provides recommendations for additional steps to advance environmental justice, and, beginning with the second report, also provides any insights gathered from each agency's Environmental Justice Assessment required under section 4(d) of this order.

Sec. 11.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

JOSEPH R. BIDEN JR.

THE WHITE HOUSE,
  April 21, 2023.