IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UTE INDIAN TRIBE OF THE UINTAH AND OURAY INDIAN RESERVATION, a federally recognized Indian Tribe, SHAUN CHAPOOSE, EDRED SECAKUKU, LUKE J. DUNCAN, RONALD WOPSOCK, JULIUS T. MURRAY III, and CHRISTOPHER L. TABBEE, individually on their own behalf and on behalf of all persons similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR; DEB HAALAND, Secretary of the Interior, United Stated Department of the Interior; BUREAU OF RECLAMATION; BUREAU OF INDIAN AFFAIRS; THE STATE OF UTAH; CENTRAL UTAH WATER CONSERVANCY DISTRICT, a political subdivision of the State of Utah; SPENCER COX, in his capacity as Governor of Utah, and TERESA WILHEMSEN, P.E., in her capacity as Utah State Engineer and Director, Utah Division of Water Rights, Salt Lake City, Utah,<br><br>        Defendants. | **MEMORANDUM DECISION & ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS**<br><br>Case No. 2:21-cv-00573-JNP-DAO<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Daphne A. Oberg |

Plaintiffs Ute Indian Tribe of the Uintah and Ouray Indian Reservation ("Tribe"), Shaun

Chapoose, Edred Secakuku, Luke J. Duncan, Ronald Wopsock, Julius T. Murray III, and

Christopher L. Tabbee ("Class Action Plaintiffs"), bring this action against the United States

Department of the Interior, Interior Secretary Deb Haaland, the Bureau of Reclamation, the Bureau

of Indian Affairs ("Federal Defendants"), the State of Utah, the Central Utah Water Conservancy District ("CUWCD"), Utah governor Spencer Cox, and Utah State Engineer Teresa Wilhelmsen in their official capacities ("State Defendants").

In their eleven Claims for Relief, Plaintiffs allege violations of federal trust duties owed to the Tribe by the federal government, violations of the Administrative Procedure Act and the National Environmental Policy Act, and a series of violations of the Tribe's and Class Action Plaintiffs' constitutional and civil rights. Defendants have moved, in three motions, to dismiss Plaintiffs' claims. *See* ECF Nos. 199, 200, 201.

For the following reasons, Defendants' motions are **GRANTED**, and Claims One through Eight, as well as Claim Eleven, are **DISMISSED** with prejudice.

## BACKGROUND

This action was originally brought in the United States District Court for the District of Columbia and was transferred to this court in September of 2021 upon the motion of the Defendants. *See Ute Indian Tribe of the Uintah & Ouray Reservation v. United States DOI*, 560 F. Supp. 3d 247, 253 (D.D.C. 2021) (hereinafter "*Ute D.C. Op.*"); ECF Nos. 69, 71. Because an explanation of the history underlying this controversy has been outlined by the transferor court in its previous order, this court will forgo detailed recitation of the facts. *See Ute D.C. Op.*, 560 F. Supp. 3d at 253-55.

However, to briefly summarize, Plaintiffs' claims arise from a series of transactions related to the management of water resources and water-related infrastructure in and around the Tribe's reservation in northeastern Utah. The Tribe alleges that the Federal Defendants have breached trust and statutory duties owed to the Tribe regarding the management and allocation of water and water

rights and generally discriminated against the Tribe and its members through the same. Relevant acts in this saga include:

1) The construction of irrigation systems authorized by the Indian Department Appropriation Act of 1906 ("1906 Act"), Pub. L. No. 59-258, 34 Stat. 325, 375-76 (1906), known as the Uintah Indian Irrigation Project ("UIIP"), which have allegedly fallen into disrepair;

2) The 1967 Midview Exchange Agreement, an agreement between the United States, the Tribe, and the Moon Lake Water Users Association, effected for the purpose of exchanging water rights and irrigation facilities between the Bureau of Indian Affairs and the Bureau of Reclamation;

3) The construction and management of water collection and distribution infrastructure, separate from the UIIP, known as the Central Utah Project ("CUP"), first authorized by Congress in 1956, Pub. L. No. 84-485, 70 Stat. 105 (1956), and the government's alleged failure to complete authorized water infrastructure to benefit the Tribe and its members;

4) The 1965 Deferral Agreement between the United States, the CUWCD, and the Tribe, which deferred some irrigation development under the CUP in exchange for the government's recognition of the Tribe's water rights as recognized by a prior survey commissioned by the Tribe;

5) The 1992 passage of the Central Utah Project Completion Act ("CUPCA"), Pub. L. No. 102-575 §§ 501–07, 106 Stat. 4600, 4650–55 (1992), including its purported waiver of any claims that the Tribe might have previously had under the 1965 Deferral Agreement

and authorizations for funding for certain water infrastructure to benefit the Tribe and its members; *and*

6) The 2018 Green River Block Exchange Contract ("GRBE Contract"), an agreement between the U.S. Bureau of Reclamation and the State of Utah under which the State of Utah purports to forebear depletions of Utah's apportioned water rights in the Colorado River under an existing interstate compact (the Upper Colorado River Basin Compact) in exchange for an authorization to draw an equivalent amount of water from the Flaming Gorge Reservoir.

Plaintiffs also challenge the Bureau of Reclamation's actions regarding the 2018 GRBE Contract under the Administrative Procedure Act and the National Environmental Policy Act in their Ninth and Tenth Claims. Additionally, the Plaintiffs' Eleventh Claim alleges a throughline of discrimination on the basis of race, ethnicity, and national origin, as well as persistent racial animus affecting the distribution of water resources in Utah, including the misappropriation of waters to which the Tribe and its members claim a present perfected right.

The Tribe filed this action against the Federal Defendants in the United States District Court for the District of Columbia in March 2018. After the Federal Defendants moved to dismiss the Tribe's claims, the Tribe amended its complaint. *See* First Amended Complaint, ECF No. 25. Subsequently, the State of Utah moved to intervene, and the Tribe was granted leave to file its Second Amended Complaint ("SAC"), ECF No. 57. The SAC added new claims against the Federal Defendants related to the 2018 GRBE Contract under the APA and NEPA, and added the State Defendants to the discrimination claim as well as three claims relating to the scope of the Tribe's water rights under the 1965 Deferral Agreement and CUPCA (SAC claims one, two, and four). *Id*.

Subsequently, all Defendants moved for dismissal of the Tribe's non-APA and non-NEPA claims and for transfer of the remaining claims to the District of Utah. In September 2021, the D.C. District Court, in turn, dismissed the breach-of-trust and discrimination claims without prejudice and transferred the Tribe's APA and NEPA claims to this district. *See generally Ute D.C. Op.*, 560 F. Supp. 3d 247.

Because it would be the Tribe's first amendment of its complaint addressing deficiencies identified by court order, the District of Utah, after the transfer of the case, granted the Tribe leave to amend its complaint and file a Third Amended Complaint ("TAC"), ECF No. 163-2. The court's Memorandum Decision and Order Granting Plaintiffs' Motion for Leave to File a Third Amended Complaint, ECF No. 185, permitted the joinder of the Class Action Plaintiffs to the discrimination claim (now the Eleventh Claim) and elected to forgo futility analysis as to amendments to the breach-of-trust and discrimination claims previously dismissed by the D.C. District Court as pleaded in the SAC. *Id*. All Defendants moved to dismiss the claims contained in the TAC, again with the limited exception of the Ninth and Tenth Claims, as discussed above. State Defendants moved only for conditional dismissal of the Ninth and Tenth Claims, seeking to be joined as defendants, ECF No. 201, and the Plaintiffs stipulated to their joinder. ECF No. 208. The court held argument on these motions on September 1, 2023. *See* ECF No. 235.

The sufficiency of the Plaintiffs' pleading of their breach-of-trust claims (Claims One through Eight) and constitutional and civil rights claims (Claim Eleven) in the TAC are considered in this order. This court acknowledges that the D.C. District Court's prior order, while persuasive, does not limit this court's power. *Arizona v. California*, 460 U.S. 605, 618 (1983); *Homans v. City of Albuquerque*, 366 F.3d 900, 904 (10th Cir. 2004); *Mason v. Texaco, Inc.*, 948 F.2d 1546, 1553 (10th Cir. 1991). However, as the Tenth Circuit has previously held, "[w]hen an action is

transferred, it remains what it was; all further proceedings in it are merely referred to another tribunal, leaving untouched whatever has been already done. Accordingly, traditional principles of law of the case counsel against the transferee court reevaluating the rulings of the transferor court." *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1516 (10th Cir. 1991) (citations and quotations omitted).

Because Plaintiffs were permitted leave to amend their breach-of-trust and discrimination claims and thereby cure pleading deficiencies identified by the order of the D.C. District Court, the court has determined, in its discretion under Rule 15 of the Federal Rules of Civil Procedure and considering the factors relevant to amendment laid out in *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006), that it is appropriate to dismiss these claims with prejudice.

## LEGAL STANDARD

Dismissal of a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure is appropriate where the plaintiff fails to state a claim upon which relief can be granted. When considering a motion to dismiss for failure to state a claim, a court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). The complaint must allege more than labels or legal conclusion and its factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

6

**DISCUSSION**

Before considering the individual Claims for Relief, the court begins in this section by discussing some overarching issues implicated in the Third Amended Complaint and touching several claims—these issues being (i) the nature of the government's trust duties owed to the Tribe, especially in light of the Supreme Court's recent decision in *Arizona v. Navajo Nation*, 143 S. Ct. 1804 (2023); (ii) the appropriate statute of limitations and the application of the continuing violation doctrine; and (iii) issues related to Plaintiffs' equitable tolling and equitable estoppel arguments.

## I.     The Federal Government's Trust Duties

Claims One through Eight of the Third Amended Complaint plead breach of trust as their cause of action. Thus, in order to state a claim upon which relief can be granted, Plaintiffs must establish that the federal government owed the Tribe a particular duty, that the duty was breached, and that the Tribe is entitled to relief as a result. *See Arizona v. Navajo Nation*, 143 S. Ct. at 1813 ("The Tribe asserts a breach-of-trust claim. To maintain such a claim here, the Tribe must establish, among other things, that the text of a treaty, statute, or regulation imposed certain duties on the United States.").

While there is "a general trust relationship between the United States and the Indian people," that general trust relationship does not, by itself, create legally enforceable obligations for the United States that might serve as a cause of action. *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 176 (2011) (quoting *United States v. Mitchell*, 463 U.S. 206, 225 (1983) ("*Mitchell II*")). Instead, the United States "assumes Indian trust responsibilities only to the extent it *expressly accepts* those responsibilities by statute." *Jicarilla*, 564 U.S. at 177 (emphasis added); *see Arizona v. Navajo Nation*, 143 S. Ct. at 1813. Even then, "[t]he trust obligations of the United States to the

7

Indian tribes are established and governed by statute rather than the common law." *Jicarilla*, 564 U.S., at 165. Such duties may *only* be assumed by "treaty, statute, or regulation." *Arizona v. Navajo Nation*, 143 S. Ct. at 1813. Because the trust duties in question must be expressly accepted under *Jicarilla*, "neither the general trust relationship between the federal government and Indian Tribes nor the mere invocation of trust language in a statute . . . is sufficient to create a cause of action for breach of trust." *Flute v. United States*, 808 F.3d 1234, 1244 (10th Cir. 2015) (quoting *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 893 (D.C. Cir. 2014)); *Arizona v. Navajo Nation*, 143 S. Ct. at 1813.

Plaintiffs assert several possible bases for the particular trust duties they claim Defendants breached, including several treaties (those of 1849, 1863, and 1868) and statutes (of 1899, 1906, and 1992). TAC ¶ 322. In its order, the D.C. District Court determined that the Tribe, in its Second Amended Complaint, failed to identify any source that might give rise to the trust duties allegedly breached. *Ute D.C. Op.*, 560 F. Supp. 3d at 260, 263. ("[T]he Tribe has not identified an enforceable duty, it fails to allege a necessary predicate for establishing an implied cause of action.").

Since the commencement of this action, and after the filing of all relevant briefing on the Defendants' motions to dismiss the TAC, the Supreme Court, in *Arizona v. Navajo Nation*, clarified and reaffirmed the standard for determining the boundaries of the federal government's trust duties owed to Tribes, as well as the standards for their enforcement by federal courts. 143 S. Ct. 1804. Most importantly, *Arizona v. Navajo Nation* affirmed the principle in *Jicarilla* that the federal government "owes judicially enforceable duties to a tribe "only to the extent it *expressly* accepts those responsibilities," *id*. at 1813 (internal citations omitted and emphasis added), because "Indian treaties cannot be rewritten or expanded beyond their clear terms." *Id*. (citation omitted).

8

In other words, "the trust obligations of the United States to the Indian tribes are established by Congress and the Executive, not created by the Judiciary." *Id*. at 1813 n.1. Further, the Supreme Court stated that courts should not "apply common-law trust principles to infer duties not found in the text of a treaty, statute, or regulation," *id*. at 1814, (citation omitted), unless the relevant legal instrument creates a "conventional" trust instrument. *Id*.

In *Arizona v. Navajo Nation*, the Court found unpersuasive arguments that a treaty's references to creating a "permanent home," *id*. at 1815, provision of "seeds and agricultural implements," *id*., or the federal government's pervasive control over water resources and the Tribe's reserved water rights, *id*., created such a specific trust obligation for the government or any conventional trust relationship. Indeed, the Supreme Court explicitly held that, when it comes to tribal claims for breach of trust, "[t]he Federal Government's liability cannot be premised on control alone." *Id*. (citing *United States v. Navajo Nation*, 556 U.S. 287, 301 (2009)).

This holding in *Arizona v. Navajo Nation* serves to clarify the applicability of *Mitchell II*'s statements on control over trust resources to the instant case and, significantly, defeats Plaintiffs' argument that comprehensive control of a resource, standing by itself and absent some other specific and express acceptance of a trust duty by treaty, statute, or regulation, might serve as the basis for a breach-of-trust claim. *Id*. at 1813; *contra* ECF No. 210 at 12-13; TAC ¶¶ 45–54, 70–73, 103–04, 108, 220, 247 (asserting that the Federal Defendants exercised pervasive, elaborate, and exclusive control over management of the Tribe's water rights and infrastructure at issue). *Arizona v. Navajo Nation* also serves to resolve any doubt that the treaties identified by the Plaintiffs, analogous to those considered by the Supreme Court, do *not* create a conventional trust relationship or otherwise permit invocation of common-law trust duties or principles. As Plaintiffs noted, the similarities between the treaties at issue in the *Navajo Nation* case and the instant case (those of

1849, 1863, and 1868) are "striking." ECF No. 210 at 17. Thus, as the D.C. District Court concluded, no treaty identified by the Plaintiffs provides a basis for the breach-of-trust claims pleaded in Claims One through Eight. In their Response to Defendants' Notice of Supplemental Authority, ECF No. 222, Plaintiffs argue, despite the D.C. District Court's conclusions to the contrary, that the 1899 Act, 1906 UIIP Act, the 1968 Colorado River Basin Project Act, and the 1992 CUPCA create enforceable trust duties and sufficiently distinguish this case from *Arizona v. Navajo Nation*.

This court, however, is unpersuaded by Plaintiffs' arguments, and instead adopts the reasoned conclusions of the D.C. District Court in its order dismissing the Tribe's claims as pleaded in the Second Amendment Complaint, which already considered at length the 1899 Act, *Ute D.C. Op.*, 560 F. Supp. 3d at 261, the 1906 Act, *id.* at 261–63, and the 1992 CUPCA, *id.* at 263, rejecting each in turn as a basis for the Tribe's breach-of-trust claims. Likewise, this court concludes that none of these treaties or acts creates a "conventional" trust relationship by express language sufficient to allow this court to impose common-law trust obligations on the federal government.

While the Tribe also argues that the 1968 Colorado River Basin Project Act created a conventional trust duty through recognition of the 1965 Deferral Agreement, *see* TAC ¶ 139, this court is persuaded that the Act neither creates any such conventional trust relationship, nor does it represent an express acceptance of any particular trust duty that would serve as the basis for a breach-of-trust claim as pleaded (as is discussed more in relation to Claim One below). *Arizona v. Navajo Nation*, 143 S. Ct. at 1813. Because this court is cautious to "stay in [its] proper constitutional lane," *id.*, it also will not attempt to derive an enforceable trust duty from any source other than "the text of a treaty, statute, or regulation," *id.*, such as the Solicitor's Memorandum, as Plaintiffs request. *See* ECF No. 222 at 3–4.

## II.     Applicable Statutes of Limitations and Accrual of Claims

### A.  As applied to Federal Defendants

Because "[j]urisdiction is power to declare the law," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998), courts typically begin with "jurisdictional questions." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007). Thus, generally, "[r]ather than assuming (without deciding) jurisdiction and going on to address the merits . . . a court must first establish as an antecedent matter that it has jurisdiction." *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 510 (D.C. Cir. 2018) (quotation omitted).

Nevertheless, it is well-established that courts may "choose among threshold grounds for denying audience to a case on the merits," *Sinochem*, 549 U.S. at 431, and may address certain nonjurisdictional, threshold issues so long as those issues can occasion a dismissal without reaching the merits. *Id*. In this case, one such threshold, nonjurisdictional issue is whether the Plaintiffs' claims are time-barred, because resolving timeliness does not involve any consideration of the merits of the claims pleaded. *Ute D.C. Op.*, 560 F. Supp. 3d at 256 (citing *Ajenifuja v. Dangote*, 485 F. Supp. 3d 120, 125–26 (D.D.C. 2020) (collecting cases) and *Elec. Privacy Info. Ctr. v. Fed. Aviation Admin.*, 821 F.3d 39, 41 n.2 (D.C. Cir. 2016) (avoiding an "arduous inquiry" into standing because timeliness afforded an "alternative . . . threshold ground for dismissal")).

When considering timeliness, a district court may dismiss a complaint as time-barred under Rule 12(b)(6) only "if the complaint itself admits all the elements of the affirmative defense by alleging the factual basis for those elements." *Fernandez v. Clean House LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018). Accordingly, this court, like the D.C. District Court, *Ute D.C. Op.*, 560 F. Supp. 3d at 256, will consider whether Plaintiffs' claims are time-barred as an independent ground for

dismissal insofar as all elements of the time-barred defense are admitted in the TAC and resolution of timeliness will not involve any consideration of the merits of the Plaintiffs' claims.

Plaintiffs argue that "there is no federal statute of limitations governing federal common law actions by Indians to enforce property rights," ECF No. 208 at 9, citing *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 241 (1985) ("*Oneida II*"). This court, however, is not persuaded that no statute of limitations should be applied in this case. *Oneida II* and the cases submitted by Plaintiffs as supplemental authority following oral argument on the motions to dismiss, *see* ECF No. 237, are inapt. As a threshold matter, the *Oneida* cases centered on Indians' "aboriginal title" to land and its relationship to the doctrine of discovery. *See Oneida II*, 470 U.S. at 233-34. The federal common-law action at issue in *Oneida II* (under which it may be true that there is no federal statute of limitations), is one to "enforce [] aboriginal land rights." *Id.* at 235; *accord Lewis v. Salazar*, No. 11-17301, 2013 U.S. App. LEXIS 4925, at *6 (9th Cir. Mar. 12, 2013); 9 POWELL ON REAL PROPERTY § 67.06[5][a] (discussing the narrow circumstances at issue under which the Oneida Tribe was exempt from otherwise-applicable statutes of limitations in that case).

Plaintiffs in the instant case do not maintain such a federal common-law action to enforce aboriginal title to land and therefore cannot avail themselves of whatever precedential value the *Oneida* cases might offer. Additionally, no case cited by Plaintiffs in their Supplemental Authority deals squarely with the statute of limitations issue *and* claims similar to their own. *Cf. Pueblo of Jemez v. United States*, 790 F.3d 1143, 1161-63 (10th Cir. 2015) (deciding accrual of claims under the Indian Claims Commission Act (ICCA), Pub. L. No. 79-726, 60 Stat. 1049, and involving Indian aboriginal title to land and the Indian "right of occupancy" under such doctrine); *Timpanogos Tribe v. Conway*, 286 F.3d 1195, 1204 (10th Cir. 2002) (citing *Oneida II* for

12

propositions regarding aboriginal title unrelated to the statute of limitations issue); *Pueblo of Isleta v. Universal Constructors, Inc.*, 570 F.2d 300 (10th Cir. 1978) (unrelated to timeliness issues); *Mescalero Apache Tribe v. Burgett Floral Co.*, 503 F.2d 336 (10th Cir. 1974) (same).

Instead, this court concludes, following a bevy of persuasive precedent, that Plaintiffs' claims are governed by the six-year statute of limitations set forward in 28 U.S.C. § 2401, which provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." *See Ute D.C. Op.*, 560 F. Supp. 3d at 256–57; *accord Sisseton-Wahpeton Sioux Tribe v. United States*, 895 F.2d 588, 592 (9th Cir. 1990) ("Indian Tribes are not exempt from statutes of limitations governing actions against the United States[.]"), *cert. denied*, 498 U.S. 824 (1990); *Christensen v. United States*, 755 F.2d 705, 706–08 (9th Cir. 1985); *San Carlos Apache Tribe v. United States*, 639 F.3d 1346, 1350–51 (Fed. Cir. 2011); *Chemehuevi Indian Tribe v. United States*, 150 Fed. Cl. 181, 212–13 (2020); *Comanche Nation v. United States*, 393 F. Supp. 2d 1196, 1208 (W.D. Okla. 2005); *Kiowa Tribe v. United States DOI*, No. CIV-22-425-G, 2022 U.S. Dist. LEXIS 99449, at *10 (W.D. Okla. June 3, 2022).

### B.  As applied to State Defendants

Additionally, although 28 U.S.C. § 2401(a), on its face, bars "civil action[s] commenced against the United States," it is not applied only against the federal government. The Tenth Circuit has previously affirmed the dismissal of claims as time-barred against non-federal defendants, pointing to § 2401(a) as providing the applicable statute of limitations for claims as against all defendants in an action. *See Ute Distribution Corp. v. Sec'y of Interior of U.S.*, 584 F.3d 1275, 1284 (10th Cir. 2009); *accord Izaak Walton League of Am., Inc. v. Kimbell*, 558 F.3d 751, 753, 757–58, 760–63 (8th Cir. 2009) (holding that § 2401 barred two claims against both federal

defendants *and* intervenor-defendant Cook County, a political subdivision of Minnesota); *see also Sierra Club v. Penfold*, 857 F.2d 1307, 1310, 1315 (9th Cir. 1988) (holding that § 2401(a) barred claims not only against federal defendants but also against intervenor-defendant Alaska Miners Association); *Chance v. Zinke*, 898 F.3d 1025, 1035 (10th Cir. 2018).

Additionally, the better part of this action, including all claims for breach of trust (Claims One through Eight and Claim Eleven), is unambiguously a "civil action commenced against the United States." 28 U.S.C. § 2401(a). Although Plaintiffs have sought to add non-federal Defendants to these claims (despite the ostensible lack of a predicate trust duty),[1] this court concludes that the statute of limitations provided by § 2401 governs *actions*—that is, the cause of action—not merely those fractions of actions that are directed toward the federal government itself.

Because Plaintiffs' breach of trust claims constitute a "civil action commenced against the United States," 28 U.S.C. § 2401(a), and because both binding and precedential caselaw demonstrate a pattern of broad application of that section, including as to non-federal defendants, this court concludes that where § 2401(a) provides the applicable statute of limitations for Plaintiffs' claims as originally filed against the Federal Defendants, it is properly applied as against all Defendants, notwithstanding Plaintiffs' arguments to the contrary. *See* ECF No. 207 at 15. The appropriate statute of limitations for claims brought under Claim Eleven is discussed in greater detail below.

---

[1] This court harbors grave doubts that any claims based upon a theory of breach of trust can be maintained in the first place against the non-federal Defendants, notwithstanding Plaintiffs' *avant-garde* theory that they might be liable insofar as they "reaped the benefits" of the federal government's actions. TAC ¶ 207. However, to avoid confronting this question squarely, the court elects to resolve these claims on timeliness grounds and a general failure to identify a cognizable trust duty held by *any* Defendant, as discussed below.

### C. Continuing Violation Doctrine

Plaintiffs' Third Amended Complaint now contains legion references to the continuing violation doctrine to ward off the defense of statute of limitations. *See* TAC ¶¶ 189–201, 212–13, 223–24, 244–45, 250–51, 259, 268–69, 276–77. Generally, "[a] claim against [the] United States first accrues on the date when all events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Ute Distribution Corp.*, 584 F.3d at 1282 (citing *Izaak Walton League of Am., Inc.*, 558 F.3d at 759); *accord SEC v. Kokesh*, 884 F.3d 979, 982 (10th Cir. 2018) ("[A] claim accrues when the plaintiff has a complete and present cause of action. In other words, a claim accrues as soon as the plaintiff can file suit and obtain relief."). However, in some cases, the continuing violation doctrine may toll the date of the accrual of claims. *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 112 (2002); *Herrera v. City of Espanola*, 32 F.4th 980, 993–994 (10th Cir. 2022) (citing *Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 740 (5th Cir. 2017)).

As recognized by the Tenth Circuit in *Herrera*, the doctrine "applies when the plaintiff's claim seeks redress for injuries resulting from a series of separate acts that collectively constitute one unlawful act, as opposed to conduct that is a discrete unlawful act." 32 F.4th at 993 (citing *Hamer*, 924 F.3d at 1098). Additionally, "[a]n important caveat to the continuing violation doctrine . . . is that it is triggered by continual unlawful acts, not by continual ill effects from the original violation." *Id*. The application of the continuing violation doctrine is considered at greater length below as applied to the particular circumstances pleaded in each claim. However, this court ultimately concludes that no claims otherwise barred by the statute of limitations (to the extent any are properly pleaded) are saved by the continuing violation doctrine.

Additionally, Plaintiffs frequently append to citations of the continuing violation doctrine in Claims One through Eight a reference to the doctrine of unreasonable delay. *See, e.g.*, TAC ¶¶ 199-201, 213, 224, 245, 251, 269, 277. This court concludes, however, as did the D.C. District Court, that because Plaintiffs do not plead any claims under APA § 706(1), with the exception of Claim Ten (not at issue here) and possibly Claim Seven, their reference to the doctrine of unreasonable delay as to all other claims is *non sequitur*. *See Ute D.C. Op.*, 560 F. Supp. 3d at 258 n.5. The application of this doctrine is considered at greater length in conjunction with Claim Seven below.

### III.   **Estoppel and Judicial Admissions**

Relatedly, Plaintiffs invoke the doctrines of estoppel and judicial admissions as alternatives to a treaty-, statute-, or regulation-based trust duty or to otherwise save their claims from dismissal on timeliness grounds. *See* TAC ¶¶ 199–200. In particular, they point to previous litigation by the United States, and statements made by the United States on the subject of the Tribe's water rights in the course of such litigation, as constituting a judicial admission of the validity or amount of the Tribe's water rights or, alternatively, as a basis for this court to estop the Defendants from asserting the defense of the statute of limitations. *See* TAC ¶¶ 50, 218. The court briefly considers these arguments related to judicial admissions, equitable estoppel, and equitable tolling in turn and concludes, in its discretion,[2] that none are properly applicable.

---

[2] The Tenth Circuit reviews statute-of-limitations rulings *de novo*, but any underlying rulings on equitable tolling and equitable estoppel are reviewed only for abuse of discretion. *Braxton v. Zavaras*, 614 F.3d 1156, 1159 (10th Cir. 2010) (equitable tolling); *Spaulding v. United Transp. Union*, 279 F.3d 901, 911 (10th Cir. 2002) (equitable estoppel); *accord Harding v. Watch Tower Bible & Tract Soc'y of N.Y., Inc.*, No. 22-6029, 2022 U.S. App. LEXIS 21133, at *2-3 (10th Cir. Aug. 1, 2022).

### A.  Judicial Admissions

"Judicial admissions are formal, deliberate declarations which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute." *U.S. Energy Corp. v. Nukem, Inc.*, 400 F.3d 822, 833 n.4 (10th Cir. 2005) (cleaned up). Plaintiffs argue that the Federal Defendants

> conceded in their *Cedarview* and *Dry Gulch* complaints that the Tribe's Treaties with the United States and the Tribe's dependent status impose upon the Federal Defendants specific and enforceable trust duties to secure, protect, preserve, and assist the Tribe in developing its *Winters* Reserved Water Rights—a judicial admission the Federal Defendants cannot now repudiate[.]

TAC ¶ 218; *see also id.* ¶ 50.

This argument is flawed for two reasons. First, "[a] judicial admission in one case does not have the conclusive effect of a judicial admission in a different case, but operates as an ordinary admission of a fact in the other case." *Lopez v. Lopez (In re Lopez)*, 2009 Bankr. LEXIS 3594, at *9 (Bankr. D.N.M. Nov. 5, 2009). As an ordinary admission, however, any statement or admission made in the 1923 litigation could "be controverted or explained by [the] party" in the current litigation, *Asarco, Ltd. Liab. Co. v. Noranda Mining, Inc.*, 844 F.3d 1201, 1212 n.3 (10th Cir. 2017); 30B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 7026 (Kenneth W. Graham, Jr. & Michael H. Graham eds., 4th ed. 2014) (collecting cases), and is not binding.

Second, and more importantly, because the purported judicial admission made by the Federal Defendants is best characterized as a *legal conclusion* (i.e., that a trust duty exists as a matter of law), it is not truly a judicial admission at all, and does not even constitute an ordinary admission. *Guidry v. Sheet Metal Workers International Association, Local No. 9*, 10 F.3d 700,

17

716 (10th Cir. 1993) ("The doctrine of judicial admissions applies only to admissions of fact; it does not apply to admissions of legal conclusions or of propositions of law.").

Thus, the doctrine of judicial admissions is inapplicable or otherwise inappropriate here. As stated above, the Plaintiffs must find, in a treaty, statute, or regulation, the express acceptance of a trust duty, and the court will not find an alternative basis for a breach-of-trust cause of action in statements made in the course of prior litigation. *See Arizona v. Navajo Nation*, 143 S. Ct. at 1813. Although the doctrine of judicial admissions may serve as a fact-finding substitute, it cannot serve as a cause-of-action substitute.

### B.  Equitable Estoppel and Tolling

Second, as an alternative to the continuing violation doctrine, discussed above, Plaintiffs seek to avail themselves of the doctrines of equitable estoppel and equitable tolling, TAC ¶ 199, on the basis of the Tribe's negotiations with the Defendants regarding the scope of the Tribe's water rights and the delays in the completion of the CUP. *Id.* ¶ 200. Indeed, Claims One, Three and Seven include, in their titles, "Estoppel." As to the First Claim (and impliedly to the Third, also on the issue of the 1965 Agreement), Plaintiffs assert that the Federal Defendants are "estopped from repudiating their agreement to the [1965] Agreement's quantification of the Tribe's Water Rights," *id.* ¶ 210, but do not expressly explain the application of estoppel to the Seventh Claim or otherwise carry their burden to justify the application of the equitable doctrine. *See Balmer Fund, Inc. v. City of Harper*, 294 F. Supp. 3d 1136, 1148 (D. Kan. 2018) (a party asserting equitable estoppel bears the burden of showing such facts as necessary under the doctrine); *Doe v. Espanola Pub. Sch.*, No. 17-917 KK/LF, 2019 U.S. Dist. LEXIS 22886, at *34 (D.N.M. Feb. 12, 2019) (same); *John Bean Techs. Corp. v. B GSE Grp.*, LLC, 480 F. Supp. 3d 1274, 1321 (D. Utah 2020) (same).

Generally, the elements of equitable estoppel include "a lack of knowledge, reliance in good faith, and action or inaction that results in an injury. Equitable estoppel is similar to promissory estoppel, but equitable estoppel is a tort doctrine that requires proof of misrepresentation." *Black Card, LLC v. Visa U.S.A., Inc.*, 766 F. App'x 583, 594 (10th Cir. 2019) (cleaned up). Similarly, under Utah law:

> The doctrine of equitable estoppel may, in a proper case, be invoked to prevent defendant from relying upon the statute of limitations, it being laid down as a general principle that, when a defendant, electing to set up the statute of limitations, previously by deception or any violation of duty towards plaintiff has caused him to subject his claim to the statutory bar, he must be charged with having wrongfully obtained an advantage which equity will not allow him to hold.

*Anderson v. Cercone*, 54 Utah 345, 353–54 (1919).[3]

Much like the doctrine of equitable estoppel, under the doctrine of equitable tolling, a Plaintiff must "show that (1) he 'diligently' pursued his rights but (2) some 'extraordinary circumstance' prevented him from timely filing his claim. *Harding v. Watch Tower Bible & Tract Soc'y of N.Y., Inc.*, No. 22-6029, 2022 U.S. App. LEXIS 21133, at *5 (10th Cir. Aug. 1, 2022) (quoting *Lozano v. Montoya Alvarez*, 572 U.S. 1, 10 (2014)). Additionally, because equity does not aid those who slumber on their rights, a plaintiff "cannot fail to exercise due care and at the same time invoke the doctrine of equitable estoppel." *COF Training Servs. v. TACS, Inc.*, 2007 U.S. Dist. LEXIS 57173, at *10 (D. Kan. Aug. 3, 2007).

Here, the particular facts of the Plaintiffs' claims, including Claims One, Three, and Seven, fail to show that extraordinary circumstances prevented the Plaintiffs from timely filing their

---

[3] Although it is not necessary to discuss at length here, the Plaintiffs' claims of "estoppel," to the extent that they plead the intentional tort of estoppel by misrepresentation, raise a number of fatal issues related to sovereign immunity. *See Rapid Enters., LLC v. United States Postal Serv.*, No. 2:22-cv-00627-JNP-JCB, 2023 U.S. Dist. LEXIS 164617, at *19-23 (D. Utah Sep. 14, 2023).

claims related to the 1965 Deferral Agreement (the basis of Claims One and Three) or the Bottle Hollow Reservoir funding provisions of the CUPCA (the basis of Claim Seven). As discussed below, Plaintiffs knew or should have known all necessary facts to support a claim under the 1965 Deferral Agreement long before mid-2012, and the Defendants' actions (including participation in negotiations stemming from the 2006 litigation), could not have reasonably induced the Plaintiffs to delay their action until after the period had run. *See Fitzgerald v. Spearhead Invs., LLC*, 493 P.3d 644 (Utah 2021). While the Plaintiffs' attempts to toll the accrual of the claims pleaded is discussed at greater length below in relation to Claims One and Three, this court ultimately declines to conclude that any tolling doctrine saves any claims otherwise subject to timeliness-based dismissal. Thus, Plaintiffs' equitable arguments are unavailing as to any claim.

**APPLICATION**

## I.  Claim One

Claim One seeks declaratory and enforcement relief for breach of trust relating to the 1965 Deferral Agreement, including declarations: (i) that the Agreement would be void *ab initio* but for its effect as a binding quantification of the Tribe's Water Rights; (ii) that Defendants are estopped from repudiating the quantification set forward in the Agreement; and (iii) that the United States has a trust obligation to defend the full quantity of Water Rights agreed to in the Deferral Agreement. TAC ¶ 214.

### A.  Failure to State a Claim

Although captioned "Estoppel, Breach of Trust, Declaratory and Enforcement Relief," Plaintiffs do not identify any "treaty, statute, or regulation" in which the federal government has "expressly accept[ed]" trust duties to perform the terms of the 1965 Deferral Agreement, *Arizona v. Navajo Nation*, 143 S. Ct. at 1813, and, as discussed above, none of the treaties or statutes

generally relied upon by the Plaintiffs create any such particular duties with regard to the 1965 Deferral Agreement. Although the 1968 Act, as Plaintiffs note, mentions the 1965 Deferral Agreement, it does *not* expressly accept the terms of the Agreement in such a way as to provide a cause of action under breach of trust. *Id.*; *contra* TAC ¶ 139. Instead, that Act merely indicates that a planning report for the Ute Indian Unit of the CUP should be completed before 1975 to meet commitments previously made by way of the 1965 Agreement. *Id.* In addition, any commitment made in that Act is expressly disclaimed by the adoption of the 1992 CUPCA, which was intended to compensate the Tribe for the government's failure to fulfill its obligations under the 1965 Agreement, as is discussed below at greater length in relation to Claim Three. For this reason, Plaintiffs fail to state a cognizable cause of action, and Claim One is properly dismissed.

## B. Timeliness

Additionally, a substantially similar claim as pleaded in the SAC was previously dismissed by the D.C. District Court, *Ute D.C. Op.*, 560 F. Supp. 3d at 256-58, because any civil claim related to the 1965 Deferral Agreement would have accrued, under 28 U.S.C. § 2401(a), by the 1992 passage of the CUPCA at the latest, insofar as the Tribe "knew or should have known that Defendants would not meet or honor its alleged rights under the 1965 Deferral Agreement or earlier cases and agreements." *Id.* at 257 (citing *Spannaus v. U.S. Dep't of Justice*, 824 F.2d 52, 56–57 (D.C. Cir. 1987) (claims accrue as soon as a plaintiff could have "maintain[ed] a suit in court."), *overruled on other grounds by Jackson v. Modly*, 949 F.3d 763 (D.C. Cir. 2020)). This court agrees with the D.C. District Court that Claim One is properly dismissed as time-barred, even assuming, *arguendo*, that a trust obligation was assumed by the federal government by way of the 1968 Act.

This is so because CUPCA was expressly designed to "put the Tribe in the same economic position it would have enjoyed had the features contemplated by the [1965 Deferral Agreement]

21

been constructed," CUPCA § 501(b)(1), (3), 106 Stat. at 4651, and settle any claims related to the 1965 Agreement. The continuing violation doctrine did not toll the Plaintiffs' cause of action until 2012, *contra* TAC ¶¶ 211–12, because numerous actions before and as late as 1992 by the Defendants put the Tribe on notice that the 1965 Deferral Agreement would not be honored. *See Ute Distribution Corp.*, 584 F.3d at 1283 (the continuing wrong doctrine is not applicable when "the plaintiff's injury is definite and discoverable, and nothing prevented plaintiff from coming forward to seek redress . . . Thus, [the plaintiff] cannot rely on the continuing wrong doctrine to save its action from being dismissed as untimely"). The D. C. District Court already considered and rejected such an argument with regard to the SAC. *See Ute D.C. Op.*, 560 F. Supp. 3d at 257–58. In the TAC, Plaintiffs clarify their argument regarding claim accrual and argue that because they were in negotiations with the Defendants over a water compact, which they now plead is "a statutory requisite under CUPCA," TAC ¶ 211, the complaint was timely filed.

But the new allegations included in the TAC are unavailing and fail to cure the deficiencies identified by the D.C. District Court. Section 507 of CUPCA conditions the Tribe's waiver of claims under the 1965 Agreement only on the receipt of moneys described in §§ 504, 505, and 506 of the Act. *See* 106 Stat. at 4655. Because Congress has inherent power to "modify or eliminate tribal rights" by statute, *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 343 (1998), *contra* TAC ¶ 205 ("Defendants' agreement was a necessary predicate for there to be a legally enforceable deferral of the Tribe's vested property rights[.]"), the Tribe's receipt of moneys was sufficient to effectuate the § 507 waiver and no "arms-length negotiations" were necessary. *Contra* TAC ¶ 208. More discussion regarding the CUPCA waiver provision, the Tribe's receipt of these moneys, and the Tribe's failure to adopt the 1990 revised compact, is included below in relation to Claim Three.

22

In short, any claims related to the federal government's obligations under the 1965 Deferral Agreement at issue in Claim One certainly accrued no later than 1992. The Tribe should have known at the passage of the Act in 1992 that the United States would not observe the terms of the 1965 Agreement, since the Act was intended to settle any and all claims related to the Agreement, and since it was intended to be a substitute for that Agreement. *See Nicholas v. Boyd*, 317 Fed. App'x. 773, 778 (10th Cir. 2009) (claim accrued when plaintiffs "should have known" facts necessary to bring a claim); *Mercer-Smith v. N.M. Children*, 416 Fed. Appx. 704, 710 (10th Cir. 2011) (same); *Colby v. Herrick*, 849 F.3d 1273, 1279 (10th Cir. 2017) (same). No inference from the fact of ongoing negotiations can be drawn that would entitle the Plaintiffs to avail themselves of the continuing violation doctrine, regardless of subsequent negotiations or correspondence. *See* TAC ¶ 195. Additionally, the newly added references to the doctrine of unreasonable delay under APA § 706(1) are irrelevant to Claim One, as the Plaintiffs do not plead a cause of action under § 706(1) in the first place, as discussed above. Thus, the TAC does not adequately cure any pleading defect recognized by the D.C. District Court in its order, and the TAC's First Claim is properly dismissed as time-barred.

## II.     Claim Two

Through their Second Claim, Plaintiffs seek a "decree requiring" the Federal Defendants to "immediately provide access to water storage infrastructure" or, in the alternative, "to construct storage infrastructure" needed to supplement its Winters water rights outlined in the 1923 Decrees. TAC ¶ 225. Plaintiffs base their breach-of-trust claim on Federal Defendants' "comprehensive, pervasive, elaborate, and exclusive control" over the 1923-decreed Winters reserved water rights and the UIIP. TAC ¶ 220.

However, as made clear by the Supreme Court in *Arizona v. Navajo Nation*, the "Federal Government's liability" on a breach-of-trust claim "cannot be premised on control alone." 143 S. Ct. at 1815 (citing *United States v. Navajo Nation*, 556 U. S. at 301). Additionally, Plaintiffs are unable to point to any express acceptance of a trust duty by treaty, statute, or regulation to provide access to water storage infrastructure as needed to supplement its 1923-decreed reserved water rights and to allow delivery of sufficient irrigation water to all irrigable lands within the UIIP service area, or to otherwise to construct storage infrastructure needed to satisfy this purpose. *See id.* at 1813. Because Plaintiffs' Second Claim fails to identify an enforceable trust duty that has been breached by the Federal Defendants, they have failed to state a claim upon which relief can be granted. *See also Ute D.C. Op.*, 560 F. Supp. 3d at 260–63.

As in Claim One, Plaintiffs' reference to the doctrine of unreasonable delay is inapt because Plaintiffs do not plead a cause of action under APA § 706(1) and there is no mandatory, nondiscretionary duty that the United States was required, but failed, to perform. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

### III.   Claim Three

#### A.  Failure to State a Claim

In their Third Claim for Relief, Plaintiffs seek declaratory relief related to the 1992 CUPCA statute, including any one of a series of declarations that the Act (i) does not waive the Plaintiffs' claims related to the 1965 Deferral Agreement insofar as the conditions for the waiver have not been met; (ii) that such waiver is limited to contract-based claims alone; and/or (iii) that such waiver is unenforceable as based on a "mutual mistake," or that Title V of the Act is otherwise "unconscionable." *Id*. ¶¶ 240–43.

Rather than pointing to a particular "treaty, statute, or regulation" in which the government "expressly accept[ed]" any particular trust responsibility, *Arizona v. Navajo Nation*, 143 S. Ct. at 1813, Plaintiffs argue that the United States, through Federal Defendants, has "affirmatively acknowledged and assumed" a general "trust responsibility to act in the Tribe's best interest" on "multiple instances." TAC ¶ 233. In support of this proposition, Plaintiffs cite a 1993 Cost-Sharing Agreement between the Department of the Interior and CUWCD, *id*., a DOI legal memorandum, *id*. ¶ 234, and a "Certification of Indian Water righted lands," *id*. ¶ 235. But none of these documents, regardless of content, can serve as the basis for an enforceable trust obligation or breach-of-trust action under *Jicarilla* and *Arizona v. Navajo Nation*. *See* 143 S. Ct. at 1813.

Additionally, none of these documents represent an "*express* accept[ance]" of any "particular" trust duties. *Id*. (emphasis added). At most, these documents merely recognize, generally, that authorized government actions should be "consistent with" existing trust duties, TAC ¶ 233, or state that the United States "recognize[s]" reservation water rights. *Id*. ¶ 234. CUPCA itself merely "authorized construction of water storage," *id*. ¶ 229, and did not create any mandatory trust obligation, the breach of which could support the Plaintiffs' claim. Relatedly, Plaintiffs fail to identify any legal theory under which a provision of federal law adopted by the political branches could be set aside or judged unenforceable by a federal court for "mutual mistake," *id*. ¶ 242, or unconscionability. *Id*. ¶ 243. Thus, Claim Three is properly dismissed as failing to state a claim upon which relief can be granted as Plaintiffs identify no breach of any cognizable trust duty.

### B. Timeliness

Claim Three is also, like Claim One, properly dismissed in its entirety as time-barred. Unlike Claim One, this Claim relates to the interpretation of the 1992 Act rather than the effect or

validity of the 1965 Agreement itself. Thus, this court will concede that whether Claim Three is time-barred should be analyzed independently of the accrual calculus applicable to the First Claim. And, unlike the D.C. District Court, this court does not take the Tribe's pleading in earlier litigation, ECF No. 68-8, to stand for the proposition that the Tribe "acknowledged its receipt of [the] funds" sufficient to effect the waiver. *See Ute D.C. Op.*, 560 F. Supp. 3d at 263 n.12.[4] Instead, "accept[ing] as true" Plaintiffs' factual allegations, *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997), this court accepts that the full amount of money due may have been in excess of the $257m that the Tribe acknowledged receiving. ECF No. 68-8 ¶ 36.

But the fact that the Tribe did not receive the *full* amount of moneys due under §§ 504–506, even if accepted as true, entitles the Tribe, at most, to seek actions "for accounting" for moneys owed and interest at 10 percent. CUPCA § 507(c). By pleading in 2006 that the United States failed to pay the full amount owed under § 507, the Tribe demonstrated that it was aware of all material facts that provide the basis for the Claim for Relief it now pleads. Although the Tribe was, in fact, in negotiations with the federal government until mid-2012, as the Plaintiffs plead, TAC ¶ 238, there is no indication from the TAC or any materials of which this court has taken judicial notice that such negotiations would have revealed any additional facts necessary to support this Claim. Instead, the 2006 litigation, and the resulting 2012 Settlement Agreement, concerned only the management and productivity of the CUPCA Trust Funds.

Even if the Tribe were to have prevailed in its 2006 litigation, it would have received only compensation and other relief related to the government's failure to tender full payment under

---

[4] Indeed, SAC ¶ 18 alleged that the United States "failed to fund timely the CUPCA Trust Funds." *See* ECF No. 68-8 at 7.

CUPCA. Thus, no material fact related to this Claim was unknown or undiscoverable to the Tribe pending the conclusion of the ongoing negotiations. Instead, this court views the Plaintiffs' allegations that the negotiations prevented them from knowing the material facts necessary to support this claim as conclusory and insufficiently pleaded.

"A general allegation [in a complaint] of ignorance at one time and of knowledge at another are of no effect. If the plaintiff made any particular discovery, it should be stated when it was made, what it was, how it was made, and why it was not made sooner." *Wood v. Carpenter*, 101 U.S. 135, 140–41 (1879); *see also Herrera*, 32 F.4th at 992 (placing the burden on the party seeking to toll the statute of limitations by operation of the continuing violation doctrine). There is no fact pleaded or rational inference to be drawn therefrom that supports a conclusion that the Plaintiffs' discovery of material facts hinged on the outcome of the negotiations. Thus, this court declines to toll the accrual of any claim that the Plaintiffs may have had until mid-2012. The time has passed for Plaintiffs to seek to outright invalidate CUPCA on the grounds pleaded in Claim Three. And here, as above, the Plaintiffs' citation to APA § 706(1) and reference to the unreasonable delay action is *non sequitur*. Thus, Claim Three is properly dismissed for failure to state a claim upon which relief might be granted and as untimely filed.

### C.  Waiver

Additionally, the Tribe voluntarily waived and released any claim or cause of action, "known or unknown," "based on harms" stemming from non-payment of the funds. *See* ECF No. 68-4 § 3. Otherwise stated, the Tribe, in 2006, sought to compel the full payment of CUPCA funds. The Tribe settled that suit for a sum of $125m, *id*. § 2, and agreed to release

> any and all claims, causes of action, obligations, and/or liabilities of any kind or
> nature whatsoever, known or unknown, regardless of legal theory, for any damages
> or any equitable or specific relief, that are based on harms or violations occurring

> before the date of the execution of this Settlement Agreement by both Parties and that relate to the United States' management or accounting of Plaintiff's trust funds or Plaintiff's non-monetary trust assets or resources.

*Id*. § 3 (emphasis added).

This waiver and release included any and all claims that "[t]he United States failed to deposit monies into trust funds or disburse monies from trust funds in a proper and timely manner," *id*. § 4(c)(3), or otherwise relating to "[t]he United States' alleged failure to perform trust duties related to the management of trust funds and non-monetary trust assets or resources, as set out in the complaint filed in this case and in this Settlement Agreement, that were alleged to be owed to Plaintiff, at any time up to the date of the execution of this Settlement Agreement by both Parties." *Id*. § 4(d). Thus, to the extent that the Plaintiffs assert that non-receipt of the CUPCA trust funds provides any basis for their cause of action, even accepting as true that the *full* amount of moneys owed was not received (as discussed above), such claims were waived under the 2012 Settlement Agreement.

To the extent that the Plaintiffs allege that additional conditions—either ratification of the proposed compact or construction of certain facilities—were necessary to effectuate the CUPCA waiver, this court disagrees as a matter of statutory interpretation. While the court must accept as true all of the allegations contained in a complaint, this tenet is inapplicable to legal conclusions. *Iqbal*, 556 U.S. at 678. This court, as a matter of law, does not agree with Plaintiffs that Title V of CUPCA was conditioned on the Tribe's ratification of the proposed revised Compact. *Contra* TAC ¶ 239. Rather, § 507 of the Act conditions the Tribe's waiver of claims related to the 1965 Agreement (and thus the scope of the federal government's trust duty, per *Yankton Sioux*, 522 U.S. at 343), *only* upon the receipt of the moneys. Section 501(b), which consists of the purpose statement of the Congress, merely states that "[t]his Act and the proposed Revised Ute Indian

28

Compact of 1990 are intended to" accomplish a number of identified goals. 106 Stat. at 4651. There is no indication that the § 507 waiver, which states that "[t]he Tribe shall waive, upon receipt of the section 504, 505, and 506 moneys, any and all claims relating to its water rights covered under the agreement of September 20, 1965" is additionally contingent upon the general purposive provisions of the statute. *See* 106 Stat. at 4655. Even if the purposive provisions of § 501 could somehow be shoe-horned into § 507, there is no indication from the plain text of § 501 itself that the fact that the Act and the proposed Compact are *both* directed toward the same general congressional aspirations means that either one is contingent upon the other.

### D.  A Note on Takings

Finally, at TAC ¶ 243, Plaintiffs cursorily allege that Title V of CUPCA constitutes an uncompensated taking of tribal property. However, Plaintiffs fail to plead sufficient facts that would provide this court with jurisdiction to hear any claims arising under the Takings Clause of the Fifth Amendment, even if they were not time-barred. *Capitol Park Ltd. Dividend Hous. Ass'n v. Jackson*, 202 F. App'x 873, 879 (6th Cir. 2006) (citing *Eastern Enter. V. Apfel*, 524 U.S. 498, 521 (1998)) ("It is well-established that regardless of the nature of the relief sought, the availability of the Tucker Act renders premature any takings claim in the federal district court."); *Broughton Lumber Co. v. Yeutter*, 939 F.2d 1547, 21 Envt'l. L. Rep. 21477, 1991 U.S. App. LEXIS 14703 (Fed. Cir. 1991) (federal district court lacked jurisdiction to hear takings claims); *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988); *see also Ingrum v. United States*, 560 F.3d 1311, 1314 (Fed. Cir. 2009) ("[A] claim alleging a Fifth Amendment taking accrues when the act that constitutes the taking occurs.").

### IV.    Claim Four

29

Through their Fourth Claim for Relief, Plaintiffs seek a "decree directing the Federal Defendants to rehabilitate the UIIP infrastructure as required in order to reinstate optimal efficiency in delivering tribal water to irrigable lands" on the reservation. TAC ¶ 252. In support of this claim, as in Claim Two, Plaintiffs point to Federal Defendants' "comprehensive, pervasive, elaborate, and exclusive control" over the administration of the UIIP as evidence of a trust obligation. *Id*. ¶ 247.

For the reasons stated above in the consideration of the Plaintiffs' Second Claim, this court holds that the Act authorizing the UIIP did not create a mandatory trust duty requiring the federal government to maintain "optimal efficiency in delivery of tribal water" to irrigable reservation lands, and, as above, control alone is insufficient to support a breach-of-trust claim. *Arizona v. Navajo Nation*, 143 S. Ct. at 1815. Thus, Plaintiffs have failed to state a claim upon which relief can be granted and Claim Four is properly dismissed.

## V.     Claim Five

In their Fifth Claim for Relief, Plaintiffs seek a declaration that the 1967 Midview Exchange Agreement is illegal, TAC ¶ 260, that Plaintiffs are "entitled to the imposition of a constructive trust on the Tribe's federally decreed water rights" that they allege were illegally alienated by the 1967 Midview Exchange Agreement, *id.* ¶ 258, as well as the *actual imposition* of such a constructive trust. *Id*. at ¶ 260. In their Response to the Federal Defendants' Motion to Dismiss, ECF No. 210 at 29, Plaintiffs characterize Claim Five as a request that this court "declare

that the transfer of tribal water rights under the Midview Exchange violated federal statute 25 U.S.C. § 177 [The Indian Non-Intercourse Act]." *Id.*[5]

### A.  Failure to State a Claim

Defendants argue, in turn, (i) that the Tribe lacked, at any point, beneficial ownership of the Midview Property, and that exchange of the property thus could not violate the Indian Non-Intercourse Act; and (ii) that the Indian Non-Recourse Act is inapplicable to "conveyances to or condemnations by the United States or its licensees," *Federal Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 119 (1960), meaning that the Plaintiffs thus fail to state a claim under the Indian Non-Recourse Act. *See* ECF No. 200 at 27–29. As a matter of statutory interpretation regarding the federal government's duties, the court agrees with Defendants that *Tuscarora Indian Nation* forecloses any claims under the Indian Non-Recourse Act for exchanges or transfers to, or arising from condemnations by, the United States, as applicable in the instant case. However, even if all of Plaintiffs' factual pleadings in Claim Five were sufficient and plausible, and setting aside the issue of the proper interpretation of *Tuscarora Indian Nation*, Plaintiffs fail to establish what cause of action entitles them to the imposition of a constructive trust over the water rights allegedly exchanged by the Agreement as a separate remedy requested in TAC ¶ 260.

At TAC ¶ 258, Plaintiffs point to *Tenneco Oil Company v. Joiner*, 696 F.2d 768 (10th Cir. 1982), for the proposition that "a constructive trust will be imposed where a fiduciary duty exists and the fiduciary violates the 'duty of loyalty and honesty which the relationship demands.'" TAC

---

[5] In relevant part, The Indian Non-Intercourse provides that "[n]o purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." 25 U.S.C. § 177.

¶ 258. But *Tenneco* is not properly read for the proposition that a violation of a fiduciary duty is sufficient for the imposition of a constructive trust, as Plaintiffs suggest. *See id*. Instead, *Tenneco Oil* holds that the violation of a duty of loyalty and honesty is a necessary, but not sufficient, precondition for the imposition of such a trust. *See* 696 F.2d at 775 ("In order for a constructive trust to be declared there must exist not only a fiduciary relationship, but also the violation of the duty of loyalty and honesty which the relationship demands.").

In any case, the general equitable remedy of constructive trusts available in common-law fiduciary relationships is inapposite in the context of the federal government's trust obligations to Indian Tribes. Instead, Plaintiffs must find that the government has "expressly accept[ed]" a trust duty or otherwise created a "conventional trust relationship" that would entitle Plaintiffs to the common-law equitable remedy of a constructive trust. *See Arizona v. Navajo Nation*, 143 S. Ct. at 1813– 14 ("[U]nless Congress has created a conventional trust relationship with a tribe as to a particular trust asset, this Court will not apply common-law trust principles to infer duties not found in the text of a treaty, statute, or regulation.") (quotation omitted). Because they have failed to do so, and because, as discussed above, no treaty, statute, or regulation creates a conventional trust relationship between the Tribe and the federal government, *id*., Plaintiffs have failed to state a claim upon which relief can be granted.

### B. Timeliness

Additionally, setting aside the nature of the government's trust obligations to the Tribe, Claim Five is untimely filed. Like the D.C. District Court, this court concludes that any viable claim the Plaintiffs may have had relating to the lawfulness of the 1967 Exchange Agreement "accrued back in 1967, when the allegedly unlawful conveyance occurred." *Ute D.C. Op.*, 560 F. Supp. 3d at 258. In the TAC, Plaintiffs attempt to overcome the timeliness issue by alleging that

"the Federal Defendants induced the Tribe into executing the Agreement based on promises that they made to the Tribe that were false and illusory," that the Tribe "reasonably place[d] its trust and reliance in the Federal Defendants' superior knowledge and sophistication," and that "the Tribe had no reason to know or suspect that the Agreement violated 25 U.S.C. § 177 [The Indian Non-Recourse Act], or that the Agreement was not in the Tribe's best interest," TAC ¶ 258, all of which, taken together, are supposed to mean that the accrual of Plaintiffs' claims was tolled until 2014. *Id*.

However, these amended pleadings are problematic for several reasons. First, regardless of whether Rule 9(b) demands particularity in pleading "constructively fraudulent" actions,[6] this court concludes that the TAC lacks "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Clinton v. Sec. Ben. Life Ins. Co.*, 63 F.4th 1264, 1280 (10th Cir. 2023) (citing *Iqbal*, 556 U.S. at 678), which would serve as the basis for the tolling of any claims arising under the 1967 Midview Exchange Agreement.

Otherwise stated, the Plaintiffs' conclusory allegations that it had no reason to know that the Agreement violated their rights under the Indian Non-Recourse Act until 2014, or that the government's actions were otherwise constructively fraudulent, are "naked assertions devoid of further factual enhancement," *Iqbal*, 556 U.S. at 678 (cleaned up), and the Plaintiffs have thus failed to provide a sound basis for tolling the accrual of their claims under the continuing violation doctrine. *See Herrera,* 32 F.4th at 992 (placing burden on party seeking to toll the statute of limitations); *Allen v. Exec. Dir. of Colo. Dep't of Corr.*, No. 21-1030, 2021 U.S. App. LEXIS

---

[6] Which apparently remains an open question in the Tenth Circuit. *See Growtech Indus., LLC v. Mary Mechanix*, L.L.P., 2022 U.S. Dist. LEXIS 173861, *9 n.5 (W.D. Okla. 2022).

35670, at *4 (10th Cir. Dec. 2, 2021) (same); *Slusser v. Vantage Builders, Inc.*, 2013- NMCA 073, 306 P.3d 524, 531-32 (N.M. Ct. App. 2013) (same).

Also, as it relates to allegations that the Plaintiffs did not know that the 1967 Exchange may have violated the Indian Non-Resource Act until 2014, this court again points to *Wood v. Carpenter*: "A general allegation [in a complaint] of ignorance at one time and of knowledge at another are of no effect. If the plaintiff made any particular discovery, it should be stated when it was made, what it was, how it was made, and why it was not made sooner." 101 U.S. at 140–41. It is simply unclear from the face of pleadings why the fact that "[t]he Tribe did not learn of [the fact that the Federal Defendants did not complete the underlying paperwork to formally transfer the Midview Property] until the BIA was asked to approve an easement for rights-of-way to Duchesne County in 2014," TAC ¶ 119, ought to toll the accrual of their claim.

If the Tribe previously believed that the transfer was finalized and formalized through the appropriate paperwork, then it was on notice and should have known all facts sufficient to maintain a suit against the Defendants regarding the Exchange. *See Ute Distribution Corp.*, 584 F.3d at 1283; *Ute D.C. Op.*, 560 F. Supp. 3d at 257 (citing *Spannaus v. U.S. Dep't of Justice*, 824 F.2d 52, 56–57 (D.C. Cir. 1987)). The completion of the "underlying paperwork" transferring assets between government agencies, even assuming that such inter-agency exchange could violate the Indian Non-Recourse Act, is not a material fact that affects what the Exchange Agreement was intended to do, how it would interact with the Non-Recourse Act or the Tribe's rights, or what the Tribe should have known about the Agreement and when it should have known it. No inference can be drawn from the facts alleged that would entitle the Plaintiffs to the continuing violation doctrine.

In sum, any exchange under the Midview Exchange Agreement is best characterized as a single act, the "continual ill effects" of which the Plaintiffs now complain. *Herrera*, 32 F.4th at 999. Because Plaintiffs fail to allege sufficient facts to demonstrate that the Federal Defendants "concealed material facts" and that the Tribe did not discover these material facts until 2014, TAC ¶ 259, or that there was no reason it "should have known" all facts necessary to maintain a suit against the Defendants within the six-year statute of limitations provided by § 2401(a), Plaintiffs are not entitled to avail themselves of the continuing violation doctrine, and the Plaintiffs' Fifth Claim is thus properly dismissed as time-barred and for failure to state a claim upon which relief can be granted.

## VI.    Claim Six

Claim Six also relates to the Midview Exchange Agreement. As an alternative to Claim Five, Plaintiffs "seek[] a declaration that the Tribe is entitled to specific performance under the Midview Exchange." TAC ¶ 262. In their Response to the Federal Defendants' Motion to Dismiss, Plaintiffs state that the Sixth Claim, while capable of being "arguably [] construed as a request for specific performance of a contract," "is best understood as a claim to vindicate the Tribe's beneficial ownership in constitutionally protected property rights, rather than enforcement of a contractual right." ECF No. 210 at 29. Thus, this court will consider the Sixth Claim as centering on whether the Exchange Agreement "constitute[d] repudiation of the Federal Defendants' trust obligations" *Id*. at 30.

For the reasons stated above regarding Claim Five, Plaintiffs have failed to plead a cognizable cause of action for breach of trust stemming from the 1967 Midview Exchange Agreement, and have pointed to no treaty, statute, or regulation entitling them to specific performance of the Midview Exchange Agreement. Additionally, for the reasons outlined above,

Claim Six, like Claim Five, accrued in 1967 upon the execution of the Agreement, and is thus time-barred under 28 U.S.C. § 2401(a).

## VII.   Claim Seven

In their Seventh Claim for Relief, Plaintiffs seek "a declaration" that, under § 505 of CUPCA, "Federal Defendants have an ongoing statutory and fiduciary obligation to secure water rights in the Bottle Hollow Reservoir sufficient to enable the Bottle Hollow Reservoir to be used as a cold-water fishery," TAC ¶ 270, along with "appropriate judicial enforcement" under 28 U.S.C. § 2202. *Id*. In relevant part, § 505 provides:

> Of the amount authorized to be appropriated by section 201, $ 500,000 in an initial appropriation shall be available to permit the Secretary to clean the Bottle Hollow Reservoir on the Ute Indian Reservation of debris and trash resulting from a submerged sanitary landfill, to remove all non-game fish, and to secure minimum flow of water to the reservoir to make it a suitable habitat for a cold water fishery. The United States, and not the Tribe, shall be responsible for cleanup and all other responsibilities relating to the presently contaminated Bottle Hollow waters.

106 Stat. at 4653.

Although Plaintiffs plead that "Congress's intent" in the statutory provision was "to instruct Federal Defendants of certain specific measures that *had to be* taken," TAC ¶ 265 (emphasis added), and despite Plaintiffs' argument that the above provision "provided further definition to Federal Defendants' fiduciary obligations toward the Tribe and its members," *id*. ¶ 266, as a matter of law, these legal conclusions and interpretations of the Act are incorrect.

Section 505(c) of CUPCA does not represent the "express accept[ance]" of a fiduciary or trust responsibility on the part of the federal government. *Arizona v. Navajo Nation*, 143 S. Ct. at 1813. Insofar as Claim Seven is properly understood as a breach-of-trust claim, Plaintiffs fail to properly plead an entitlement to relief under any treaty, statute, or obligations, that creates a trust responsibility that might support their claim and request for declaratory or other relief. Instead, §

505 of CUPCA merely makes such funds *available*. The Seventh Claim is therefore properly dismissed for failure to state a claim.

The D.C. District Court previously held that Plaintiffs did not plead their claim under the Administrative Procedure Act. *Ute D.C. Op.*, 560 F. Supp. 3d at 258 n. 5. This court agrees. However, even assuming that this court liberally construes the pleadings and accepts that Claim Seven may be interpreted as one pleaded under the APA, Claim fails because it cannot show any action that a federal agency was required, but failed, to take. *See Norton*, 542 U.S. at 64.

## VIII. Claim Eight

In Claim Eight, entitled "Request for Accounting," Plaintiffs ostensibly seek "an historical accounting apprising the Tribe of [] activities impacting the trust corpus of its Reserved Water Rights . . . [and] of its administration - including repair, maintenance, and rehabilitation - of the UIIP." TAC ¶ 274. Although Plaintiffs argue that such trust responsibilities were not waived by the 2012 Settlement Agreement, *id.* ¶ 274, they fail to articulate what treaty, statute, or regulation creates any trust entitlement for such accounting in the first place.

Here, as elsewhere, Plaintiffs begin from the proposition that they are owed the full suite of conventional trust obligations as one might find in a common-law trust relationship, including an obligation to "keep the beneficiaries apprised of the disposition of the trust corpus." *Id.* ¶ 273. However, as made clear in *Arizona v. Navajo Nation*, the federal government's trust obligations may be styled as "a trust relationship that is limited or bare compared to a trust relationship between private parties at common law." 143 S.Ct. at 1814; *accord Jicarilla*, 564 U.S. at 178 (the court will generally not "apply common-law trust principles" to the Indian trust relationship).

With no presumption of common-law trust obligations at play, Plaintiffs are instead obliged to demonstrate where, exactly, the United States "expressly accept[ed]" a duty to provide an

accounting or keep the Tribe apprised of the disposition of the trust corpus. *Arizona v. Navajo Nation*, 143 S. Ct. at 1813. However, as discussed above, no treaty, statute, or regulation creates such an obligation nor any conventional trust relationship from which such a duty might be inferred. Thus, Plaintiffs therefore failed to state a claim upon which relief can be granted and Claim Eight is properly dismissed.

### IX.  Claims Nine and Ten

Claims Nine and Ten stem from the U.S. Bureau of Reclamation's 2019 Green River Block Exchange Contract with the State of Utah. Claim Nine alleges, among other things, that the Federal Defendants' failure to consider the Tribe's underlying water rights rendered the agency's action in executing and implementing the Exchange Contract "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law" under 5 U.S.C. § 706(2).

Relatedly, Claim Ten pleads that, under the APA and NEPA, 42 U.S.C. §§ 4321 *et seq*., Defendants failed to take a hard look at "the existing and future projected water supply and demands on the Green River and the Colorado River, and their tributaries." TAC ¶ 303. Plaintiffs also allege that the Federal Defendants "failed to take a hard look at the potential impacts to the environment of the Uintah and Ouray Indian Reservation in relation to the Tribe's senior-priority, present perfected *Winters* Reserved Water Rights to the natural flow of the Green River and its tributaries," *id*. ¶ 304, and that, "[e]ven as to the limited problems that Defendants properly identified and studied, Defendants failed to make a convincing case that the impacts of the GRBE Contract will be insignificant." *Id*. ¶ 309. Thus, Plaintiffs ask this court to set aside the USBR's issuance of a FONSI under APA § 706(2).

Federal Defendants, in their Motion to Dismiss, do not move for dismissal of these claims. *See generally* ECF No. 200. Neither does Defendant Central Utah Water Conservancy District. *See*

*generally* ECF No. 199. However, in the motion of the State of Utah, Utah Governor Spencer Cox, and Utah State Engineer and Director Teresa Wilhelmsen, the State Defendants move the court to dismiss Claims Nine and Ten conditionally, and that "Plaintiffs should be granted expedited leave to file an amended complaint that adds the State as Defendants to Claims Nine and Ten." ECF No. 201 at 23.

Because Plaintiffs "willingly stipulate to the State's joinder as a party-defendant under Claims Nine and Ten," ECF No. 208 at 5, 17, the court concludes that it is unnecessary to consider the issue of joiner under the mechanism State Defendants identify in *Paiute-Shoshone Indians of Bishop Community of Bishop Colony, Cal. v. City of Los Angeles*, 637 F.3d 993, 997 (9th Cir. 2011). Further instruction as to such joinder and amendment is provided below in the conclusion of this order. However, for the reasons stated above, to the extent that Claim Nine is predicated on a theory of breach of trust (insofar as it is entitled "Violation of the APA and Breach of Trust"), Plaintiffs have failed to state a claim, and no argument on the trust theory will be considered by this court in future proceedings.

## X.    Claim Eleven

Claim Eleven is a compound claim, entitled "Breach of Trust and Denial of Due Process and Equal Protection under the Fifth and Fourteenth Amendments to the U. S. Constitution, 42 U.S.C. § 1983, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d." Through Claim Eleven, the Tribe asserts on behalf of its members, as *parens patriae*, and the putative Class Action Representatives assert on their own behalf and on behalf of a class of persons similarly situated, any relief to which they might be entitled through the aforementioned causes of action.

In the Memorandum Decision and Order Granting Motion for Leave to File Third Amended Complaint, ECF No. 185, the court concluded that the requirements for joinder were met for the

purposes of the Third Amended Complaint and joined putative Class Action Plaintiffs as to Claim Eleven under FED. R. CIV. P. 20(a)(1). *Id.* at 7, 14. This court will, in turn, consider the issues of the Tribe's standing to bring the claims asserted under Claim Eleven and, subsequently, the sufficiency of the pleadings as a whole as to the constitutional and civil-rights claims. Although Claim Eleven is also titled as a "Breach of Trust" action, for the reasons stated above in relation to Claims One through Eight, this court concludes that the Plaintiffs fail to identify any source of a trust duty that could serve as the basis of a breach-of-trust claim. Finally, the sufficiency of the pleading as to the constitutional claims, § 1983, and Title VI is discussed below.

### A.  Tribal Standing

The TAC pleads that the Tribe and Class Action Plaintiffs "seek declaratory and injunctive relief, together with monetary damages as permitted by law in an amount to be proven at trial." TAC ¶ 337. As a preliminary matter, this court notes that the D.C. District Court held that the Tribe would have standing to assert equal-protection violations, if at all, under a *parens patriae* theory of standing, rather than a collective (tribal corporation) theory. *Ute D.C. Op.*, 560 F. Supp. 3d at 263-64. This court agrees. Although the issue of the Tribe's standing with regard to the due-process and other claims was not directly addressed by the D.C. District Court, that court determined that *parens patriae* standing, under any claim or theory of recovery as offered in what is now Claim Eleven, would be impermissible as against the federal government by operation of the *Mellon* bar. *Id.* at 20 (citing *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179-80 (D.C. Cir. 2019) and *Mass. v. Mellon*, 262 U.S. 447, 485-86 (1923)).

Here, again, this court agrees with the D.C. District Court. The *Mellon* bar, properly interpreted, generally precludes the Tribe from standing as *parens patriae* in an action against the federal government. *Mass. v. Mellon*, 262 U.S. 447, 485–86 (1923); *Northern Paiute Nation v.*

*United States*, 10 Cl. Ct. 401, 406 (1986) ("Since the Tribe, in relation to the Federal Government, is lower in the hierarchy of governments, somewhat akin to a state, it would seem reasonable to conclude that the Tribe cannot litigate as a *parens patriae* against the Federal Government on behalf of its members."). More importantly, however, the Tribe cannot avail itself of *parens patriae* standing in the first place and thus cannot bring the claims asserted under Claim Eleven as to *any* Defendant, including the non-federal Defendants.

Many elements of the Eleventh Claim as pleaded by the Tribe—such as those relating to the treatment of tribal members by non-Indians or as common beneficial owners of certain water rights—amount to a "generalized grievance" that the government entities are "not acting in a way in which" the Tribe "maintains is in accordance with federal laws," which is an insufficient basis for this court to exercise jurisdiction. *Wyo. ex rel. Sullivan v. Lujan*, 969 F.2d 877, 883 (10th Cir. 1992). This proposition set forward in *ex rel. Sullivan* is traceable to a series of Supreme Court cases delineating the prudential boundaries of federal courts' exercise of jurisdiction.

Among these cases, *Warth v. Seldin* held that "when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." 422 U.S. 490, 499 (1975) (citing *Ex parte Levitt*, 302 U.S. 633, 634 (1937)); *accord United States v. Hays*, 515 U.S. 737, 742-44 (1995). The Court rationalized this sort of prudential consideration of "generalized grievances" by stating that "[w]ithout such limitations closely related to Art. III concerns but essentially matters of judicial self-governance the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." *Warth*, 422 U.S. at 500 (lack of punctuation in original).

Thus, insofar as the Tribe seeks to assert constitutional claims arising from, for example, racial discrimination, the Tribe seeks only to assert the separate constitutional rights of its individual members, which the Class Action Plaintiffs are much better suited to do, and which they now seek to do in the Third Amended Complaint. Because the Tribe is not asserting a "quasi-sovereign" interest, but instead seeks to invoke the individual interests of tribal members in the aggregate, *see Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 600 (1982); *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976); *see generally Oklahoma ex rel. Johnson v. Cook*, 304 U.S. 387 (1938); *Oklahoma v. Atchison, T. & S. F. R. Co.*, 220 U.S. 277 (1911), this court declines to exercise jurisdiction.

On the other hand, to the extent that the Tribe seeks to invoke *parens patriae* standing for relief from harms that are *not* common to all or substantially all of its members, such as for harms stemming from failure to store water in CUP facilities (which harms a limited class of owners of irrigable tribal lands in particular, *see, e.g.*, TAC ¶ 79), this court will similarly decline to exercise jurisdiction. *See South Carolina v. North Carolina*, 558 U.S. 256, 266 (2010); *United States v. Santee Sioux Tribe*, 254 F.3d 728, 734 (8th Cir. 2001) ("The *parens patriae* doctrine cannot be used to confer standing on the Tribe to assert the rights of a dozen or so members of the Tribe."); *Alfred L. Snapp*, 458 U.S. at 600 (no *parens patriae* standing where the state is merely "stepping in to represent the interest of particular citizens"). Thus, for the foregoing reasons, and in addition to the pleading deficiencies outlined below, the Tribe lacks standing as to Claim Eleven.

### B.  Failure to State a Claim

In addition to the Tribe's lack of standing, the D.C. District Court held that the Tribe, in the SAC, did not adequately allege animus against Federal or State Defendants sufficient to give rise to relief under any of its constitutional or civil-rights claims. *Ute D.C. Op.*, 560 F. Supp. 3d at 264–

65. The D.C. District Court determined that the Tribe failed to "raise a plausible inference that an invidious discriminatory purpose was a motivating factor in the relevant decision," *id.* (citing *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977)), and instead pleaded only disproportionate impact. *Id.* Regarding Title VI, the court held that "the Tribe has not stated facts that plausibly allege that either the State of Utah or any other State actor intentionally discriminated against it based on race or any another protected class" within the time period germane to the appropriate statute of limitations. *Id.*

In considering the sufficiency of the TAC, this court will, as a preliminary matter, first establish the appropriate statute of limitations applicable under Claim Eleven to determine whether the Complaint sufficiently pleads actionable claims during the relevant time period, as did the D.C. District Court. *Id.* That time period—whether the cause of action is construed to be § 1983, Title VI, or even an implied, direct cause of action under *Bivens*—is four years in the State of Utah. *Id.* at 265 & n.13 (determining the relevant statute of limitations in this case under the § 1983 and Title VI claims to be four years); *Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 237–38 (D.D.C. 2007) (courts apply "the statute of limitations from 42 U.S.C. § 1981 and § 1983 which in turn, rely on the respective personal injury statute of limitations in a jurisdiction"); *Hoang Van Tu v. Koster*, 364 F.3d 1196, 1199 (10th Cir. 2004) ("Utah provides a four-year residual statute of limitations for personal injury actions, which we will apply to plaintiffs' *Bivens* claims."); *id.* ("Under federal law, the statute of limitations on a *Bivens* claim "begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action."). While this court will review the TAC in its entirety, it will pay particular attention to any amendments to the pleadings that might merit a departure from the D.C. District Court's previous dismissal of the Tribe's civil rights and constitutional claims.

Under Rule 9(b) of the Federal Rules of Civil Procedure, "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b) (emphasis added). In turn, the Tenth Circuit has concluded that this liberal pleading standard is also the appropriate yardstick for claims based on racial bias and discrimination. *Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1269-70 (10th Cir. 1989) (unpublished). Although the Tenth Circuit has previously implied that the standards for intentional discrimination (as would be applicable for a Title VI claim) and animus (applicable, for example, to the Due Process claim) may potentially diverge, *see Ashaheed v. Currington*, 7 F.4th 1236, 1244 (10th Cir. 2021), this court will assume that all relevant mental states need only be pleaded by the more liberal Rule 9(b) standard.

However, the general rules of pleading, including the boundaries of facial plausibility, nevertheless apply in determining the sufficiency of the pleading. *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."); *Arlington Heights*, 429 U.S. at 266 ("To plead animus, a plaintiff must raise a plausible inference that an invidious discriminatory purpose was a motivating factor in the relevant decision."). The Tenth Circuit has also employed what it has termed the "refined" standard, designed to prevent placing too onerous of a burden on plaintiffs. *See Gee v. Pacheco*, 627 F.3d 1178, 1185 (10th Cir. 2010). Under the refined standard, the Tenth Circuit has held that plausibility depends in part on "the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (cleaned up).

Additionally, "[c]ontext matters in notice pleading," *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008), and, in the § 1983 or constitutional context, where "defendants often include the government agency and a number of government actors sued in their individual capacities . . . it is particularly important in such circumstances that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Robbins*, 519 F.3d at 1250 (citing *Twombly*, 127 S. Ct. at 1970–71 n.10) (emphasis in original); *accord Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 921 n.9 (10th Cir. 2012) ("the pleading failed to isolate the allegedly unconstitutional acts of each defendant"); *Matthews v. Bergdorf*, 889 F.3d 1136, 1148 (10th Cir. 2018) ("A complaint that fails to differentiate wrongful acts among multiple defendants, alleging instead multiple violations by unspecified defendants does not provide the fair notice the law requires.").

Similarly, in *Robbins*, the Tenth Circuit directed the dismissal of claims that "use[d] . . . either the collective term 'Defendants' or a list of the defendants named individually but with no distinction as to what acts are attributable to whom," 519 F.3d at 1250, making it "impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed," *id.*, and finding insufficient pleading of facts as to make the claims pleaded plausible. This might be so, in part, to ensure that claims proceeding beyond the pleading stage have "discernable boundaries and manageable discovery limits." *Uchytil v. Avande, Inc.*, 2018 U.S. Dist. LEXIS 31737, at *5 (W.D. Wash. Feb. 27, 2018) (citing *U.S. ex. rel. Clausen v. Lab. Corp. of Am., Inc.*, 198 F.R.D. 560, 564 (N.D. Ga. 2000), *aff'd* 290 F.3d 1301 (11th Cir. 2002)).

Turning to the Complaint in this case, the most significant new pleadings include allegations that the events of 1905-1910 reveal not only a pattern of "invidious discrimination,"

but also "persistent racial animus . . . that continues to this day," TAC ¶ 316, with particular emphasis on the diversion of scarce water resources in the broader context of American history. *Id*. ¶ 317. The TAC also now relates water diversions to a sordid history of past violence against Native Americans. *Id*. ¶¶ 317-319.[7] Given the new parties joined as Defendants in the TAC, the Complaint now alleges that Governor Cox and State Engineer Wilhelmsen "have participated in, adopted, and/or ratified one or more acts or omissions" that violate the rights of the Tribe or its members. *Id*. ¶ 322. In particular, the TAC points to "the State of Utah's repudiation of the quantification of the Tribe's Reserved Water Rights under the 1965 Deferral Agreement," *id*., "the State's solicitation and approval of the Green River Block Exchange Contract, granting the State of Utah administrative authority over water releases from Flaming Gorge Dam and Reservoir," *id*., and "the State of Utah's continued assertion of administrative jurisdiction over tribal waters inside the Tribe's Reservation." *Id*.

The TAC also alleges that the State Defendants acted "in concert or collusion with one or more Federal Defendants and/or their officers to insure that no tribal waters are stored in CUP facilities," *id*., when, for example, Federal Defendants allocated open storage capacity in CUP facilities identified by the Tribe to the State of Utah. *Id*. Later in Claim Eleven, amendments to the

---

[7] The CUWCD, in its Motion to Dismiss the TAC, ECF No. 199, objects to and requests that this court strike Plaintiffs' allegations of "racial cleansing and genocidal campaigns," which it deems "impertinent and scandalous." *Id*. at 2 n.1. However, "[g]enerally, to succeed on a motion to strike under Rule 12(f), the moving party must demonstrate that the challenged allegations are entirely unrelated to the controversy and are prejudicial." *Doe by Smith v. Intermountain Healthcare, Inc.*, 2022 WL 180646, at *14 (D. Utah Jan. 20, 2022) ("Motions to strike are generally 'viewed with disfavor by the federal courts and are infrequently granted.'"). While certainly severe, these allegations are not unrelated to the allegations of racial animus that underlie the Eleventh Claim, and this court declines to unnecessarily "tamper with" the pleadings. *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976).

pleadings more specifically allege that the diversion of water resources away from the Tribe and to the non-Indian population of Utah was done "intentionally" and "with [] knowledge," *id*. ¶ 329, and that the GRBE Contract represented an act of "racial animus." *Id*. ¶ 330.

Because, in Claim Eleven as in other claims related to the 1965 Deferral Agreement and other twentieth-century events, this court declines to toll the accrual of the Tribe's claims under the continuing violation doctrine (or related doctrines in equity), relevant additions to the pleading that might state a claim are limited to allegations of discrimination occurring within the four-year statute of limitations: for example, that Governor Cox and State Engineer Wilhelmsen "have participated in, adopted, and/or ratified one or more acts or omissions" that violate the rights of the Tribe or its members," *id*. at 322, that the Green River Block Exchange Contract and the State's assertion of administrative authority were part of a pattern of invidious discrimination and racial animus, *id*. ¶¶ 316–17, 322, and that, more generally, the Defendants acted "in concert or collusion . . . to insure that no tribal waters are stored in CUP facilities." *Id*.; *id*. ¶ 1 (alleging that Defendants "conspired to racially discriminate against the Ute Indian Tribe").

However, these allegations are unmistakably conclusory—particularly Plaintiffs' allegations that "it is racial and ethnic animus . . . that has motivated all of the wrongs Plaintiffs have alleged," *id*. ¶ 317; *cf. id*. ¶ 4, that individual Defendants have "participated in, adopted, and/or ratified one or more acts or omissions" depriving Plaintiffs of the use of their water rights and thereby violating the constitution, *id*. ¶ 322, and that the Defendants otherwise acted together "in concert or collusion" to ensure no tribal waters are stored in CUP facilities. *Id*. ¶ 322. As a result, they are properly disregarded by this court. *See Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012) (declining to consider conclusory allegations for purposes of satisfying the standard of notice pleading).

47

Similarly, the allegation that "[t]he GRBE Contract . . . is but the latest act of conspiracy, racial animus, and invidious discrimination" is definitionally conclusory and devoid of factual enhancement that might be grounds for a plausible inference of discriminatory intent, such as "[d]epartures from the normal procedural sequence" or "contemporary statements by members of the decisionmaking body." *Arlington Heights*, 429 U.S. at 266–68. Similarly, the TAC fails to provide sufficient factual allegations from which this court might reasonably infer that the Class Action Plaintiffs have suffered disparate impacts as a result of their tribal status, or that any federal actions were motivated by an invidious discriminatory purpose against them on the basis of protected, suspect classifications. *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

Other allegations, including those that were included in the SAC and that have already been dismissed by the D.C. District Court for failure to state a claim, *see Ute D.C. Op.*, 560 F. Supp. 3d at 263–65, still fail to provide a plausible basis for intentional discrimination or racial animus, even when taken together with the new additions outlined above. For example, TAC ¶ 328 alleges that "the Federal Defendants have adopted a systematic and continuous practice of administering their authority in a manner that favors non-Indian water users in Utah to the detriment of the Tribe and its members, resulting in the diminishment of the Tribe's Reserved Water Rights on the impermissible bases of race, ancestry, ethnicity, national origin, and religion." However, such pleading lacks sufficient "details" to provide more than "mere speculation." *Khalik*, 671 F.3d at 1194. Further, under the *Robbins* "refined" pleading standard adopted in the Tenth Circuit, this court cannot help but notice the broad "swath of conduct" swept into the plain terms of the

Complaint, much of it necessarily innocent, in the long history of managing water and other resources in the American West. 519 F.3d at 1247.

Plaintiffs argue that, even if they cannot establish prima facie proof of discriminatory intent, they have shown enough evidence to, at the very least, "warrant review of outside evidence to help discern any possible discriminatory intent." ECF No. 210 at 37 (citing *Arlington Heights*, 429 U.S. at 266–67). However, they have failed to meet the requirements of notice pleading and give fair notice of the grounds for their Eleventh Claim, and the new amendments fail to cure the defects previously identified by the D.C. District Court.

In short, contrasting the context of the pleading, *Cty. of Allegheny*, 515 F.3d at 233, the broad swath of conduct at issue, *Robbins*, 519 F.3d at 1247, and the number of Defendants (as well as the relationships between them), *all against* the sparse, generalized, and conclusory pleading as to discriminatory acts, discriminatory motives, and the presence of racial animus—all of which is particularly thin as to events occurring within the applicable four-year statute of limitations—this court concludes that Plaintiffs have failed to give the Defendants "fair notice" of the grounds that might provide a basis for any of the several causes of action underlying the Eleventh Claim, *Erickson v. Pardus*, 551 U.S. 89, 93 (2007), or provide this court or the Defendants with reasonable and manageable standards or expectations for discovery.

Considering the TAC as a whole, accepting all non-conclusory factual allegations therein as true, and keeping in mind the spirit of the liberal rules of pleading that are designed to protect the interests of justice, *Dias v. City and Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (citing *Duran v. Carris*, 238 F.3d 1268, 1270 (10th Cir. 2001)), this court concludes that Claim Eleven fails to state a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678.

## CONCLUSION AND ORDER

For the foregoing reasons, the courts **GRANTS** Defendants' motions to dismiss (ECF Nos. 199, 200, 201). Claims One through Eight and Claim Eleven are hereby **DISMISSED** with prejudice. The Tribe is granted expedited leave and instructed to file a Fourth Amended Complaint removing all dismissed claims and adding the State of Utah to the remaining claims according to the State Defendants' motion, *see* ECF No. 201 at 23. Claims Nine and Ten shall be renumbered as Claims One and Two, respectively. Additionally, no claim by the Class Action Plaintiffs, and no claim against Governor Spencer Cox, Teresa Wilhemsen, or the Central Utah Water Conservancy District shall be included in the Fourth Amended Complaint. All other motions pending before this court in this matter are hereby **DENIED** as moot.

DATED September 26, 2023.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge