IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UTE INDIAN TRIBE OF THE UINTAH AND OURAY INDIAN RESERVATION,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, DOUG BURGUM,[1] Secretary of the Interior, United States Department of the Interior, BUREAU OF RECLAMATION, BUREAU OF INDIAN AFFAIRS, and THE STATE OF UTAH,<br><br>    Defendants. | MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S REQUESTED RELIEF<br><br>Case No. 2:21-cv-00573-JNP-DAO<br><br>Chief District Judge Jill N. Parrish<br><br>Magistrate Judge Daphne A. Oberg |

Plaintiff Ute Indian Tribe of the Uintah and Ouray Indian Reservation brings claims against Defendants United States Department of Interior, Secretary of the Interior Doug Burgum, Bureau of Reclamation, and Bureau of Indian Affairs (collectively "Defendants")[2] under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–47. ECF No. 246 ("Fourth Am. Compl.") ¶¶ 190–247. In doing so, it challenges Defendants' execution of the Green River Block Exchange Contract

---

[1] Burgum is substituted for former Secretary of the Interior Deb Haaland pursuant to FED. R. CIV. P. 25(d).

[2] The State of Utah is also a named defendant, but the court refers to it separately as Utah. Utah joins in and adopts the arguments raised by Defendants in their opposition brief but otherwise does not advance any relevant arguments. ECF No. 269 ("Utah's Opp'n").

("Exchange Contract"). *Id.* After considering the parties' briefing and the administrative record, the court DENIES Plaintiff its requested relief and DISMISSES Plaintiff's claims for the reasons below. ECF No. 262 ("Pl.'s Opening Br."); ECF No. 268 ("Defs.' Opp'n"); ECF No. 271 ("Pl.'s Reply"); ECF No. 288 ("Defs.' Sur Reply"); ECF No. 254 ("Administrative R."); ECF No. 258-1 ("Suppl. Administrative R.").

## BACKGROUND

Plaintiff's challenge implicates complex factual and legal issues, many of which have already been discussed in depth in earlier opinions in this action and a related challenge to the Exchange Contract. *See, e.g.*, ECF No. 244 ("Order Granting Defs.' Mot. to Dismiss"); *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, No. 219CV00636DBBCMR, 2021 WL 2826751, at *2–3 (D. Utah July 7, 2021), *aff'd*, 72 F.4th 1166, 1172–77 (10th Cir. 2023). Drawing on these opinions when relevant, the court provides background regarding the relevant water rights, the Exchange Contract, and the procedural history leading to Plaintiff's current challenge.

### I.    Water Rights

"[T]he Colorado River and its tributaries provide water to nearly 40 million people for municipal use, supply water to irrigate nearly 5.5 million acres of land, and [are] the lifeblood for at least 22 federally recognized tribes[], 7 National Wildlife Refuges, 4 National Recreation Areas, and 11 National Parks." *Ctr. for Biological Diversity*, 72 F.4th at 1172 (citation modified). Especially relevant to this case is the Green River, "a major tributary of the Colorado River," which begins in Wyoming and then mainly flows through Utah, with a brief detour into western Colorado, before merging into the Colorado River in southeastern Utah. *Id.*

Plaintiff is a "federally recognized, sovereign Indian tribe" and "occup[ies] the Uintah and Ouray Indian Reservation in the Green River Basin of northeastern Utah." Pl.'s Opening Br. at 2.

2

The Reservation includes "five major river drainages with seven contributing rivers that generally flow southeast and east into the Green River." *Id.* Plaintiff asserts reserved water rights in the Green River system "necessary to sustain a permanent homeland on their reservation" under the doctrine recognized by the Supreme Court in *Winters v. United States*, whereby the federal government's reservation of tribal lands implicitly reserves corresponding water rights. 207 U.S. 564, 576–77 (1908); Pl.'s Opening Br. at 6. *See also Arizona v. Navajo Nation*, 599 U.S. 555, 561 (2023) ("Under this Court's longstanding reserved water rights doctrine, sometimes referred to as the *Winters* doctrine, the Federal Government's reservation of land for an Indian tribe also implicitly reserves the right to use needed water from various sources—such as groundwater, rivers, streams, lakes, and springs—that arise on, border, cross, underlie, or are encompassed within the reservation."). Such reserved water rights "vest[] on the date of the reservation," are "superior to the rights of future appropriators," and "are not lost through non-use." *Cappaert v. United States*, 426 U.S. 128, 138 (1976); *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1155 (9th Cir. 2017). While the United States holds legal title to *Winters* rights and can bring suit to enforce these rights, it "holds [legal tile] only as [a] trustee" on behalf of Indian tribes and "the rights [otherwise] clearly belong to the [applicable t]ribes" for practical purposes. *See Shoshone Bannock Tribes v. Reno*, 56 F.3d 1476, 1479–80 (D.C. Cir. 1995); *Hawkins v. Bernhardt*, 436 F. Supp. 3d 241, 249–50 (D.D.C. 2020), *aff'd sub nom. Hawkins v. Haaland*, 991 F.3d 216 (D.C. Cir. 2021) (citation modified); L. OF WATER RIGHTS AND RESOURCES § 6:13.

Based on the history of its reservation, Plaintiff claims two sets of reserved water rights with different priority dates: (1) those "appurtenant to the Uintah Valley portion of its Reservation . . . [with] a priority date of 1861," and (2) those "appurtenant to the Uncompahgre portion of its Reservation . . . [with] a priority date of 1882." Pl.'s Opening Br. at 6–7; Fourth Am. Compl. ¶¶ 24,

28–29. Defendants accept this characterization and do not challenge the scope or priority of these reserved water rights. Defs.' Opp'n at 9.

Meanwhile, Utah's water rights in the Green River system are governed by "[m]ultiple interstate compacts, legislation, and agreements." *Ctr. for Biological Diversity*, 72 F.4th at 1173. The federal government and seven states executed the Colorado River Compact of 1922, which divided the Colorado River system into an upper and a lower basin and apportioned 7.5 million acre-feet[3] ("AF") per year to each basin. *Id.*; Suppl. Administrative R. at Ex. A-1; 43 U.S.C. § 617l. The states encompassing the Upper Basin, including Utah, then executed the Upper Colorado River Basin Compact of 1948 to "provide for the equitable division and apportionment" of water rights allocated to the Upper Basin under the 1922 compact. Pub. L. No. 81-37, 63 Stat. 31 (1949); *Ctr. for Biological Diversity*, 72 F.4th at 1173. Under this 1948 compact, "Utah is entitled to 23 percent of the water apportioned to and available for use in the Upper Basin," and it "does not need further federal authorization to regulate the appropriation, use, and control of its apportioned water rights." *Ctr. for Biological Diversity*, 72 F.4th at 1174.

However, as Plaintiff argues and Defendants do not challenge, Utah's water rights under these compacts are junior to Plaintiff's reserved water rights because the Colorado River Compact left "[p]resent perfected rights to the beneficial use of waters of the Colorado River System [such as Plaintiff's reserved rights] . . . unimpaired." Suppl. Administrative R. at Ex. A-1; Fourth Am. Compl.¶ 31; Defs.' Opp'n at 12. Thus, Plaintiff's reserved rights—which since 1861 or 1882 have been present perfected—take precedent over Utah's compact rights, and Plaintiff or the United

---

[3] "An acre-foot is equivalent to 325,851 gallons of water, or enough water to cover an acre of land 1 foot deep, and is the common unit of measurement when talking about quantities of water at scale." *Ctr. for Biological Diversity*, 72 F.4th at 1173 n.3.

States as Plaintiff's trustee can enforce these senior rights against Utah or any other junior rightsholder. *See, e.g.*, *Hawkins*, 436 F. Supp. 3d at 251.

## II.     The Exchange Contract

The Exchange Contract was executed between the United States, acting through Defendant Bureau of Reclamation ("Reclamation"), and Utah "to facilitate an equal exchange of water" that would allow Utah to use its compact water rights without jeopardizing Reclamation's environmental obligations.[4] *Ctr. for Biological Diversity*, 2021 WL 2826751, at *2; Administrative R. at 1–11.[5] Specifically, Utah agreed to refrain from depleting water on the Green River downstream of the Flaming Gorge Dam that it otherwise would be entitled to appropriate pursuant to its compact rights. Administrative R. at 5. This would help Reclamation fulfill its legal obligation to ensure that this portion of the Green River would remain an adequate ecosystem for endangered fish. *Id.* at 1–2, 4–5. In exchange, Utah would be able to use an equivalent amount of water released from the Flaming Gorge Dam's storage facilities. *Id.* at 3, 5. Thus, "in essence," the Exchange Contract "would merely change Utah's point of diversion of water to which it is already entitled" wherein Utah would collect water from the Flaming Gorge Dam rather than further

---

[4] While otherwise Utah would be able to exercise its compact rights without needing any further federal authorization, these specific compact rights had been granted to Reclamation from Utah as part of planned infrastructure development and then assigned back to Utah after development had stalled. *See Ctr. for Biological Diversity*, 72 F.4th at 1175–76. According to the terms of the assignment, Utah is required to enter into service contracts with the United States in certain circumstances before it can exercise the assigned rights. *Id.* Plaintiff's challenge does not directly turn on the assignment, but these requirements help explain why Utah chose to execute the Exchange Contract. *See* Administrative R. at 3 ("[Utah] desires to develop the Assigned Water Right in a manner legally conforming to the Assignment Provision.").

[5] When citing the administrative record, the court uses the Bates numbering rather than internal paginations.

downstream to protect a portion of the Green River of particular ecological and legal significance. *Ctr. for Biological Diversity*, 72 F.4th at 1172.

Unsurprisingly, the details of the Exchange Contract—many of which are contested in this case—are significantly more complex. *See id.* at 1176; Administrative R. at 5–10. For example, the following provision establishes the amount of water Utah would be able to deplete from the Flaming Gorge Dam's storage facilities:

> Each water year, [Utah] may deplete up to 72,641 acre-feet, which is the amount of water that would have been available to deplete under part of its Compact Entitlement Water and Assigned Water Right, but which has instead been forborne and designated to meet [Reclamation's environmental obligations downstream of the Flaming Gorge Dam].

*Id.* at 6. Any third party seeking to acquire a share of this newly available water from the Flaming Gorge Dam would be required to file water rights applications pursuant to Utah law. *Id.* at 7. However, Utah would not be granted any authority to "call[] for releases" from the Flaming Gorge Dam but rather Reclamation would supply water throughout the year on its own schedule "in accordance with the flexibility in Reclamation's operations under [existing regulations]." *Id.* at 5. To ensure that Reclamation could release sufficient water from the Flaming Gorge Dam, the Exchange Contract established various communication requirements whereby Utah would regularly inform Reclamation of its estimated and actual water use. *Id.* at 7. Additionally, Utah agreed to pay "a proportionate share of the annual operation and maintenance costs [of Flaming Gorge infrastructure] allocable to [its consumption of water]" and to "make annual payments to the United States as compensation for the benefits received under [the Exchange Contract]." *Id.* at 6–7.

6

Before executing the Exchange Contract, Reclamation issued a draft environmental assessment finding that the Exchange Contract would not have "significant impacts to the human or natural environment" and, consequently, a more detailed environmental impact statement was not required under NEPA. *Id.* at 784–878; *Ctr. for Biological Diversity*, 72 F.4th at 1176–77. It then issued a final environmental assessment, which responded to public comments and reaffirmed the earlier conclusion. Administrative R. at 24–293.

### III.    Procedural History

Plaintiff, together with other litigants, initiated this action in the United States District Court for the District of Columbia. ECF No. 3-1 ("Compl."). The initial complaint brought breach-of-trust and discrimination claims that were unrelated to the Exchange Contract, which Plaintiff did not challenge until its second amended complaint. *Id.* ¶¶ 164–216; ECF No. 57 ("Second Am. Compl.") ¶¶ 307–45; Order Granting Defs.' Mots. to Dismiss at 4. Eventually, the D.C. district court dismissed Plaintiff's breach-of-trust and discrimination claims without prejudice and transferred the remaining APA and NEPA claims challenging the Exchange Contract to this court. ECF No. 114 ("Mem. Opinion"); *Ute Indian Tribe of Uintah & Ouray Rsrv. v. United States Dep't of Interior*, 560 F. Supp. 3d 247 (D.D.C. 2021). After Plaintiff added similar breach-of-trust and discrimination claims, the claims were dismissed by court with prejudice. ECF No. 186 ("Third Am. Compl.") ¶¶ 202–77, 311–37; Order Granting Defs.' Mots. to Dismiss at 50. This previous order left Plaintiff's APA and NEPA claims unaddressed, other than a short statement indicating that these claims would likely be deficient to the extent that they were "predicated on a theory of breach of trust" already rejected by the court. Order Granting Defs.' Mots. to Dismiss at 39.

Now, the court is left with Plaintiff's APA and NEPA claims, which are presented in the operative complaint. Fourth Am. Compl. ¶¶190–247. Plaintiff first challenges Defendants' action

of executing the Exchange Contract as "arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law" under the APA. *Id.* ¶ 191. In doing so, Plaintiff develops a variety of legal theories but its primary assertions are (1) the Exchange Contract "contravene[s] federal law and policy requiring the United States to recognize Indian trust assets and act consistent with the [f]ederal government's trust responsibility for Indian trust assets" and (2) it is "based on a legally indefensible premise that the State of Utah's unperfected apportionment of Colorado River water can be freely alienated and transferred." *Id.* Plaintiff separately challenges Defendants' failure to prepare an environmental impact statement as unlawful under NEPA and the APA. *Id.* ¶¶ 225–47. These legal theories are further developed in Plaintiff's opening brief. Pl.'s Opening Br. The administrative record, which was filed non-electronically by Defendants, has been supplemented with documents by Plaintiff. Administrative R.; Suppl. Administrative R.

## STANDARD OF REVIEW

"Under the APA, courts 'shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *Ctr. for Biological Diversity*, 72 F.4th at 1177 (quoting 5 U.S.C. § 706(2)(A)). An agency's action is arbitrary and capricious if it

> has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Ctr. for Biological Diversity*, 72 F.4th at 1177. The court's APA review is "based on the full administrative record that was before all decision makers." *Bar MK Ranches v.*

*Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993); § 706 ("[T]he court shall review the whole record or those parts of it cited by a party.").

In carrying out this review, "[i]t is the duty of the reviewing court to 'ascertain whether the [agency] examined the relevant data and articulated a rational connection between the facts found and the decision made.'" *Ctr. for Biological Diversity*, 72 F.4th at 1177–78 (quoting *Colorado Wild, Heartwood v. U.S. Forest Serv.*, 435 F.3d 1204, 1220 (10th Cir. 2006)). "[T]he reviewing court must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment." *Id.* at 1178 (quoting *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008)). The "court should not attempt itself to make up for [any] deficiencies" in the agency's reasoning and "may not supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43; *Ctr. for Biological Diversity*, 72 F.4th at 1178.

At the same time, the court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Ctr. for Biological Diversity*, 72 F.4th at 1178 (quoting *Licon v. Ledezma*, 638 F.3d 1303, 1308 (10th Cir. 2011)). And, under the APA's harmless error rule, "errors in . . . administrative proceedings will not require reversal unless [p]laintiffs can show they were prejudiced." *Bar MK Ranches*, 994 F.2d at 740;  § 706 ("[D]ue account shall be taken of the rule of prejudicial error.").

## DISCUSSION

As discussed above, Plaintiff's challenge is divided into two claims, with the first challenging the execution of the Exchange Contract irrespective of Defendants' NEPA obligations and the second challenging Defendants' decision to not prepare an environmental impact statement under NEPA. The court considers these claims in turn, following the structure of Plaintiff's opening

brief.[6] After careful review of the administrative record and the parties' arguments, the court finds

that Plaintiff has failed to identify any reversible error on the part of Defendants and, consequently,

Plaintiff is not entitled to any relief.

## I.        Claim One: The Exchange Contract

### A.        The Identification and Accounting of Water Rights

Plaintiff first challenges the Exchange Contract on the grounds that Defendants failed to

identify and account for Plaintiff's reserved water rights. Pl.'s Opening Br. at 19–21. Throughout

its briefing, Plaintiff develops different theories regarding what precisely Defendants failed to do

and why it constitutes reversible error under the APA. But, even after carefully considering these

alternative theories, the court fails to identify any reversible error.

To begin, Plaintiff suggests that Defendants executed the Exchange Contract with a

fundamental misunderstanding regarding the nature of Utah's water rights:

> [The Exchange Contract] is predicated on the assumption that
> [Utah's] entire apportionment of Colorado River mainstream water
> under the 1948 Upper Colorado River Compact is an alienable
> property right at the disposal of the state government of Utah. To the
> contrary, [Utah] does not have the authority to forbear, lease,
> transfer, or otherwise dispose of unperfected water directly from its
> apportionment without first accounting for the full quantity of
> [Plaintiff's] water rights.

*Id.* at 19. Certainly, Defendants' choice to execute the Exchange Contract would likely be arbitrary

and capricious if they were oblivious to the fact that Utah could not live up to its end of the bargain.

But Plaintiff fails to articulate why Utah cannot honor its commitments. Under the Tenth Circuit's

---

[6] The court also considers an argument contained in Plaintiff's complaint but not developed in Plaintiff's briefing that Defendants lacked a proper statutory basis for executing the Exchange Contract.

interpretation of the Exchange Contract, Utah merely agrees to refrain from using water in the Green River that it would otherwise be entitled to, however much water that happens to be, and in exchange gets access to an equal amount of water from the Flaming Gorge Dam.[7] *Ctr. for Biological Diversity*, 72 F.4th at 1171–72, 1176. Thus, under this controlling interpretation, the Exchange Contract assumes nothing about how much water Utah will be entitled to in a given year but instead simply assumes that Utah will be able to refrain from exercising whatever legal entitlement it ends up having. Under this structure, it is clear—if not tautological—that Utah can fulfill its obligations irrespective of Plaintiff's reserved senior water rights. If, for example, Utah ends up having no entitlement to water in the Green River because of Plaintiff's senior rights, then Utah can trivially perform its half of the bargain by refraining from exercising its non-existent rights; but, in exchange, Utah would get no access to water from the Flaming Gorge Dam because the amount of water it receives directly matches how much water it gives up. *See id.* at 1172 ("[The Exchange Contract] does not change or increase the *amount* of water to which Utah is entitled.") (emphasis in original). Insofar as Utah is simply committing to refrain from exercising its entitlements, whatever they happen to be, there is no inherent need for Utah to account for Plaintiff's senior rights in advance or receive permission from Plaintiff. Plaintiff cites no legal authority suggesting otherwise.

Next, Plaintiff faults Defendants for "grossly mischaracteriz[ing] the legal character of [Plaintiff's] *Winters* reserved rights, describing [Plaintiff's] waters as *future* water rights that will

---

[7] To be sure, there is language in the Exchange Contract that assumes Utah can "deplete up to 72,641 acre-feet" of water year pursuant to its compact rights. Administrative R. at 6. But even if this assumption turns out to be incorrect because of Plaintiff's senior rights, it does not affect the mechanics of the Exchange Contract or the substance of Defendant's reasoning and thus would be harmless error.

11

vest only upon the execution of a compact between [Plaintiff], the State of Utah, and the [f]ederal [g]overnment." Pl.'s Opening Br. at 20 (emphasis in original) (citing Administrative R. at 100). Such a mischaracterization plausibly could constitute a serious deficiency in Defendants' reasoning that may render their action arbitrary and capricious. But the record fails to reflect Plaintiff's assertions. The following is the relevant section of the final environmental assessment:

> The United States recognizes reserved water rights associated with the Uintah and Ouray Reservation and has been working with the Ute Tribe and the State of Utah for the past several decades to develop a Compact to quantify these rights. *Once this Compact is signed, it is anticipated that the Ute Tribe will have a water right with a priority date of 1861 to the natural flows in the Green River*. The hydrology analyses for both the FGFEIS and this EA assumed the eventual signing of the Compact (that volume of water was included as a reasonably foreseeable depletion) and show that the operation of FG Dam would not interfere with the exercise of these senior Green River water rights.
>
> Furthermore, development of the State water right along the Green River would not affect the ability of the Ute Tribe of the Uintah and Ouray Reservation to develop their reserved water rights as they hold senior water rights along the river and Reclamation must comply with applicable water law including the doctrine of prior appropriation.

Administrative R. at 100 (emphasis added). The emphasized sentence, read out of context, may suggest that Defendants mischaracterized Plaintiff's water rights as future rights that would only vest upon the execution of a compact. But context, both in the preceding sentence and subsequent paragraph, suggests that Defendants correctly recognized that Plaintiff's rights had already vested irrespective of any forthcoming compact, which would merely quantify existing rights. Even if Defendants mischaracterized Plaintiff's rights in a single sentence, this isolated misstatement is

12

not reflected in Defendants' reasoning—which elsewhere reflects a proper understanding of Plaintiff's rights—and thus would be harmless error.[8]

Finally, Plaintiff suggests that the execution of the Exchange Contract was arbitrary and capricious because Defendants violated their own Indian Trust Asset policy, which required Defendants "to recognize and fulfill [their] legal obligations to identify, protect, and conserve the trust resources of federally recognized Indian tribes and tribal members" and discuss "[a]ll impacts to [Indian trust assets], even those considered nonsignificant." *Id.* at 98; Pl.'s Opening Br. at 20–21. Plaintiff's reserved water rights are trust assets—with the United States holding legal title as a trustee—that implicate the policy, but the court ultimately concludes that Defendants' analysis complied with the policy's requirements.

Specifically, the environmental assessment identified Plaintiff's reserved water rights and found, through its hydrology analysis, that the proposed operation of the Flaming Gorge Dam "would not interfere with the exercise of [Plaintiff's] senior Green River water rights" because it would not substantially affect the flow of water on the Green River. Administrative R. at 100. In addition, the environmental assessment determined that permitting Utah to develop water rights "would not affect the ability of [Plaintiff] to develop [its] reserved water rights [because it] hold[s] senior water rights along the river." *Id.* Thus, Defendants identified the relevant trust assets, even

---

[8] In the context of Plaintiff's NEPA claim, Plaintiff also faults this portion of the environmental assessment for describing its water rights as having a priority date of 1861 when in fact portions of its water rights instead have a later priority date of 1882. Administrative R. at 100; Pl.'s Opening Br. at 28. But it is unclear whether this portion of the environmental assessment is a true misstatement rather than a simple failure to describe the full legal complexity of Plaintiff's rights. And to the extent there is any error, Defendants simply assumed that all of Plaintiff's *Winters* rights had a priority date of 1861. This would be harmless error because Plaintiff's rights remain senior to all other relevant water rights, regardless of whether the 1861 or 1882 priority date is used.

13

though they were not precisely quantified, and determined that the action would not affect Plaintiff's ability to utilize the trust assets. This analysis, however cursory, appears to fully comply with Defendants' Indian trust asset policy. Plaintiff does not identify any relevant trust assets that Defendants failed to identify nor any impact on trust assets that Defendants failed to consider.

Thus, the court finds Plaintiff's various legal theories regarding Defendants' failure to identify and account for Plaintiff's water rights unconvincing. Defendants' reasoning reflected an adequate understanding of the relevant water rights and how they would be impacted by the Exchange Contract, undermining any allegations of reversible error.

B.      Government-to-Government Consultation

Plaintiff's second argument is that the execution of the Exchange Contract was arbitrary and capricious under the APA because Defendants failed "to engage in government-to-government consultation with [Plaintiff] during the development of the [Exchange Contract] and its associated environmental review process" as required by the Department of Interior's internal policy, which, in turn, was implemented to satisfy an executive order. Pl.'s Opening Br. at 21–23. In doing so, Plaintiff cites a Department of Interior policy that would require Defendants to "consult with tribes on a government-to-government basis whenever [their] plans or actions have tribal implications."[9]

*Id.* at 21 (quoting *Chapter 4: Department of the Interior Policy on Consultation with Indian Tribes*

---

[9] It is unclear whether the court can even consider this policy in its review because Plaintiff has failed to provide a corresponding cite to the administrative record. Some Tenth Circuit caselaw suggests that this court can take judicial notice of this policy pursuant to FED. R. EVID. 201(b)(2). *See New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 702 n.21 (10th Cir. 2009). But other caselaw cautions "that consideration of extra-record materials is appropriate in 'extremely limited' circumstances." *Lee v. U.S. Air Force*, 354 F.3d 1229, 1242 (10th Cir. 2004) (quoting *Am. Min. Cong. v. Thomas*, 772 F.2d 617, 626 (10th Cir. 1985)). Regardless, the court assumes without deciding that it can take judicial notice of the policy under Rule 201(b)(2) and finds that even with the policy Plaintiff has failed to identify reversible error.

*and Alaska Native Corporations*, The Department of Interior Department Manual (Nov. 9, 2015), https://www.doi.gov/sites/doi.gov/files/elips/documents/512-dm-4.pdf [https://perma.cc/8X57-Z9FU], at 2). *See also* Administrative R. at 98 (describing a similar government-to-government consultation policy).

However, the record contradicts Plaintiff's assertion that Defendants "made no effort whatsoever to engage in meaningful government-to-government consultation with [Plaintiff]." Pl.'s Opening Br. at 22. Rather, the record demonstrates that Reclamation actively solicited Plaintiff's feedback, held a public meeting which Plaintiff attended, received comments from Plaintiff, and responded to Plaintiff's comments regarding the draft environmental assessment. *See, e.g.*, Administrative R. at 45, 99, 238, 287, 602, 670–80, 748, 880–82.

Plaintiff also argues that Defendants violated the government-to-government consultation process because they failed to engage in further consultation with Plaintiff after a public meeting was held discussing the draft environmental assessment, notwithstanding Plaintiff's request. Pl.'s Opening Br. at 22–23. But Plaintiff cites nothing indicating that Defendants were required to engage in consultation at every stage in their process or whenever they received a request from a tribal representative. While the court is mindful of the important values furthered by government-to-government consultation, "[t]here must be a limit to [consultation] . . . if government is to go on." *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915). *Cf. Cure Land, LLC v. United States Dep't of Agric.*, 833 F.3d 1223, 1236 (10th Cir. 2016) (noting in a related context that an "agency is afforded 'considerable discretion to decide the extent to which such public involvement is practicable'") (quoting *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 698 (10th Cir. 2015)). Thus, the court concludes that Defendants' numerous efforts

15

to contact Plaintiff and solicit its feedback on the Exchange Contract and the environmental review process suffice to satisfy the government-to-government consultation requirement.

This conclusion is consistent with the cases cited by Plaintiff. *See* Pl.'s Opening Br. at 22. In most, a court only identified a failure to comply without government-to-government consultation requirements if the agency executed a legally significant action without providing tribes with an opportunity to provide meaningful engagement. *See Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 720–21 (8th Cir. 1979); *Cedar Band of Paiutes v. U.S. Dep't of Hous. & Urb. Dev.*, No. 4:19-CV-30-DN-PK, 2019 WL 3305919, at *7 (D. Utah July 23, 2019); *Quechan Tribe of Fort Yuma Indian Rsrv. v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104, 1118–19 (S.D. Cal. 2010). Other cases interpret government-to-government consultation policies to require agencies to engage in "extra, *meaningful* efforts to involve tribes in the decision-making process" that go beyond the consultation available to the public writ large. *See Wyoming v. United States Dep't of the Interior*, 136 F. Supp. 3d 1317, 1345–46 (D. Wyo. 2015) (emphasis in original), *vacated and remanded sub nom. Wyoming v. Sierra Club*, No. 15-8126, 2016 WL 3853806 (10th Cir. July 13, 2016). But the record indicates that Defendants provided such extra engagement insofar as they directly communicated with Plaintiff and conducted an additional meeting in Nevada at Plaintiff's request.[10] Administrative R. at 99, 287, 880–82

---

[10] In its reply brief, Plaintiff argues that this Nevada meeting "was never intended to be a government-to-government consultation, in part because the meeting took place outside of [Plaintiff's] territorial jurisdiction, and, therefore, outside of [Plaintiff's] leadership's constitutional authority to engage in official acts in its governmental capacity." Pl.'s Reply at 19. But this meeting still demonstrates Defendants' commitment to identify and engage with Plaintiff's concerns regarding the Exchange Contract, even if attendees at the meeting were communicating information in an unofficial capacity.

Accordingly, Plaintiff fails to demonstrate that Defendants' consultation efforts violated their internal policy or otherwise constitute reversible error under the APA.

### C.      Granting Utah Administrative Control Over and Access to Stored Water

Next, Plaintiff argues that the Exchange Contract impermissibly gives "the State of Utah access to stored water in [the] Flaming Gorge Reservoir and confer[s] administrative authority over the releases of such stored water" in violation of "statutory directives governing the administration of storage infrastructure" and trust obligations to Plaintiff. Pl.'s Opening Br. at 23.

As a preliminary matter, the court notes that this argument mischaracterizes the Exchange Contract insofar as it suggests that Utah gains any administrative authority over the release of stored water. To be sure, the Exchange Contract does grant Utah access to water stored in the Flaming Gorge Dam. *See* Administrative R. at 5 ("In exchange, [Utah] is authorized to deplete an equal amount of [water] from releases from [Flaming Gorge Dam storage infrastructure] throughout the year."). But the terms of the Exchange Contract explicitly clarify that "[Utah] will not make calls for releases from [Flaming Gorge Dam storage]" and instead Utah will use stored water "as it is released [by Reclamation] in accordance with the flexibility in [its] operations." *Id.* In its reply, Plaintiff cites a provision describing how "[w]ater right applications will be filed with the Utah State Engineer in accordance with [Utah law] for all diversions of water." Pl.'s Reply at 3 (quoting Administrative R. at 7). But this provision of the Exchange Contract merely specifies how Utah can allocate its available water to third parties who in turn can access the water after it is released from the Flaming Gorge Dam. Administrative R. at 7. Nothing in this provision—nor anything else in the record cited by Plaintiff—suggests that Utah is granted any authority to direct releases from the Flaming Gorge Dam. Thus, Plaintiff's argument is unpersuasive to the extent

that it is predicated on the false assumption that the Exchange Contract confers Utah administrative authority over Flaming Gorge infrastructure.

Plaintiff's remaining argument is that the Exchange Contract violates statutory and trust obligations by "giving . . . Utah direct access to stored water from the Flaming Gorge before using this storage infrastructure to store [Plaintiff's] present perfected water rights." Pl.'s Opening Br. at 25. While this argument does fairly characterize the Exchange Contract, it inaccurately describes Defendants' statutory and trust-based duties and thus is unpersuasive.[11]

With respect to Defendants' statutory duties, Plaintiff cites the following provision that allegedly requires Defendants to prioritize storing Plaintiff's reserved water rights when managing the Flaming Gorge Dam and Reservoir:

> The dam and reservoir provided for by section 617 of this title shall be used: First, for river regulation, improvement of navigation, and flood control; second, for irrigation and domestic uses and satisfaction of present perfected rights in pursuance of Article VIII of said Colorado River compact; and third, for power. The title to said dam, reservoir, plant, and incidental works shall forever remain in the United States, and the United States shall, until otherwise provided by Congress, control, manage, and operate the same, except as herein otherwise provided: *Provided, however,* That the Secretary of the Interior may, in his discretion, enter into contracts of lease of a unit or units of any Government-built plant, with right to generate electrical energy, or alternatively, to enter into contracts of lease for the use of water for the generation of electrical energy as herein provided, in either of which events the provisions of section 617d of this title relating to revenue, term, renewals,

---

[11] The parties debate whether the court's previous order forecloses Plaintiff from basing its APA challenge on trust obligations. *Compare* Defs.' Opp'n at 17 ("The [c]ourt's directive was clear: No argument on the trust theory will be considered by the [c]ourt in future proceedings.") *with* Pl.'s Reply at 4–5 (arguing that the court merely foreclosed Plaintiff from relying on "the theory that there is an independent cause of action against . . . Defendants for breach of their fiduciary obligations"). The court ultimately need not resolve this disagreement about how to interpret its previous order because it finds that, irrespective of any previous orders, Plaintiff simply has failed to identify any trust obligations with respect to Flaming Gorge infrastructure.

> determination of conflicting applications, and joint use of transmission lines under contracts for the sale of electrical energy, shall apply.

Pl.'s Opening Br. at 23–24 (quoting 43 U.S.C. § 617e) (emphasis omitted). But this interpretation of § 617e faces a fundamental problem because the provision is inapplicable to the Flaming Gorge Dam and Reservoir.[12] As Plaintiff acknowledges, § 617e only directly applies to "[t]he dam and reservoir provided for by [43 U.S.C. § 617]," which are hundreds of miles away from the Flaming Gorge Dam and Reservoir. Pl.'s Opening Br. at 23–24 (quoting § 617e). Plaintiff claims that another statute, 43 U.S.C. § 620m, applies § 617e requirements to Upper Basin water infrastructure generally and Flaming Gorge infrastructure in particular. *Id.* at 24. But § 620m only directs the Secretary of the Interior "to comply with the applicable provisions" of various existing statutes "in the storage and release of water from reservoirs in the Colorado River Basin." § 620m. This provision merely clarifies that existing requirements remain controlling but does nothing to extend § 617e's requirements—which governed one specific dam and reservoir—to a completely new context. Plaintiff cites no caselaw or other legal authority suggesting that § 617e has a broader reach. Accordingly, the court concludes that Defendants are under no statutory obligation to prioritize storing Plaintiff's water in Flaming Gorge infrastructure.

Plaintiff is much less clear on the supposed basis of Defendants' trust obligations to prioritize storing Plaintiff's water rights. *See* Pl.'s Opening Br. at 23–26. While the United States

---

[12] There are other serious problems facing Plaintiff's interpretation. First, § 617e can be interpreted as specifying permissible uses without imposing any hierarchy. *But see United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 761 n.3 (1950) (Douglas, J., concurring in part and dissenting in part) (suggesting otherwise). Second, even if § 617e creates a hierarchy, it is unclear whether the hierarchy requires Plaintiff's water needs to be prioritized over the purposes of the Exchange Contract. The water granted to Utah may qualify as a "domestic use[]" or as a form of "river regulation," in which case Plaintiff's water needs would not take priority. § 617e.

holds legal title to Plaintiff's reserved water rights as a trustee, this specific trust relationship "d[oes] not require the United States to take [any] affirmative steps to secure water for [Plaintiff]." *See Navajo Nation*, 599 U.S.at 569–70 (holding that reserved *Winters* right do not obligate the United States to affirmatively provide water storage absent contrary indications in treaties or statute). Thus, the mere fact that the United States has some trust responsibilities regarding Plaintiff's reserved water rights is insufficient to establish that Defendants have trust obligations with respect to Flaming Gorge water storage.

After considering the various legal materials cited by Plaintiff and contained in the administrative record, the court is unable to identify any provision whereby the federal government "expressly accepts . . . responsibility[y]" to provide Plaintiff water storage through the Flaming Gorge Dam and Reservoir.[13] *Id.* at 564 (quoting *United States v. Jicarilla Apache Nation*, 564 U.S.

---

[13] Plaintiff suggests that this express-acceptance standard only applies to trust obligations that can be the basis for an independent cause of action. Pl.'s Reply at 5–6. On this theory, there may be weaker trust obligations that are insufficient to support an independent breach-of-trust claim but still may be relevant to the APA analysis. While this theory is logically possible, the Supreme Court described the express-acceptance standard as applying to all "judicially enforceable duties" and based its reasoning on general separation-of-powers grounds that "Congress and the President exercise the 'sovereign function' of organizing and managing 'the Indian trust relationship.'" *Navajo Nation*, 599 U.S. at 564 (quoting *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 175 (2011)). Given this reasoning, the court cannot conclude that the United States has legal obligations to operate Flaming Gorge infrastructure on behalf of Plaintiff absent some relatively explicit legal provision creating that requirement.

To be sure, there is older caselaw suggesting that a trust relationship may arise "[e]ven in the absence of express language about a trust fund, a trust, or a fiduciary connection" in certain circumstances. *See Cheyenne-Arapaho Tribes of Oklahoma v. United States*, 966 F.2d 583, 588–89 (10th Cir. 1992). But this exception to the express-acceptance standard is limited to fiduciary relationships with respect to "tribal monies or properties" that are controlled by the federal government. *Id.* Nothing in the record suggests that the Flaming Gorge infrastructure implicates tribal money or property controlled by the government in a manner that would create a trust relationship via this exception.

162, 177 (2011)). *See also Vigil v. Andrus*, 667 F.2d 931, 934 (10th Cir. 1982) ("[T]he federal government generally is not obligated to provide particular services or benefits in the absence of a specific provision in a treaty, agreement, executive order, or statute.") These materials include various statutes, bills of complaint and court decrees, and agreements.[14] *See, e.g.*, Pl.'s Opening Br. at 8–12. But none purport to grant Plaintiff any right to water storage in Flaming Gorge infrastructure nor establish that Defendants' specific choice to give Utah access to stored water as part an exchange was unlawful or otherwise constituted reversible error.

While Plaintiff emphasizes a recent Federal Circuit opinion that interpreted a 1906 statute as creating trust obligations for the federal government to "hold and operate . . . infrastructure for [Plaintiff's] benefit," this holding was limited to infrastructure created under the 1906 statute. *Ute Indian Tribe of the Uintah & Ouray Indian Rsrv. v. United States*, 99 F.4th 1353, 1368–69 (Fed. Cir. 2024); Pl.'s Opening Br. at 8. Indeed, the Federal Circuit only recognized trust duties to maintain infrastructure after finding that such duties were explicitly created by the plain text of the 1906 statute. *Ute Indian Tribe*, 99 F.4th at 1368. Here, by contrast, Plaintiff is unable to "identif[y] 'a substantive source of law that establishes specific . . . duties'" with respect to Flaming Gorge infrastructure. *Id.* (quoting *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003)).

---

[14] Specifically, the relevant statutes include the Indian Appropriations Act of March 1, 1899, Pub. L. 55-324, 30 Stat. 941 (1899), the Uintah Indian Irrigation Project of 1906, Pub. L. 59-258, 34 Stat. 325 (1906), and the Reclamation Projects Authorization and Adjustment Act of 1992, Pub. L. 102-575, 106 Stat. 4600 (1992); the relevant bills of complaints and court orders are contained in Suppl. Administrative R. Exs. A-2, A-3, A-4, A-5; and the relevant agreement is contained in Suppl. Administrative R. Ex. A-6. Plaintiff also cites memoranda contained in Suppl. Administrative R. Exs. A-7, A-8, A-9 that interpret these and other legal materials, which the court also considers.

To be sure, Plaintiff plausibly argues that its relationship with the United States reflects a broader pattern whereby the United States' "dealings with the Indian tribes have been too often marked by injustice, neglect and even ruthless disregard of their interests and necessities." *Seminole Nation v. United States*, 318 U.S. 629 (1943) (Murphy, J., dissenting); Pl.'s Opening Br. at 2–12; Fourth Am. Compl. ¶¶ 2–169. But this history, however morally demanding, is insufficient to create "judicially enforceable duties" with respect to Flaming Gorge infrastructure that can support Plaintiff's argument and justify APA relief. *Navajo Nation*, 537 U.S. at 564.

Thus, Plaintiff has failed to identify any legal right to use Flaming Gorge storage facilities, whether statutory or trust-based, that were disregarded by Defendants and jeopardized by the Exchange Contract. To the extent that Plaintiff's challenge presupposes the existence of that sort of right, it is unsuccessful and does not identify any reversible error.

### D.      Statutory Authority

Plaintiff also suggests in the operative complaint that the execution of the Exchange Contract was unlawful because it exceeded Defendants' statutory authority. Fourth Am. Compl. ¶¶ 192–96. Defendants cited 43 U.S.C. § 389 as the statutory basis for Reclamation to execute the agreement on the theory that it authorizes the Secretary of the Interior to "enter into such contracts for exchange . . . of water [or] water rights . . . as in his judgment are necessary and in the interests of the United States." Administrative R. at 3 (quoting § 389) (modification in original); Fourth Am. Compl. ¶ 192. But Plaintiff asserts that this statutory provision contains a limitation and only allows the Secretary to execute exchange contracts "for the purpose of orderly and economical construction or operation and maintenance of any project." § 389; Fourth Am. Compl. ¶ 194. Plaintiff then alleges that the Exchange Contract is unrelated to this purpose and thus outside Defendants' statutory authority under § 389.

However, even if Plaintiff's interpretation of the statute is granted, the court disagrees with Plaintiff's conclusion. The Exchange Contract was explicitly designed to govern the operation of Flaming Gorge infrastructure and minimize its impact on downstream ecosystems through coordination with Utah. Administrative R. at 1–2, 4, 41. Therefore, the agreement was executed for the orderly operation of a project and has an adequate purpose under § 389.

Thus, Plaintiff's allegations that the Exchange Contract exceeded Defendants' statutory authority are undermined by the record and fail to justify reversal.

## II. Claim Two: Environmental Impact Statement

Plaintiff's second claim is that Defendants' process for determining that no environmental impact statement was required and its corresponding failure to prepare an environmental impact statement violated NEPA and thus require the court to set aside the Exchange Contract under the APA as unlawful. *See* Fourth Am. Compl. ¶¶ 225–47. Pl.'s Opening Br. at 26–30. The court begins with a discussion of NEPA's requirements before considering Plaintiff's NEPA arguments, which ultimately are unpersuasive.

### A. NEPA Requirements

NEPA creates a variety of procedural requirements that "ensure[] that the agency and the public are aware of the environmental consequences of proposed projects." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 177 (2025). These procedures require "agencies [to] take a 'hard look at environmental consequences' and provide for broad dissemination of relevant environmental information." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.1 (1976)) (citation modified). *See* 42 U.S.C. § 4332 (articulating NEPA's animating policy goals).

Under NEPA, "[a]gencies must prepare a 'detailed statement' for all 'major Federal actions significantly affecting the quality of the human environment.'" *Ctr. for Biological Diversity*, 72 F.4th at 1178 (quoting 42 U.S.C. § 4332(2)(C)). In determining whether an action requires a more detailed environmental impact statement under § 4332(2)(C), an agency often must prepare an environmental assessment—which is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact." *Id.*; 40 C.F.R. §§ 1501.4(c), 1508.9 (2019).[15] When an agency determines that no environmental impact statement is required, the environmental assessment should "briefly present[] the reasons why an action . . . will not have a significant effect on the human environment." 40 C.F.R. § 1508.13. Significance is a context-sensitive standard, responsive to site-specific effects, and informed by the intensity of both short-term and long-term effects. 40 C.F.R. § 1508.27.

As the Supreme Court has recently articulated, "the central principle of judicial review in NEPA cases is deference." *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 179. This follows from the fact that "[t]he agency is better equipped to assess what facts are relevant to the agency's own decision than a court is." *Id.* at 181. In determining whether an agency action causes significant environmental effects, "an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry." *Id.* at 182–83. The court, when evaluating these decisions, "should afford substantial deference and should not

---

[15] Notwithstanding recent changes to NEPA regulations, "[Defendants'] actions are subject to the previous regulations because the actions were all completed prior to the effective date of the new regulations and because [Defendants] applied the prior regulations." *Ctr. for Biological Diversity*, 72 F.4th at 1178 n.6. Accordingly, the court cites and applies the regulations that were in effect at the time of Defendants' decision-making.

micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 183.

B.      Plaintiff's Arguments

With these principles in mind, the court turns to reviewing the substance of Plaintiff's NEPA arguments. The crux of Plaintiff's theory is that Defendants "failed to identify potentially significant impacts necessitating the preparation of a full [environmental impact statement]" when preparing their environmental assessment, which makes the execution of the Exchange Contract unlawful under NEPA and requires reversal under the APA. Pl.'s Opening Br. at 28. But this theory, which is advanced through numerous more specific arguments, is unsuccessful.

First, Plaintiff repeats its earlier arguments that the environmental assessment mischaracterized Plaintiff's water rights "as future water rights contingent upon the execution of an intergovernmental water compact." *Id.* at 28. But, as already discussed, this argument ignores context that indicates that Defendants correctly understood Plaintiff's rights as presently vested irrespective of any future compacts. *See* Administrative R. at 100.

Second, Plaintiff suggests that the environmental assessment "only acknowledges [Plaintiff's] 1861 priority water rights, which are those water rights appurtenant to the Uintah Valley portion of [Plaintiff's reservation]" and "omits any reference whatsoever to [Plaintiff's] 1882 priority water rights, which include those . . . sourced directly from the natural flow of the Green River." Pl.'s Opening Br. at 28. However, the environmental assessment indicates that Defendants considered all "reserved water rights associated with the Uintah and Ouray Reservation." Administrative R. at 100. While perhaps Defendants failed to understand the legal complication that some of these rights had a priority date of 1882 rather than 1861 in light of the unique history of Plaintiff's reservation, this possible deficiency is a "mere flyspeck[]" that does

25

not justify reversal. *See Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1165 (10th Cir. 2012) ("Deficiencies in an environmental assessment that are mere flyspecks and do not defeat NEPA's goals of informed decisionmaking and informed public comment will not lead to reversal.") (citation modified). Plaintiff does not explain how this added complexity is at all relevant to the environmental analysis, and it appears simply irrelevant because this complexity does not change the fact—which is what Defendants relied on in their analysis— that Plaintiff's water rights have seniority over all other relevant rights.

Third, Plaintiff argues that Defendants' hydrological modeling "failed to adequately account for the 110-year trend of decreasing water supply, alongside the exacerbating factor of climate change," which was established by Defendants' own data and raised in comments from Plaintiff.[16] Pl.'s Opening Br. at 29–30. The administrative record, by contrast, indicates that Defendants at least acknowledged Plaintiff's concerns and purported to incorporate them into their final hydrological modeling. Administrative R. at 240–42, 287. Regardless, the Tenth Circuit has already addressed a virtually identical challenge—which claimed that Defendants "failed to address scientific data and studies projecting that climate warming in the future is likely to leave the Colorado River system drier than it has been in the past"—and found that Defendants' response was adequate under NEPA and the APA. *Ctr. for Biological Diversity*, 72 F.4th at 1179–81. *But see id.* at 1190, 1196 (Rossman, J., concurring in part, dissenting in part, and dissenting in the judgment) (criticizing this conclusion). Plaintiff offers no viable basis to distinguish the Tenth

---

[16] In making this argument, Plaintiff does not provide a citation to its own comment, but it does cite a similar comment raised by the U.S. Fish and Wildlife Service. Pl.'s Opening Br. at 29–30 (citing Administrative R. at 693). But the court can still identify what appears to be the relevant comment. *See* Administrative R. at 674–76.

26

Circuit's holding, and the court concludes that it forecloses Plaintiff's NEPA challenge based on Defendants' hydrologic modeling.[17]

Fourth, Plaintiff alleges that Defendants falsely described the no action alternative because they "assume[d] the [same] water extractions [would] occur even if the contract [was] not approved," just at different locations. Fourth Am. Compl. ¶¶ 241, 243. However, once again, the Tenth Circuit has rejected a virtually identical challenge and found that Defendants' "choice of the no-action alternative" complied with NEPA and was "neither arbitrary nor capricious." *Ctr. for Biological Diversity*, 72 F.4th at 1185–87. This holding is controlling.[18]

Fifth, Plaintiff asserts that Defendants violated NEPA by "fail[ing] to explore and evaluate all reasonable alternatives." Fourth Am. Compl. ¶ 245. But neither the record nor Plaintiff's briefing offer any clarity as to what other alternatives Defendants should have considered. Thus, the court concludes that Defendants' decision to only consider the no-action alternative and the execution of the Exchange Contract fell "within a broad zone of reasonableness" and is entitled to deference in light of their technical expertise. *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 183.

Therefore, Plaintiff fails to establish that Defendants' action should be reversed based on any NEPA violations.

---

[17] In its reply, Plaintiff suggests that the Tenth Circuit's holding relied on *Chevron U.S.A, Inc., v. Natural Resources Defense Council, Inc.*'s deference regime, which has since been repudiated. Pl.'s Reply at 11–12; 467 U.S. 837 (1984); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024) (overturning *Chevron*). However, the Tenth Circuit's holding in no way relied on or even invoked *Chevron* deference, which only applied in the context of agency statutory interpretation. *See Ctr. for Biological Diversity*, 72 F.4th at 1179–81; *Loper Bright*, 603 U.S. at 379. Thus, *Chevron*'s reversal in no way impacts the Tenth Circuit's controlling analysis.

[18] Again, this holding in no way applied or invoked *Chevron* and thus is not undermined by *Loper Bright Enterprises v. Raimondo. See Ctr. for Biological Diversity*, 72 F.4th at 1185–87.

## CONCLUSION AND ORDER

Plaintiff fails to identify any reversible error under the APA for the reasons above. Accordingly, the court DENIES Plaintiff its requested relief and DIMISSES Plaintiff's remaining claims under the APA and NEPA.

DATED July 30, 2026

BY THE COURT

Jill N. Parrish
United States District Court Judge